**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cr225** |
| | ) | |
| | ) | |
| **STEVEN J. ROSEN** | ) | |
| **KEITH WEISSMAN** | ) | |

**<u>MEMORANDUM OPINION</u>**

In this Espionage Act prosecution, defendants Steven Rosen and Keith Weissman have been charged in Count I of a superseding indictment with conspiring to transmit information relating to the national defense[1] to those not entitled to receive it, in violation of 18 U.S.C. § 793(g). Defendants, by pretrial motion, attack the constitutionality of § 793 in three ways. First, they argue that the statute, as-applied to them, is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. Second, they argue that the statute, as-applied to them, abridges their First Amendment right to free speech and their First Amendment right to petition the government. Third, defendants assert the First Amendment rights of others by attacking the statute as facially overbroad. In the alternative, defendants urge the Court to avoid these constitutional issues by interpreting the statute as applying only to the transmission of tangible items, *i.e.*, documents, tapes, discs, maps and the like.

In addition, defendant Rosen has been charged in Count III of the superseding indictment with aiding and abetting the transmission of information relating to the national defense to one

---

[1]The phrase "information relating to the national defense" will sometimes be referred to herein as NDI.

-1-

not entitled to receive it, in violation of 18 U.S.C. § 793(d) and 2.  He seeks dismissal of this count on the ground that the facts alleged in the superseding indictment in support of this count are legally insufficient.

**I.**[2]

During the period of the conspiracy alleged in Count I, defendants Rosen and Weissman were employed by the American Israel Public Affairs Committee (AIPAC) in Washington, D.C. AIPAC is a pro-Israel organization that lobbies the United States executive and legislative branches on issues of interest to Israel, especially U.S. foreign policy with respect to the Middle East.  Rosen was AIPAC's Director of Foreign Policy Issues and was primarily engaged in lobbying officials of the executive branch with policy-making authority over issues of interest to AIPAC.  Rosen did not have a security clearance during the period of the alleged conspiracy, and had not held a security clearance since his employment with the RAND Corporation in the late 1970s and early 1980s.  Indeed, Rosen's security clearance had been terminated on or about July 6, 1982.  Defendant Weissman was AIPAC's Senior Middle East Analyst and worked closely with Rosen in lobbying the executive branch of the U.S. government.  Weissman has never held a security clearance.  Alleged co-conspirator Lawrence Franklin worked on the Iran desk in the Office of the Secretary of the Department of Defense (DOD) and held a top secret security clearance during the alleged conspiracy.[3]

---

[2]As is appropriate in considering a motion to dismiss brought pursuant to Rule 12(b), Fed.R.Crim.P., the facts set forth herein are derived exclusively from the superseding indictment. *United States v. Brandon*, 298 F.3d 307, 311 (4th Cir. 2002).

[3]On October 5, 2005, Franklin pled guilty to one count of conspiracy to communicate national defense information to one not entitled to receive it, in violation of 18 U.S.C. §§ 793(d) and (g), and to one count of conspiracy to communicate classified information to an agent of a

In general, the superseding indictment alleges that in furtherance of their lobbying activities, defendants (i) cultivated relationships with government officials with access to sensitive U.S. government information, including NDI,[4] (ii) obtained the information from these officials, and (iii) transmitted the information to persons not otherwise entitled to receive it, including members of the media, foreign policy analysts, and officials of a foreign government.

The government's recitation of the acts constituting the conspiracy begins on April 13, 1999, when Rosen told an unnamed foreign official (FO-1) that he had "picked up an extremely sensitive piece of intelligence" which he described as "codeword protected intelligence."  Rosen proceeded to relate this piece of intelligence, which concerned terrorist activities in Central Asia, to the foreign official.  Rosen and FO-1 continued this discussion over lunch a few weeks later. The superseding indictment alleges further that Weissman's role in the conspiracy became apparent on June 11, 1999, when Weissman told the same foreign official that he had obtained a "secret FBI, classified FBI report" relating to the Khobar Towers bombing from three different sources, including a member of the United States government.  Later that day, Weissman told FO-1 that he had interested a member of the media in the report.

According to the superseding indictment, roughly eighteen months later, on December 12, 2000, Rosen and Weissman met with a United States government official (USGO-1) who had access to classified information relating to U.S. strategy pertaining to a certain Middle East country.  Following this meeting, Rosen allegedly had a conversation with a member of the

---

foreign government in violation of 50 U.S.C. § 783 and 18 U.S.C. § 371.

[4]The detailed content of the alleged NDI referred to in this Memorandum Opinion is the subject of sealed proceedings underway pursuant to the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, and is therefore not disclosed here.

media in which he communicated classified information relating to the U.S. government's

deliberations on its strategy towards that particular Middle Eastern country.

The next overt act in furtherance of the alleged conspiracy occurred over one year later,

when, on January 18, 2002, Rosen met with another U.S. government official (USGO-2).  After

this meeting, Rosen prepared a memorandum referencing classified information provided by

USGO-2 and distributed this memorandum to AIPAC staff.  A few days later, Rosen relayed

some of the information provided by USGO-2 to a foreign national.  Rosen met again with

USGO-2 on March 12, 2002 and discussed classified information regarding Al-Qaeda.  Rosen

allegedly disclosed this classified information to a fellow AIPAC employee the next day, and to

another foreign embassy official (FO-2) the day after that.

In August 2002, Rosen was introduced to Franklin through a contact at the DOD.  The

two agreed to meet on August 21, 2002, but the meeting was postponed.  Rosen, Weissman,

Franklin and another DOD employee finally met nearly six months later, on February 12, 2003.

At this meeting, Franklin disclosed to Rosen and Weissman information relating to a classified

draft internal United States government policy document concerning a certain Middle Eastern

country.   He told Rosen and Weissman that he had prepared a separate document based on the

draft policy document.  The three alleged co-conspirators met again on March 10, 2003 at Union

Station in Washington, D.C.  The three men conducted the meeting in successive restaurants and

ended the meeting in an empty restaurant.  Later that week, Rosen met with FO-2 and discussed

the same draft internal policy document that Franklin had discussed with Rosen and Weissman.

Both Rosen and Weissman had similar conversations with FO-1 later that same day.  Rosen also

called a senior fellow at a Washington, D.C. think tank and discussed the information concerning

the government's internal policy deliberations that had been provided by Franklin.

A week after his meeting with Rosen and Weissman at Union Station, Franklin faxed to Rosen's AIPAC office fax machine a document he had produced which contained information derived from the appendix of the U.S. draft internal policy document Franklin had discussed in his February meeting with Rosen and Weissman.  The next day, Rosen discussed this information with a member of the media, prefacing his discussion with the statement, "I'm not supposed to know this."  Rosen had a similar discussion with another member of the media on May 30, 2003.

In June 2003, Franklin, Rosen and Weissman arranged another lunch meeting.  This meeting took place on June 26, 2003 at a restaurant in Arlington, Virginia.  At the outset of the meeting Rosen told Franklin that he understood the difficult "constraints" under which Franklin was meeting, but notwithstanding these constraints, the three men proceeded to discuss the same draft internal policy document, as well as a newspaper article discussing the same classified document.  The lunchtime discussion soon broadened to include internal United States policy deliberations, and at some point during the lunch, Franklin allegedly disclosed to Rosen and Weissman classified information relating to potential attacks on United States forces in Iraq.  He told Rosen and Weissman that the information was "highly classified" and asked them not to use it.  Later that day, Rosen described this information as "quite a story" and referring to Franklin, told Weissman "that this channel is one to keep wide open insofar as possible."  Consistent with this advice, Weissman took Franklin to a major league baseball game a few days later.

At some point over the next year, Franklin was approached by law enforcement and he thereafter agreed to cooperate with the Federal Bureau of Investigation (FBI) in its investigation

of Rosen and Weissman. On or about July 9, 2004 Weissman and Franklin, now acting as a cooperating witness, agreed to meet. At this meeting Franklin disclosed to Weissman NDI involving United States intelligence related to certain Middle Eastern countries. On July 21, 2004, Franklin again met with Weissman and allegedly disclosed to him classified national defense information concerning a foreign government's covert actions in Iraq. Before disclosing the information, Franklin warned Weissman that the information he was about to receive was highly classified "Agency stuff" and that Weissman could get into trouble by having the information. Following the meeting, Weissman returned to his office and related to Rosen what he had learned from Franklin. During the course of the day, Rosen and Weissman disclosed this information to another foreign official (FO-3) and a journalist, describing the information as "Agency information" and telling the journalist that the source of the information was "an American intelligence source" who was "100 percent credible." Weissman also told a fellow AIPAC employee what he had learned earlier that day from Franklin. Nearly a month later, on August 20, 2004, Weissman again disclosed to a journalist the classified national defense information he had obtained from Franklin during their July 21, 2004 meeting.

Within weeks of Weissman's July 21, 2004 meeting with Franklin, the FBI contacted both Rosen and Weissman and asked them whether Franklin had ever disclosed classified information to either of them. Both Rosen and Weissman admitted knowing Franklin, but each denied that Franklin had ever disclosed classified information to them. After his interview, on August 27, 2004, Rosen contacted FO-2 and asked to meet with FO-2 and FO-3 to discuss a "serious matter." Rosen also told FO-2 that the FBI had "made some allegations which are important" and added that he did not want to "discuss it on the phone" and did not want to go to

FO-2's embassy office.  Accordingly, Rosen and FO-2 met later that day in a restaurant, and then proceeded to talk outside the restaurant where their conversation could not be monitored.  These facts constitute the sum of Rosen's and Weissman's offense conduct as alleged in Count One of the superseding indictment.

The superseding indictment also charges Rosen with aiding and abetting Franklin in the latter's violation of 18 U.S.C. § 793(d).  Specifically, Rosen is alleged to have aided and abetted Franklin's March 17, 2003 transmission by fax of the document he had created from the classified draft internal policy document related to a certain Middle Eastern country.

Rosen and Weissman have challenged the constitutionality of Count I of the superseding indictment on three separate but related grounds.  First, the defendants argue that the government's application of 18 U.S.C. § 793(e) in this prosecution violates the Fifth Amendment's Due Process Clause under the vagueness doctrine because the statute's indeterminate language failed to provide these defendants with adequate warning that their conduct was proscribed.  In addition to this as-applied vagueness claim, defendants make two arguments based on the guarantees of the First Amendment.  First, they argue that their conduct, as alleged in the superseding indictment, may not be proscribed without transgressing the First Amendment's guarantees of free speech and the right to petition the government.  Second, even assuming the statute's constitutional application here, they raise a facial challenge to the statute pursuant to the First Amendment's well-recognized overbreadth doctrine.  Finally, in a separate motion to dismiss, Rosen challenges the sufficiency of the allegation that he aided and abetted Franklin's violation of § 793(d).  Each of these contentions is separately addressed.

**II.**

The operative statute at issue in defendant's constitutional challenge is codified at 18

U.S.C. § 793 and provides, in pertinent part, as follows:

> **(d)** Whoever, lawfully having possession of, access to, control over, or being entrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted or attempts to communicate, deliver, transmit or cause to be communicated, delivered or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it; or

> **(e)** Whoever having unauthorized possession of, access to, or control over any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, instrument, appliance, or note relating to the national defense, or information relating to the national defense which information the possessor has reason to believe could be used to the injury of the United States or to the advantage of any foreign nation, willfully communicates, delivers, transmits or causes to be communicated, delivered, or transmitted, or attempts to communicate, deliver, transmit or cause to be communicated, delivered, or transmitted the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it to the officer or employee of the United States entitled to receive it . . . .

> Shall be fined under this title or imprisoned not more than ten years, or both.

> **(g)** If two or more persons conspire to violate any of the foregoing provisions of this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of the conspiracy.

18 U.S.C. § 793.  A brief history of this statute provides necessary context and helps illuminate

the analysis of the questions presented.

For much of this nation's history, those who violated the nation's trust by engaging in

unauthorized disclosures of government secrets were prosecuted under generally applicable

statutes punishing treason, unlawful entry into military bases, and theft of government property.

*See* Harold Edgar and Benno C. Schmidt, Jr., *The Espionage Statutes and Publication of Defense Information*, 73 Colum. L. Rev. 929, 940 (1973) [hereinafter *Espionage Statutes*].  The first statute specifically intended to protect  government secrets, and § 793's progenitor, was the Defense Secrets Act of 1911.[5]  In terms that have survived largely unaltered for nearly a century, it prohibited the willful communication of knowledge concerning "anything connected with the

---

[5]Section 1 of this statute provided—

[1] That whoever, for the purpose of obtaining information respecting the national defense, to which he is not lawfully entitled, goes upon any vessel, or enters any navy-yard, naval station, fort, battery, torpedo station, arsenal camp, factory, building, office, or other place connected with the national defense, owned or constructed or in process of construction by the United States, or in the possession or under the control of the United States or any of its authorities or agents, and whether situated within the United States or in any place non-contiguous to but subject to the jurisdiction thereof; [2] or whoever, when lawfully or unlawfully upon any vessel, or in or near any such place, without proper authority, obtains, takes, or makes, or attempts to obtain, take, or make any document, sketch, photograph, photographic negative, plan, model, or knowledge of anything connected with the national defense to which he is not entitled; [3] or whoever, without proper authority, receives or obtains, or undertakes or agrees to receive or obtain, from any person, any such document, sketch, photograph, photographic negative, plan, model, or knowledge, knowing the same to have been so obtained, taken or made; [4] or whoever, having possession of or control over any such document, sketch, photograph, photographic negative, plan, model, or knowledge, willfully and without proper authority, communicates or attempt to communicate the same to any person not entitled to receive it, or to whom the same ought not, in the interest of the national defense, be communicated at that time; [5] or whoever, being lawfully intrusted with any such document, sketch, photograph, photographic negative, plan, model, or knowledge, willfully and in breach of his trust, so communicates or attempts to communicate the same, shall be fined not more than one thousand dollars, or imprisoned not more than one year, or both.

36 Stat. 1804 (1911).  Section 2 of this statute related to communication of information connected with the national defense to agents of a foreign government, and is the obvious precursor to 18 U.S.C. § 794.

national defense" to one "not entitled to receive it."  The statute did not define what was "connected to the national defense," nor did it provide a clear basis for determining who was "entitled to receive" that knowledge.  Notwithstanding these deficiencies, the drafters of the next legislative attempt to protect government secrets, which became known as the Espionage Act of 1917, were generally content to adopt the basic language of the 1911 statute.  Thus, title I, section 1, subsection (d) of the Espionage Act provided that—

> whoever, lawfully or unlawfully having possession of, access to, control over, or being intrusted with any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, instrument, appliance, or note relating to the national defense, wilfully communicates or transmits or attempts to communicate or transmit the same to any person not entitled to receive it, or willfully retains the same and fails to deliver it on demand to the officer or employee of the United States entitled to receive it. . . . shall be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or both.

*See* 40 Stat. 217 (June 15, 1917).[6]  This provision, which is the precursor to both §§ 793(e) and (d), was altered in three material respects when Congress last amended the statute as part of the Internal Security Act of 1950.  *See* 64 Stat. 987 (Sept. 23, 1950).  First, Congress removed those with unlawful possession of NDI from the ambit of subsection (d), and created subsection (e) which focuses on this subset of persons.  *See id.*  Second, Congress expanded the category of what could not be communicated pursuant to §§ 793(d) and (e) to include "information relating to the national defense," but modified this additional item by adding a scienter requirement to the effect that "the possessor has reason to believe [the information] could be used to the injury of the United States or to the advantage of any foreign nation."  *See id.*  Finally, in contrast to

---

[6]This provision of the Espionage Act was codified in 1948 at 18 U.S.C. § 793.  *See* Act of June 25, 1948, 62 Stat. 736, 737.

subsection (d), Congress drafted subsection (e) to require one with unlawful possession of national defense information to return it to the government even in the absence of a demand for that information.  *See id.*; *see also New York Times Co. v. United States*, 403 U.S. 713, 738 n. 9 (1971) (White, J., concurring) (citing S. Rep. No. 81-2369, at 8-9 (1950)).

Over the years, numerous commentators have criticized these provisions as excessively complex, confusing, indeed impenetrable.[7]  Yet, despite repeated calls for reform of these provisions in the more than half century since their last amendment in 1950, the statute has remained unchanged.

Section 793's litigation history is sparse, but nonetheless both pertinent and instructive. The modest number of reported decisions reflect that § 793 prosecutions are relatively rare and that over the years, the statute has successfully weathered several constitutional challenges on both vagueness and First Amendment grounds.  While the Supreme Court has never considered a § 793(d) or (e) case, it has considered and rejected a vagueness challenge to the phrase "information relating to the national defense" as used in a related espionage statute.  *See Gorin v.*

---

[7]*See New York Times Co. v. United States*, 403 U.S. 713, 754 (1971) (Harlan, J., dissenting) (describing § 793(e) as a "singularly opaque statute."); *United States v. Morison*, 844 F.2d 1057, 1086 (4th Cir. 1988) (Phillips, J., concurring) (urging Congress to pass "carefully drawn legislation" replacing § 793).  *See generally*, Harold Edgar and Benno C. Schmidt, *Curtiss-Wright Comes Home: Executive Power and National Security Secrecy*, 21 Harv. C.R.-C.L. L. Rev. 349, 393 & n. 159 (1986) ("The espionage statutes are incomprehensible if read according to the conventions of legal analysis of text, while paying fair attention to legislative history.  This is especially true of the sections relating to publication of defense information and the preliminary acts of information-gathering and communication."); Anthony Lewis, *National Security: Muting the "Vital Criticism,"* 34 U.C.L.A. 1687, 1698 (1987) ("The espionage sections of the Federal Criminal Code are a singularly impenetrable warren of provisions originally passed by Congress under the stresses of World War I."); Edgar and Schmidt, *Espionage Statutes*, 73 Colum. L. Rev. at 998 (referring to §§ 793(d) and (e) as "the most confusing and complex of all the federal espionage statutes.").

*United States*, 312 U.S. 19 (1941).  At the circuit level, authority is less sparse, but still relatively

scarse.  Particularly pertinent here is *United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988), in

which the Fourth Circuit denied vagueness and First Amendment challenges to § 793 by a naval

intelligence officer who transmitted classified satellite photographs of Soviet naval preparations

to a British periodical.  The Fourth Circuit has also considered and rejected vagueness challenges

to § 793 and related espionage statutes in other cases.  *See United States v. Truong*, 629 F.2d

908, 918-19 (4th Cir. 1980) (rejecting vagueness challenge based on lack of evil intent in term

willfulness); *United States v. Dedeyan*, 584 F.2d 36, 40 (4th Cir. 1978) (rejecting vagueness and

overbreadth challenges to the term "relating to the national defense" as used in § 793(f)); s*ee also*

*United States v. McGuinness*, 35 M.J. 149, (C.M.A. 1992) (rejecting a vagueness challenge to the

term "unauthorized" as used in § 793(e)).

Aware of these unsuccessful vagueness challenges to § 793, defendants attempt to

distinguish their as-applied challenges by arguing that the instant prosecution is unprecedented in

that it involves the alleged *oral* retransmission of information relating to the national defense,

whereas other challenges to § 793 have involved the transmission of tangible items such as

documents, or photographs.  Indeed, a survey of the prosecutions under the modern version of

§ 793(e) discloses no prosecutions for the oral retransmission of information relating to the

national defense.[8]  It is worth noting, however, that there have been prosecutions for the oral

---

[8]*See, e.g., United States v. Poulson*, 41 F.3d 1330, 1333 (9th Cir. 1994) (charged with the
willful retention of stolen computer tapes containing air tasking orders); *United States v. Pollard*,
959 F.2d 1011, 1015-16 (4th Cir. 1992) (transmission of photocopied documents to Israeli
intelligence services); *United States v. Morison*, 844 F.2d 1057, 1061 (4th Cir. 1988)
(transmission of stolen documents and satellite photos to British news magazine); *United States
v. Zettl*, 835 F.2d 1059, 1060 (4th Cir. 1987) (delivery of classified Navy documents); *United
States v. Walker*, 796 F.2d 43, 45 (4th Cir. 1986) (transmittal of Navy documents containing

transmission of information relating to the national defense under 18 U.S.C. § 794 and its

predecessor statutes, which prohibit the communication of information relating to the national

defense to an agent of a foreign government.[9]  In addition, one case has been brought under both

§ 794(a) and § 793(d) for the oral transmission of national defense information to the Soviets.

*See United State v. Smith*, 592 F.Supp. 424, 427 (E.D.Va. 1984). Whether the fact that no person

has been prosecuted under § 793(e) for the oral transmission of information relating to the

national defense has any constitutional significance is addressed below.

### III.

Before addressing defendants' various constitutional challenges, it is first necessary to

address the defendants' statutory argument that the word "information" as used in § 793 should

be construed as including only tangible information.  This construction would preclude

application of the statute to individuals who, like defendants, transmit NDI orally.  If so

construed, of course, § 793 would not reach the conduct alleged here and therefore obviate the

---

classified information to the Soviets); *United States v. Truong Ding Hung*, 629 F.2d 908, 911-12 (4th Cir. 1980) (transmission of documents relating to the national defense to Socialist Republic of Vietnam during the 1977 Paris peace negotiations); *United States v. Kampiles*, 609 F.2d 1233, 1235 (7th Cir. 1980) (delivery of military technical manual to the Soviets); *United States v. Lee*, 589 F.2d 980, 982-83 (9th Cir. 1999) (transmittal of documents relating to a covert communications satellite study to the Soviets); *United States v. Doe*, 455 F.2d 1270, 1272 (1st Cir. 1972) (transmittal of the "Pentagon Papers" ultimately published by the New York Times and the Washington Post); *United States v. Ntube*, No. 93-0322-2, 1996 WL 808068 (D.D.C. 1996) (delivery of classified documents to certain African countries).

[9]*See, e.g., Gorin v. United States*, 111 F.2d 712, 715 (9th Cir. 1940) *aff'd* 312 U.S. 19 (1940) (describing the oral transmission of the substance of reports); *United States v. Pelton*, 835 F.2d 1067, 1070-71 (4th Cir. 1987) (oral transmission of information relating to the national defense to Soviets); *United States v. Rosenberg*, 195 F.2d 583, 588 (2d Cir. 1952) (describing the transmission of documents, writings, sketches, notes and information relating to the national defense to the Soviets).

need to address the defendants' constitutional challenges.

The phrase "information relating to the national defense" is not defined by the statute, and therefore, as with any issue of statutory interpretation, the appropriate place to begin the analysis is with the plain meaning of the statute's words and the context in which they are used.  *See United States v. Groce*, 398 F.3d 679, 681 (4th Cir. 2005).  The word "information" is a general term, the plain meaning of which encompasses knowledge derived both from tangible and intangible sources.  *See, e.g.,* The American Heritage College Dictionary 698 (1993) (defining information as "knowledge derived from study, experience, or instruction" and "knowledge of a specific event or situation; intelligence.").  Defendants do not dispute the plain meaning of the term "information," but argue instead that plain meaning cannot control because construing the word "information" as encompassing intangible information renders the statute's retention clauses absurd.[10]  And, it is well-established that the plain meaning of a term may should not control if it leads to an absurd result.  *See Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.,* 530 U.S. 1, 6 (2000).   In brief, the defendants' argument proceeds as follows:  The operative provisions in this prosecution, § 793(d) and (e), prohibit both (1) the communication of any document, note, map, etc., or information relating to the national defense to one not entitled to receive it, and (2) the willful retention of "the same."  While it is logical to punish the communication of intangible information, it is illogical to punish the retention of intangible information since a person cannot avoid remembering something he learned, thereby retaining it,

---

[10]Subsection (d)'s retention clause makes criminally liable anyone who "willfully retains [an item related to the national defense] and fails to deliver it on demand to the officer or employee of the United States entitled to receive it." 18 U.S.C. § 793(d).  Subsection (e) contains a similar clause, but does not require that a demand be made for the item related to the national defense.  18 U.S.C. § 793(e).

nor can a person deliver their memory to one entitled to receive it, as the statute's retention

clauses would seem to require.  Assuming, reasonably enough, that the two clauses apply to "the

same" type of information, defendants assert that since it would be illogical to construe the term

"information" as including intangible information in the retention clause, the communication

clause must also apply only to tangible information.  At the very least, defendants argue, this

reflects that an ambiguity infects the statute, requiring the application of the canon of

constitutional avoidance,[11] the rule of lenity,[12] and the related canons of *ejusdem generis* and

*noscitur a sociis*.[13]

While not without superficial appeal, this argument ultimately fails to persuade.  A closer

look at § 793's history reveals that the absurdity identified by the defendants is a result of

inadvertence and careless drafting, and not an indication that the drafters intended to restrict the

prohibition of the first clause to tangible items.[14]  The grandfather of subsections (d) and (e) of

---

[11]The canon of constitutional avoidance counsels that "when deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail . . . ." *See Clark v. Martinez*, 543 U.S. 371, 381-82 (2005)

[12]*See Pasquantino v. United States*, 544 U.S. 349, 383 (2005) ("[W]hen confronted with 'two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.'") (quoting *McNally v. United States*, 483 U.S. 350, 359-60 (1987)).

[13]*See United States v. Andrews*, 441 F3d 220, 223 (4th Cir. 2006) ("According to the *ejusdem generis* canon, '[a] general word or phrase [that] follows a list of specifics . . . will be interpreted to include only items of the same type as those listed.'"); *Id.* at 224 ("According to the *noscitur a sociis* canon, the meaning of an undefined word or phrase 'should be determined by the words immediately surrounding it.'").  In this respect, defendants argument is that because §§ 793(d) and (e) prohibit the retransmission of a long list of tangible items, "information" should also be limited to information contained in tangible form.

[14]*See generally*, Edgar and Schmidt, *Espionage Statutes*, 73 Colum. L. Rev. at 1050.

§ 793, the fourth clause of the Defense Secrets Act of 1911, clearly prohibited the willful

communication of any "knowledge of anything connected with the national defense."[15]  When

this provision was reenacted as part of the Espionage Act of 1917, the drafters added the

retention clause, and rather than again listing the items relating to the national defense that could

not be retained, the drafters simply referred to those items listed in the first clause by using the

phrase "the same."  In an apparent attempt to avoid the absurdity noted above, the drafters simply

dropped the term "knowledge" from the list of items detailed in the first clause.  *See* 40 Stat. 217

(1917).  *See generally* Edgar and Schmidt, *Espionage Statutes*, 73 Colum. L. Rev. at 1012.  Thus,

had the defendants been charged under section 1(d) of the Espionage Act of 1917, their argument

that the statute does not cover oral transmissions would be more persuasive.  But in 1950, the

Congressional drafters of the current provision, concerned over this potential loophole in the

statute's coverage, attempted to fix it by adding to the statute the phrase "information relating to

the national defense which the possessor has reason to believe could be used to the injury of the

United States or to the advantage of a foreign nation."  *See generally* Edgar and Schmidt,

*Espionage Statutes*, 73 Colum. L. Rev. at 1021-31, 1050.  This formulation was not new, but was

derived from similar language in section 2 of the Espionage Act, the predecessor to 18 U.S.C.

§ 794.  As used in that provision, the term "information related to the national defense" was

understood to apply to information existing in both tangible and intangible form,[16] and it is

---

[15]36 Stat. 1804 (1911).  *See supra* note 4.

[16]*See Gorin v. United States,* 111 F.2d 712, 716 (9th Cir. 1940).  The phrase "information
related to the national defense" as used in 18 U.S.C. § 794 continues to be understood as
including orally transmitted information.  *See Rosenberg*, 195 F.2d 588; *Pelton*, 835 F.2d 1070-
71.

reasonable to conclude that the 1950 drafters intended to adopt the same meaning.  As the Fourth

Circuit has stated in relation to these two provisions, "[w]hen a statute is a part of a larger Act as

these statutes are, the starting point for ascertaining legislative intent is to look to other sections

of the Act *in pari materia* with the statute under review." *United States v. Morison*, 844 F.2d

1057, 1064 (4th Cir. 1988).  Indeed, this conclusion is buttressed by a statement of the district

court in *Morison,* in which it stated that the statute—

> defines all types of tangibles: "any document, writing, code book, signal book,
> sketch, photograph, photographic negative, blueprint, plan, map, model,
> instrument, appliance, or note relating to the national defense," and also describes
> *intangibles*: "information relating to the national defense which information the
> possessor has reason to believe could be used to the injury of the United States or
> to the advantage of any foreign nation."

*See United States v. Morison*, 622 F.Supp. 1009, 1011 (D.Md. 1985) (emphasis added); *see also*

Edgar and Schmidt*, Espionage Statutes*, 73 Colum. L. Rev. at 1021.

Because construing the term "information" as including both tangible and intangible

information is consistent with the plain meaning of the term and supported by the legislative

history, it is not necessary to resort to the canon of constitutional avoidance or to the rule of

lenity, which both apply only when choosing between two equally plausible interpretations.  *See*

*Clark*, 543 U.S. at 385; *Pasquantino*, 544 U.S. at 383.  Nor is application of the canons of

*ejusdem generis* or *noscitur a sociis* appropriate, since it is clear that Congress's intent in

amending the statute in 1950 was to plug the loophole created when the term "knowledge" was

dropped from the Espionage Act.

Thus, because the word "information" as used in the first clause of the statute applies

both to tangible and intangible information, and because defendants are not charged under the

second clause, the absurdity pointed out by the defendants is of no consequence to the present

prosecution. For this reason, it is necessary to address the defendants' constitutional challenges.

## IV.

Defendants' first constitutional challenge to the statute is based on the principle that the

Due Process clause of the Fifth Amendment prohibits punishment pursuant to a statute so vague

that "men of common intelligence must necessarily guess at its meaning and differ as to its

application." *United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally v. General

Constr. Co.*, 269 U.S. 385, 391 (1926)). Specifically, defendants allege that, as-applied to them,

both §§ 793(d) and (e) are fatally vague with respect to determining: (1) the content of

information covered by the phrase "information relating to the national defense," and (2) the

individuals "not entitled to receive" that information.

The vagueness doctrine is premised on the principle that due process of law requires the

government to provide potential defendants fair warning that their conduct may be proscribed,

and is further animated by the concern that vague statutes may encourage arbitrary and

discriminatory enforcement. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). Thus, to

take a well known example of a statute that failed to provide adequate notice, the Supreme Court

found unconstitutionally vague a statute making it "unlawful for any person willfully . . . to make

any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries"

because it failed to provide an "ascertainable standard of guilt . . . adequate to inform persons

accused of violation thereof of the nature and cause of the accusation against them." *United

States v. L. Cohen Grocery Co.*, 255 U.S. 81, 90 (1921). The Supreme Court relied on the

vagueness doctrine's second rationale in *Kolender v. Lawson*, 461 U.S. 352 (1983), where it

-18-

struck down a penal statute requiring a person stopped for loitering to provide police officers

with "credible and reliable identification" because it failed to "establish minimal guidelines to

govern law enforcement" and therefore "furnishes a convenient tool for harsh and discriminatory

enforcement by local prosecuting officials against particular groups deemed to merit their

displeasure." *Id.* at 360 (internal quotations and citations omitted).  *See also Morales,* 527 U.S. at

60. ("The broad sweep of the ordinance also violates 'the requirement that a legislature establish

minimal guidelines to govern law enforcement.'") (quoting *Kolender*, 461 U.S. at 358).

     While acknowledging these general principles, courts applying the vagueness doctrine

also recognize that the language of any statute will possess some level of indeterminacy, and

therefore courts sensibly do not require the scope of a criminal statute to be defined with perfect

precision and clarity.  In the words of the Fourth Circuit,

> It is sufficient . . . to satisfy requirements of "reasonable certainty," that while "the
> prohibitions of a statute may not satisfy those intent on finding fault at any cost,
> they are set out in terms that the ordinary person exercising ordinary common
> sense can sufficiently understand and comply with, without sacrifice to the public
> interest."

*United States v. Morison*, 844 F.2d 1057, 1071 (4th Cir. 1988) (quoting *Arnett v. Kennedy*, 416

U.S. 134, 159 (1974)).  It is also well established that "clarity at the requisite level may be

supplied by judicial gloss on an otherwise uncertain statute."  *Lanier*, 520 U.S. at 266; *see also*

*Morison*, 844 F.2d at 1071 ("all vagueness may be corrected by judicial construction which

narrows the sweep of the statute within the range of reasonable certainty.").  In sum, courts

considering vagueness challenges require that criminal statutes "either standing alone or as

construed, make reasonably clear at the relevant time that the defendant's conduct was criminal."

*Lanier*, 520 U.S. at 266.

Finally, and especially pertinent to the present challenge, there exists a generally recognized proposition that an otherwise unconstitutionally vague statute can survive a challenge if it contains a specific intent requirement. As the Supreme Court cogently put it: "[W]here the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law." *Screws v. United States,* 325 U.S. 91, 102 (1945). Thus, an otherwise intolerably vague statute may avoid a finding of unconstitutional vagueness if its application is contingent on the accused's knowledge that he is committing an unlawful act. These principles govern defendants' vagueness challenge.

### A.

Defendants first argue that the content of the information described by the phrase "information relating to the national defense" is insufficiently clear when such information is transmitted orally. In this respect, it has long been recognized that the phrase "information relating to the national defense" is quite broad and potentially too broad since, especially in time of war, any information could conceivably relate to the national defense. *See United States v. Heine*, 151 F.2d 813, 815 (2d Cir. 1945) ("It seems plain that the section cannot cover information about all those activities which become tributary to 'the national defense' in time of war; for in modern war there are none which do not."). Courts, facing the obvious need to find some limiting construction, have not limited the phrase by specific subject matter, but instead have chosen to limit the phrase by requiring the government to prove (i) that the information is closely held by the government and (ii) that the information is the type of information that, if disclosed, could harm the United States. A review of the most pertinent case law interpreting

-20-

and cabining the phrase is instructive.

In *Gorin v. United States*, 312 U.S. 19 (1941), the Supreme Court rejected a similar vagueness challenge to identical language used in section 2(a) of the Espionage Act, currently codified at 18 U.S.C. § 794(a).[17]   In that case, defendant Gorin, a citizen of the U.S.S.R., had obtained from defendant Salich, a naval intelligence officer, the substance of over fifty reports relating to Japanese activities in the United States, which the two had conspired to transmit to the Soviet Union.  *Id.* at 22.  The Supreme Court rejected an attempt by defendants to tie the term "information relating to the national defense" to information relating to those places listed in section 1(a) of the statute, currently codified at § 793(a),[18] stating instead that the term "national

---

[17]Section 2(a) of the Espionage Act provided as follows:

> Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or *information relating to the national defense*, shall be punished by imprisonment for not more than twenty years . . . .

40 Stat. 217 (emphasis added).  This statute is identical, in all material respects, to 18 U.S.C. § 794(a).

[18]Section 1(a) of the Espionage Act prohibited anyone from obtaining:

> information concerning any vessel, aircraft, work of defense, navy yard, naval station, submarine base, coaling station, fort, battery, torpedo station, dockyard, canal, railroad, arsenal, camp, factory, mine, telegraph, telephone, wireless, or signal station, building, office, or other place connected with the national defense, . . . or any place in which any vessel, aircraft, arms, munitions, or other materials or instruments for use in time of war are being made, prepared, repaired, or stored . . .

defense" had acquired a well-known meaning "as a generic concept of broad connotations,

referring to the military and naval establishments and the related activities of national

preparedness." *Gorin*, 312 U.S. at 28.  Significantly, as the trial court in *Gorin* instructed the

jury, the term encompasses the United States' own intelligence reports about another nation's

military activities, "[f]or from the standpoint of military or naval strategy it might not only be

dangerous to us for a foreign power to know our weaknesses and our limitations, but it might

also be dangerous to us when such a foreign power knows that we know that they know of our

limitations." *Id.* at 31.

The considerable breadth of the subject matter falling within the phrase "related to the

national defense" has been confirmed in more recent cases.  Thus, in *United States v. Truong*

*Dinh Hung*, 629 F.2d 908 (4th Cir. 1980), the Fourth Circuit rejected the defendants' argument

that "information relating to the national defense" was restricted to military matters, holding

instead that the U.S. diplomatic cables relating to the 1977 Paris peace negotiations with the

North Vietnamese were "related to the national defense" within the meaning of §§ 793 and 794.

*Truong*, 629 F.2d at 918.  In response to Truong's argument that the material he transmitted was

not covered by the phrase, the Fourth Circuit explained that "Congress intended 'national

defense' to encompass a broad range of information and rejected attempts to narrow the reach of

the statutory language." *Id.* (citing Edgar and Schmidt, *Espionage Statutes*, 73 Colum. L. Rev. at

972-74).  Similarly, in *Morison*, the Fourth Circuit approved the district court's instruction to the

jury describing "information relating to the national defense" as including "all matters that

─────────────────────────

if such person had intent or reason to believe that such information would be used to the injury of
the United States or to the advantage of a foreign nation.  40 Stat. 217.

directly or may reasonably be connected with the national defense of the United States against any of its enemies.  It refers to the military and naval establishments and the related activities of national preparedness."  *Morison*, 844 F.2d at 1071.  In sum, the phrase "information relating to the national defense" has consistently been construed broadly to include information dealing with military matters and more generally with matters relating to United States foreign policy and intelligence capabilities.

Rather than limiting the subject matter scope of the phrase "information relating to the national defense," or restricting it to tangible material, courts have carefully cabined the phrase's scope in two ways.  First, courts have limited the term by requiring that the information be closely held by the government.  This requirement was recognized by the Supreme Court in *Gorin*,[19] and served as the basis for Judge Hand's decision in *United States v. Heine*, 151 F.2d 813 (2d Cir. 1945), in which he reversed Heine's conviction under the predecessor to § 794 because the information about airplane production Heine delivered to the Germans was publicly available.  *See id.* at 817.  As Judge Hand put it,

> As declared in *Gorin* . . . it is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all.

*Id.* at 816.  Similarly, the Fourth Circuit's rejection of a vagueness challenge to the term "information relating to the national defense" in *Morison*, was based, in part, on the district judge's instruction to the jury that "the government must prove that the documents or the photographs are closely held in that they have not been made public and are not available to the

---

[19]312 U.S. at 28.

general public." *Morison*, 844 F.2d at 1071-72.[20]

Contrary to the government's assertion, the Fourth Circuit's decision in *United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000), does not compel the conclusion that information not officially disclosed, but in the public domain, retains its status as "information relating to the national defense." In that case, the Fourth Circuit held that the government's assessment of the reliability of publicly available information—as opposed to the information itself—might itself be information relating to the national defense. *Id.* at 578-79. As the Fourth Circuit put it: "That our government believes the estimates to be correct in and of itself is a fact that would be highly valuable to other countries." *Id.* at 578. Because the disclosure of classified documents discloses the "government's implicit stamp of correctness and accuracy," the disclosure of official documents may violate the statute even if the information contained within the documents is publicly available. *Id.* Thus, it is the confirmation of the accuracy (or presumably also the inaccuracy) of material in the public domain, and not the public domain material itself, that a jury may consider to be "information relating to the national defense." Because the instant case does not involve the disclosure of classified documents, this distinction will matter only if the defendants' oral disclosure of information in the public domain included an official confirmation of what had previously been mere rumor or speculation.[21] Further, although the confirmation of

_____

[20]S*ee also Truong*, 629 F.2d at 918 n.9 (noting that district court's instruction to jury that "the defendants would not be guilty of transmitting national defense information if the information were available in the public domain" was proper); *United States v. Allen*, 31 M.J. 572, 627-28 (N.C.M.R. 1987) (stating that the term includes only "information that is not generally accessible to the public, *i.e.*, it must be non-public information.").

[21]*See United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir. 1972) ("Rumor and speculation are not the equivalent of prior disclosure, however, and the presence of that kind of surmise should be no reason of avoidance of restraints upon confirmation from one in a position

publicly available information relating to the national defense may at times constitute a

disclosure of information relating to the national defense, this is not always the case, for as the

Fourth Circuit has cautioned, "one may imagine situations in which information has been so

widely circulated and is so generally believed to be true, that confirmation by one in a position to

know would add nothing to its weight." *Knopf*, 509 F.2d at 1370-71.  As explained below, the

distinction between a confirmation of information relating to the national defense already in the

public domain that can be NDI and one that cannot depends on whether the confirmation may

potentially harm the national security.  In sum, information related to the national defense

typically cannot qualify as such if it is in the public domain; it must be closely held by the

government.  Yet, in appropriate circumstances, this NDI can include the government's closely

held assessment or confirmation of certain public domain information.

The second judicially imposed limitation on the phrase "information relating to the

national defense" is the requirement that its "disclosure would be potentially damaging to the

United States or useful to an enemy of the United States." *Morison*, 844 F.2d at 1071-72.  This

important requirement is implicit in the purpose of the statute and assures that the government

cannot abuse the statute by penalizing citizens for discussing information the government has no

compelling reason to keep confidential.  As the Supreme Court has instructed, the statute only

applies to information for which there is an "occasion for secrecy," and there is no "occasion for

secrecy" unless disclosure of the information the government seeks to protect implicates an

---

to know officially."); *Alfred A. Knopf, Inc. v. Colby*, 509 F.2d 1362, 1370 (4th Cir. 1975)
("Rumors and speculations circulate and sometimes get into print.  It is one thing for a reporter or
author to speculate or guess that a thing may be so or even quoting undisclosed sources, to say
that it is so; it is quite another thing for one in a position to know of it officially to say so.").

important government interest such as the national security.  *See Gorin*, 312 U.S. at 28.  This

second NDI judicial gloss was explicitly relied upon in the concurring opinions of Judges

Wilkinson and Phillips in *Morison* as necessary to save the statute from Morison's First

Amendment challenge.  As Judge Wilkinson explained:

> The district court's limiting instructions properly confine prosecution under the
> statute to disclosures of classified information potentially damaging to the military
> security of the United States.  In this way the requirements of the vagueness and
> overbreadth doctrines restrain the possibility that the broad language of this statute
> would ever be used as a means of punishing mere criticism of incompetence and
> corruption in the government.

*Morison*, 844 F.2d at 1084 (Wilkinson, J., concurring); *see also id.* at 1086 (Phillips, J.,

concurring) ("I agree that the limiting instruction which required proof that the information

leaked was either 'potentially damaging to the United States or might be useful to an enemy'

sufficiently remedied [the statute's vagueness and overbreadth].").

Thus, the phrase "information relating to the national defense," while potentially quite

broad, is limited and clarified by the requirements that the information be a government secret,

*i.e.*, that it is closely held by the government, and that the information is the type which, if

disclosed, could threaten the national security of the United States.  So cabined, the phrase

"information relating to the national defense" avoids fatal vagueness and passes Due Process

muster; given these two limitations the phrase provides fair notice of what it encompasses and is

also an adequate safeguard against arbitrary enforcement.

## B.

Defendants also argue that they lacked constitutionally adequate notice as to who was

"entitled to receive" the national defense information, especially given the fact that the

information was transmitted orally and therefore possessed no markings of "SECRET,"

"CONFIDENTIAL" or other indicia typical of classified material.  It is true that the statute itself

provides no definition of the phrase "entitled to receive," nor does it expressly delegate to the

executive branch the authority to determine who is entitled to receive national defense

information.[22]  Yet, this is not the end of the analysis.  The Fourth Circuit addressed a similar

challenge in *Morison*, and held that drafters of the Espionage Act correctly assumed that the

President had the inherent authority to limit the communication of information relating to the

national defense and that these preexisting rules and regulations of the Executive Branch would

determine who is entitled to receive NDI.  *Morison*, 844 F.2d 1065-66.  Indeed, during the

debates over the passage of the Espionage Act in 1917, Senator Sutherland observed that "the

phrase 'lawfully entitled' means nothing more and nothing less than that the particular

information must have been forbidden not necessarily by an act of Congress; because in dealing

with military matters the President has very great powers."  *Id.* (quoting 54 Cong.Rec. 3489).  In

other words, Congressional drafters viewed the phrase "entitled to receive" as an unfilled vessel

into which the Executive Branch could pour more detailed content consistent with the phrase's

plain meaning and the statute's purpose.  Precisely this occurred.

     In the instant case, as in *Morison*, the rule regulating who is "entitled to receive" is the

Executive Order setting forth a uniform classification system for national security information.

---

[22]*Cf.* 18 U.S.C. § 798 (prohibiting disclosure of certain classified information to an
unauthorized person, and defining "unauthorized person" as "any person who, or agency which,
is not authorized to receive information of the categories set forth in subsection (a) of this
section, by the President, or by the head of a department or agency of the United States
Government which is expressly designated by the President to engage in communication
intelligence activities for the United States.").

*See* Exec.Order No. 13,292, 68 Fed.Reg. 15,315 (March 25, 2003) *amending* Exec.Order No.

12,958, 60 Fed.Reg. 19,825 (April 17, 1995).  The current classification system provides for the

classification of information into one of three categories – Top Secret, Secret, and Classified –

depending on the harm to the United States that would result from the information's disclosure,[23]

and restricts access to classified information to those with a corresponding security clearance and

a need-to-know.  *Id.* at 15,315-16, 15,324.  The classification system also acknowledges that

classified information may be disseminated beyond the executive branch by those with authority

to do so.  *See id.* at 1325.[24]  Thus, while the language of the statute, by itself, may lack precision,

the gloss of judicial precedent has clarified that the statute incorporates the executive branch's

classification regulations, which provide the requisite constitutional clarity.[25]

------------------------------------

[23]*See id.* at 15,326.  Specifically, the designation "Top Secret" applies to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security.  The designation "Secret" applies to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security.  Finally, the designation "Confidential" applies to information, the unauthorized disclosure of which reasonably could be expected to cause damage to the national security.  The current classification system also contemplates "special access programs" which further restrict access to certain information. *Id.*

[24]Specifically, Section 4.1(e) provides that "Persons authorized to disseminate classified information outside the executive branch shall ensure the protection of the information in a manner equivalent to that provided within the executive branch," and Section 5.2(b) provides that "[i]n an emergency, when necessary to respond to an imminent threat to life or in defense of the homeland, the agency head or any designee may authorize the disclosure of classified information to an individual or individuals who are otherwise not eligible for access."  *Id.*

[25]*See Morison*, 844 F.2d at 1075 ("We therefore hold that the words 'entitled to receive' in the statute in this case can be limited and clarified by the Classification Regulations and, as so limited and clarified, are not vague.").  *See also United States v. Truong Dinh Hung*, 629 F.2d 908, 919 n.10 (4th Cir. 1980) ("Section 793(e) contains another possible ambiguity.  It punishes only those who have "unauthorized possession of national defense information.  The trial judge provided adequate content for this phrase by advising the jury that a person would have authorized possession if he had an appropriate security clearance and if he gained access to the

**C.**

Defendants seek to distinguish this clear precedent clarifying the phrases "information relating to the national defense" and "entitled to receive" by arguing that because they received the information orally it was difficult to know at the time whether it was classified.  And in this respect, although evidence that the information was classified is neither strictly necessary nor always sufficient to obtain a prosecution under § 793, the classification of the information by the executive branch is highly probative of whether the information at issue is "information relating to the national defense" and whether the person to whom they disclosed the information was "entitled to receive" the information.  This is so because: (1) the subject matter of classified information must concern the national security or military preparedness of the nation,[26] (2) access to classified information is restricted to a small number of people and accordingly is "closely

_____

document because it was necessary to the performance of his official duties.").

[26]*See* Exec.Order No. 13,292, 68 Fed.Reg. 15,315, 15,317 (March 25, 2003).  Section 1.4 of the classification regulation lists the exclusive types of information which may be considered for classification, including information concerning—

> (a) military plans, weapons systems, or operations; (b) foreign government information; (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; (d) foreign relations or foreign activities of the United States, including confidential sources; (e) scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism; (f) United States government programs for safeguarding nuclear materials or facilities; (g) vulnerabilities or capabilities of systems, installations, infrastructure, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism; of (h) weapons of mass destruction.

*Id.*

held,"[27] and (3) classified information must be the type of information the disclosure of which

could damage the nation's security.[28]  In addition, as noted, the classification status of

information alleged to be related to the national defense governs who is "entitled to receive" the

information.

Citing these parallels, defendants argue that the difficulty in determining whether orally

transmitted information is classified is highly relevant to whether the statute provides

constitutionally adequate notice.  A comparison of the application of the statute as-applied here

to intangible information and the application of the statute in the typical § 793 prosecution to the

delivery of classified documents (or any other tangible item) illustrates this point.  All classified

documents are clearly marked with a classification level and are often marked classified or

unclassified at the paragraph level.[29]  For this reason, a person possessing such a document can

easily determine: (i) whether the possession is authorized, (ii) which portions of the information

the government is attempting to keep secret, and (iii) who else is entitled to receive the

document.  In contrast, a conversation about classified information, even one accompanied by a

---

[27]*See id*. at 15,324 (detailing in Section 4.1(a) the restrictions on access to classified information).

[28]*See id.* at 15,315-16 (detailing in Section 1.2 the various levels of classification which depend on the amount of damage to the national security that could result from disclosure of the information).  The classification regulation also prohibits the classification of information in order to "(1) conceal violations of law, inefficiency, or administrative error; (2) prevent embarrassment to a person, organization, or agency; (3) restrain competition; or (4) prevent or delay the release of information that does not require protection in the interest of the national security."  *Id.* at 15318.

[29]*See* Exec.Order No. 13,292, 68 Fed.Reg. 15,315, 15,317 (March 25, 2003) (detailing, in Section 1.6, the identification and markings that must accompany any classified document or other classified media).

generic warning that "this information is classified," is not likely to apprise the listener of precisely which portions of the information transmitted in the conversation are classified, or whether a more general description of the information retains its classification status such that it is sufficiently closely held and potentially damaging to the United States to violate the statute. Defendants argue that the difficulty in determining the classification of intangible information renders the application of the statute to them unconstitutionally vague.  In addition, the defendants argue that because they were not government employees familiar with the executive branch's classification regulations, and because the classification regulations are not explicitly incorporated into the statute, they did not have a constitutionally sufficient basis for determining who is "entitled to receive" the information.  *See Morison*, 844 F.2d at 1074 (describing Morison's familiarity with the classification regulations and concluding that "certainly the phrase 'not authorized to receive it' was well understood by the defendant.").

Although defendants' argument is not without some force, it is ultimately unpersuasive. It is true that the difficulty in determining orally transmitted information's classification status is highly relevant to whether the defendants knew, as is alleged, that they were transmitting NDI to one not entitled to receive it, but the defendants' attempt to convert this difficulty into a reason for finding the statute unconstitutionally vague must ultimately fail.  This is so because the statute requires the government to prove the defendants *"willfully"*[30] committed the prohibited

---

[30]18 U.S.C. § 793.  In this regard, the Fourth Circuit in *Morison* approved the district court's use of the standard specific intent instruction for the term "willfully."  *See Morison*, 844 F.2d at 1071 ("An act is done *willfully* if it is done voluntarily and *intentionally* and with the *specific intent to do something that the law forbids.  That is to say, with a bad purpose either to disobey or to disregard the law.*"); *see also United States v. Truong Dinh Hung*, 629 F.2d 908, 919 (4th Cir. 1980) (describing an act done "willfully" as an act committed with a "design to mislead or deceive another.  That is, not prompted by an honest mistake as to one's duties, but

conduct, and this "willfulness" requirement "eliminat[es] any genuine risk of holding a person

'criminally responsible for conduct which he could not reasonably understand to be proscribed.'"

*United States v. Hsu*, 364 F.3d 192, 197 (4th Cir. 2004) (quoting *United States v. Sun*, 278 F.3d

302, 309 (4th Cir. 2002)).  Indeed, the Fourth Circuit has relied on this specific intent

requirement in rejecting similar claims of vagueness in *Morison* and *Truong*.[31]

Thus, the government in this case must prove beyond a reasonable doubt that the

defendants knew the information was NDI, *i.e.*, that the information was closely held by the

United States and that disclosure of this information might potentially harm the United States,

and that the persons to whom the defendants communicated the information were not entitled

under the classification regulations to receive the information.  Further the government must

prove beyond a reasonable doubt that the defendants communicated the information they had

received from their government sources with "a bad purpose either to disobey or to disregard the

law." *Morison*, 844 at 1071.  It follows, therefore, that if the defendants, or either of them, were

truly unaware that the information they are alleged to have received and disclosed was classified,

or if they were truly ignorant of the classification scheme governing who is entitled to receive the

information, they cannot be held to have violated the statute.  Thus, while the factual distinctions

pointed out by defendants undoubtedly affect the government's burden, they do not render the

---

prompted by some personal or underhanded motive.").

[31]*Morrison*, 844 F.2d at 1071 ("Combining the two instructions, the one on wilfulness and the one defining national defense, the district judge in this case gave precisely the instruction on this vagueness issue that we approved in *United States v. Truong Dinh Hung*, 629 F.2d at 919.").

statute unconstitutionally vague.[32]

In addition to proving that the defendants committed the prohibited acts "willfully," the statute imposes an additional and significant scienter requirement when a person is accused of transmitting "information relating to the national defense."  Thus, the statute, as-applied to these defendants also requires the government to prove that such information was communicated with "reason to believe it could be used to the injury of the United States or to the advantage of any foreign nation."  18 U.S.C. §§ 793(d), (e).  This language accompanied Congress's amendment of the statute in 1950 adding the term "information" back into the provisions' list of enumerated items relating to the national defense, and it is clear from both the text and the legislative history that this additional scienter requirement applies only to the communication of intangible "information," and is intended to heighten the government's burden when defendants are accused of communicating intangible information.[33]  As has been noted, the statute's "willfulness" requirement obligates the government to prove that the defendants knew that disclosing the NDI could threaten the nation's security, and that it was illegal, but it leaves open the possibility that

_____

[32]See Hsu, 364 F.3d at 197 n.1 ("Defendants attempt to distinguish Sun by focusing on factual differences between it and the case at hand.  Specifically, they argue that, unlike the defendants in Sun, they were not experienced 'munitions exporters' and the encryption devices here, unlike the missile and bomb parts at issue in Sun, are not exclusively designed for military use. . . . These factual differences, however, do not change the legal analysis.  The reasoning in Sun—that requiring the jury to find a defendant acted 'willfully' necessarily leaves 'innocent' exporters outside the statute's scope and so vitiates any vagueness concerns—applies equally here.").

[33]See Edgar and Schmidt, Espionage Statutes, 73 Colum.L.Rev. at 1023 (citing S.Rep.No. 427, 80th Cong., 1st Sess. 7 (1949)); id. at 1024 (H.R.Rep.No. 647, 81st Cong., 1st Sess. (1949)). See also Morison, 844 F.2d at 1073 n.26 (noting the anomalous statement in the legislative history that this second scienter requirement is the only intent scienter requirement) (citing H.R.Rep. No. 647, 81st Cong., 1st Sess. (1949), at 3-4).

defendants could be convicted for these acts despite some salutary motive.  For example, if a

person transmitted classified *documents* relating to the national defense to a member of the media

despite knowing that such an act was a violation of the statute, he could be convicted for

"willfully" committing the prohibited acts even if he viewed the disclosure as an act of

patriotism.  By contrast, the "reason to believe" scienter requirement that accompanies

disclosures of *information*, requires the government to demonstrate the likelihood of defendant's

bad faith purpose to either harm the United States or to aid a foreign government.  In this sense,

requiring the government to prove that "the possessor has reason to believe [the information

relating to the national defense] could be used to the injury of the United States or to the

advantage of any foreign nation" is not duplicative of the requirement that the government prove

the defendant willfully disclose information that is potentially damaging to the United States

because the latter concerns only the quality of the information, whereas the former relates to the

intended (or recklessly disregarded) effect of the disclosure.

This conclusion is buttressed by reference to the contemporary judicial construction of

similar language as used in related statutes.  In *Gorin*, the leading precedent interpreting the

Espionage Act at the time of § 793's last amendment in 1950, the Supreme Court rejected a

vagueness challenge to the precursor to § 794(a), in part, on the basis of the "obvious delimiting

words in the statute" requiring that the defendants act with "intent or reason to believe that the

information to be obtained is to be used to the injury of the United States, or to the advantage of

any foreign nation."  *Gorin*, 312 U.S. at 27-28. According to Justice Reed, this "phrase requires

those prosecuted to have acted in bad faith." *Id.* at 28.[34]  This is significant because when

Congress amended §§ 793(d) and (e) to reintroduce the term "information" it chose to modify the

term with essentially the same delimiting words relied upon by *Gorin* less than ten years earlier,[35]

presumably with the intent that prosecutions under these provisions require the same proof of bad

faith.[36]  The Supreme Court relied on this language when it rejected Gorin's vagueness challenge

to the phrase "information relating to the national defense," *Gorin*, 312 U.S. at 28, and this added

scienter requirement is yet another ground for rejecting the defendants' vagueness challenge here.

---

[34]Nearly forty years later, the Fourth Circuit considered a similar vagueness challenge to the phrase "relating to the national defense" as it is used in 18 U.S.C. § 793(f)(2), which penalizes those who have been entrusted with information relating to the national defense and knowingly fail to report its loss, theft, abstraction or destruction to a superior officer.  The Fourth Circuit upheld the provision despite the absence of the delimiting words cited in *Gorin,* reasoning that the statute's requirement of knowledge of illegal abstraction impliedly includes knowledge of injury to the United States.  *United States v. Dedeyan*, 584 F.2d 36, 39 (4th Cir. 1978) (upholding a conviction for failure to report the abstraction of a document relating to the national defense).

[35]There are two slight differences between the formulation of the intent requirement in §§ 793(a) and 794(a) and that of §§ 793(d) and (e).  The former requires "*intent or* reason to believe . . . ." whereas the latter only requires a "reason to believe . . . ."  Because one who has the intent to believe communication of the information may harm the United States or aid a foreign nation necessarily has a reason to believe communication of the information will do the same, the elimination of the superfluous disjunctive does not affect the conclusion that Congress intended the same evil intent recognized by the Supreme Court in *Gorin*.  Nor is it material that the statute at issue in *Gorin* required an "intent or reason to believe that the [the information] *is* to be used to the injury of the United States" whereas § 793(d) and (e) require that there be a "reason to believe that the information *could* be used to the injury of the United States . . . ."  The use of a slightly less demanding intent requirement does not alter the conclusion that this language is intended to require bad faith.

[36]*See Woodford v. Ngo*, 548 U.S. ___, 2006 WL 1698937, *14 (2006) ("[I]f we have already provided a definitive interpretation of the language in one statute, and Congress then uses nearly identical language in another statute, we will give the language in the latter statute an identical interpretation unless there is a clear indication in the text or legislative history that we should not do so.").

In summary, any inherent vagueness in the terms "relating to the national defense" or "entitled to receive" as used in §§ 793(d) and (e) is cured through the judicial glosses that have been added to these phrases. To the extent that oral transmission of information relating to the national defense makes it more difficult for defendants to know whether they are violating the statute, the statute is not thereby rendered unconstitutionally vague because the statute permits conviction only of those who "willfully" commit the prohibited acts and do so with bad faith. So construed, both phrases pass Fifth Amendment muster; they are not unconstitutionally vague as applied to these defendants.

## D.

Seeking to avoid this conclusion, defendants argue that notwithstanding the clarity of the statute's language, the application of the statute to these defendants is so novel and unprecedented that it violates the fair warning prong of the vagueness doctrine. As explained *supra*, the constitutionally required clarity of a statute may be provided through the gloss of judicial interpretation, and it is precisely the judicial glosses on § 793 that save the statute from defendants' vagueness challenge. The corollary of this principle is that "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266. This principle is animated by the same concern for fair warning that animates the Constitution's prohibition of ex post facto laws. As the Supreme Court has stated:

> [A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law, such as Art. I, s. 10, of the Constitution forbids . . . . If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by

-36-

judicial construction.

*Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1967) (prohibiting application of criminal

trespass statute to sit-in demonstrators when neither the language of the statute nor past precedent

gave adequate warnings that conduct was proscribed).[37]  Thus, the test under these precedents is

whether the language and application of the statute has provided defendants adequate warning

that their conduct was proscribed.  Section 793, as-applied here, meets this test; its language and

history provided adequate warning to these defendants that the statute proscribed the alleged

conduct.

Defendants argue that the present prosecution represents a novel construction of the

statute which they could not have anticipated because "leaks" of classified information by non-

governmental persons have never been prosecuted under this statute.  The statute's plain

language rebuts this argument.[38]  It is clear from this plain language that defendants' conduct, as

alleged in the superseding indictment is within the sweep of the statute.  This is in sharp contrast

to the statute in *Bouie*, which "on its face is narrow and precise," lulling "the potential defendant

into a false sense of security, giving him no reason even to suspect that conduct clearly outside

the scope of the statute as written will be retroactively brought within it by an act of judicial

---

[37]*See also Marks v. United States*, 430 U.S. 188, 191-92 (1977) (reversing a federal conviction for transport of obscene material because it rested on an unforeseeable change in the Supreme Court's definition of obscenity); *Rabe v. Washington*, 405 U.S. 313, 315 (reversing a conviction under a state obscenity law because it rested on an unforeseeable judicial construction of the statute).

[38]In amending the statute in 1950, Congress made it quite clear that the statute was intended to apply to the transmission of national defense information by non-government employees by adding subsection (e).  Similarly, as previously discussed, by adding the term "information" to the statute Congress plainly meant to ensure that the oral communication of information was within the statute's ambit.

construction." *Bouie*, 378 U.S. at 352.  The same cannot fairly be said of § 793.  It follows, that

in contrast to the *Bouie* defendants, the defendants here cannot argue persuasively that the result

reached here amounts to an unforeseeable judicial enlargement of § 793.

And, it is useful in this regard to address defendants' frequent use of the term "leak" in

advancing their argument that there was not constitutionally adequate notice that the statute

reached the alleged conduct.  The term "leak," at bottom, connotes in this context, an

unpermitted or unauthorized transmission or transfer of information, which of course, is an act

plainly within § 793, assuming all the other requirements are met.  So, labeling an event a "leak"

does not remove the event from the statute's scope.  At best, the term "leak" is a euphemism used

to imply or suggest to a careless reader that the transmission of the information was somehow

authorized.  Whether the "leaks" or transmissions of information in this case were authorized is

likely to be a sharply controverted issue in this case and if the government does not carry its

burden of showing that the transfers of information were unauthorized, the prosecution fails.  But

the analysis here proceeds, as it must, on the superseding indictment's allegations, including the

allegation that all transmissions of NDI were unauthorized.  At this point, therefore, defendants

frequent use of "leak" as a characterization of what occurred is unavailing.

Also unsuccessful is defendants' claim that past applications of the statute fail to provide

fair warning that the statute could be applied to the facts alleged in the superseding indictment.

*Morison* itself rebuts this claim.  Notably, in *Morison* the Fourth Circuit considered the very

similar argument that the statute was intended to apply only to classic espionage cases and

therefore did not apply to Morison's "leak" to a news publication.  In rejecting this argument, the

Fourth Circuit noted the rarity of prosecutions under § 793(e), but stated—

that the rarity of prosecution under the statutes does not indicate that the statutes were not to be enforced as written.  We think in any event, the rarity of use of the statute as a basis for prosecution is at best a questionable basis for nullifying the clear language of the statute, and we think the revision of 1950 and its reenactment of section 793(d) demonstrate that Congress did not consider such statute meaningless or intend that the statute and its prohibitions were to be abandoned.

*Morison*, 844 F.2d at 1067.  The Fourth Circuit's reasoning in rejecting Morison's challenge is equally applicable to the defendants here, and therefore, for the same reasons, defendants' vagueness challenge based on the novelty of this prosecution fails as well.

## V.

The defendants' next constitutional challenge rests on the First Amendment's guarantees of free speech and the right to petition the government for grievances.[39]  Defendants raise this First Amendment challenge to the statute as applied to them, and under the doctrine of overbreadth, as applied to those third parties not currently before the Court who may be prosecuted under the statute in the future.  *See Village of Schaumburg v. Citizens for a Better Envt.*, 444 U.S. 620, 634 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the Court.").  Defendants' First Amendment challenge exposes the inherent tension between the government transparency so essential to a democratic society and the government's equally compelling need to protect from disclosure information that could be used by those who wish this nation harm.  In addressing this tension, it

_____

[39]The First Amendment states in full as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amd. I.

is important to bear in mind that the question to be resolved here is not whether § 793 is the

optimal resolution of this tension, but whether Congress, in passing this statute, has struck a

balance between these competing interests that falls within the range of constitutionally

permissible outcomes.  *See Dennis v. United States*, 341 U.S. 494, 525 (1951) (Frankfurter, J.,

concurring).

As an initial matter, it is necessary to confront the government's proposed categorical rule

that espionage statutes cannot implicate the First Amendment.  This contention overreaches.  In

the broadest terms, the conduct at issue — collecting information about United States' foreign

policy and discussing that information with government officials (both United States and

foreign), journalists, and other participants in the foreign policy establishment — is at the core of

the First Amendment's guarantees.  *See Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("[T]here is

practically universal agreement that a major purpose of [the First] Amendment was to protect the

free discussion of governmental affairs.").  And, even under a more precise description of the

conduct — the passing of government secrets relating to the national defense to those not entitled

to receive them in an attempt to influence United States foreign policy — the application of

§ 793 to the defendants is unquestionably still deserving of First Amendment scrutiny.  Indeed,

the government's proposed categorical rule has been rejected by the Supreme Court in other

contexts, and should be rejected here, as well.  As the Supreme Court stated:

> Like insurrection, contempt, advocacy of unlawful acts, breach of the peace,
> obscenity, solicitation of legal business, and the various other forumulae for the
> repression of expression that have been challenged in this Court, libel can claim
> no talismanic immunity from constitutional limitations.  It must be measured by

standards that satisfy the First Amendment.[40]

So, too, the mere invocation of "national security" or "government secrecy" does not foreclose a First Amendment inquiry. *See Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring) ("The First Amendment interest in informed popular debate does not simply vanish at the invocation of the words 'national security.'").

The Fourth Circuit's holding in *Morison*, chiefly relied on by the government to support its position, is not to the contrary.  While Judge Russell, writing for the panel, found that the statute's application to Morison did not implicate the First Amendment, both Judge Wilkinson and Judge Phillips wrote separately to express their respective views that the First Amendment *was* implicated by Morison's prosecution, but that the government's interest in that case was sufficient to overcome Morison's First Amendment rights.  *Compare Morison*, 844 F.2d at 1068 (Russell, J.) ("[W]e do not perceive any First Amendment rights to be implicated here.") *with id.* at 1081 (Wilkinson, J., concurring) ("I do not think the First Amendment interests here are insignificant."); *id.* at 1085 (Phillips, J., concurring) ("I agree with Judge Wilkinson's differing view that the first amendment issues raised by Morison are real and substantial and require the serious attention which his concurring opinion then gives them.").  Thus, the panel majority in *Morison* viewed the application of § 793(e) to Morison as implicating the First Amendment. Also worth noting is that the conduct alleged here is arguably more squarely within the ambit of

---

[40]*New York Times v. Sullivan*, 376 U.S. 254, 269 (1964) (citing *Herndon v. Lowry*, 301 U.S. 242 (1937) (insurrection); *Bridges v. California*, 314 U.S. 252 (1941) (contempt); *Pennekamp v. Florida*, 328 U.S. 331 (1946) (contempt); *De Jonge v. State of Oregon*, 299 U.S. 353 (1937) (advocacy of unlawful acts); *Edwards v. South Carolina*, 372 U.S. 229 (1963) (breach of the peace); *Roth v. United States*, 354 U.S. 476 (1957) (obscenity); and *NAACP v. Button*, 371 U.S. 415 (1963) (solicitation of legal business)).

the First Amendment than Morison's conduct.  Morison was convicted of "purloining from the intelligence files of the Navy national defense materials clearly marked as 'Intelligence Information' and 'Secret' and for transmitting that material to 'one not entitled to receive it.'" *Morison*, 844 F.2d at 1067.  In the instant case, defendants are accused of the unauthorized possession of information relating to the national defense, which they then orally communicated to others, all within the context of seeking to influence United States foreign policy relating to the Middle East by participating in the public debate on this policy.  In the end, the government's attempt to invoke Judge Russell's analogy of Morison's conduct to theft is, at the very least, strained.  For these reasons, *Morison* cannot be taken to stand for the proposition that prosecutions brought pursuant to § 793 do not implicate the First Amendment.

Nor do early decisions interpreting other provisions of the Espionage Act support the government's argument that this prosecution does not implicate the First Amendment.  These cases dealt with prosecutions under Section 3 of Title I of the Espionage Act, which prohibited certain disruptions of the nation's war efforts.[41]  When considering First Amendment challenges

---

[41]Section 3 of Title I of the Espionage Act provided:

> Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States or to promote the success of its enemies and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, shall be punished by a fine not more than $10,000 or imprisonment for not more than twenty years, or both.

40 Stat. 217, 219 (1917).  This provision was amended by the Sedition Act of May 16, 1918, which prohibited individuals from saying anything with the intent to obstruct the sale of war bonds; to "utter, print, write, or publish any disloyal, profane, scurrilous, or abusive language" intended to cause contempt or scorn for the form of government of the United States, the

-42-

to prosecutions under this statute, the Supreme Court did not adopt a categorical rule that

prosecutions under the Espionage Act did not implicate the First Amendment, but carefully

weighed the government's interest in prosecuting the war against the defendants' First

Amendment interests.  Justice Holmes, writing for the majority in *Schenck*, famously formulated

a shorthand for this balancing approach:

> The question in every case is whether the words used are used in such
> circumstances and are of such a nature as create a clear and present danger that
> they will bring about the substantive evils that Congress has a right to prevent.  It
> is a question of proximity and degree.

*Schenck v. United States*, 249 U.S. 47, 52 (1919).  The Supreme Court engaged in this balancing

approach in subsequent Espionage Act cases, and while the convictions were uniformly upheld,

Justice Holmes frequently dissented or joined Justice Brandeis' dissent on the ground that the

harm to the nation's interest was insufficient to overcome the defendants' First Amendment

rights to free speech in the particular case.[42]   Thus, these cases refute do not support the

government's claim for a categorical rule that Espionage Act prosecutions are immune from First

Amendment scrutiny; but rather that, with respect to the First Amendment, "the character of

---

Constitution, or the flag; to urge the curtailment of production of war materials with the intent of
hindering the war effort; or to utter any words supporting the cause of any country at war with the
United States or opposing the cause of the United States."  *See* 40 Stat. 553 (1918).

[42]*See Abrams v. United States*, 250 U.S. 616, 628 (1919) (Holmes, J., dissenting) ("It is
only the present danger of immediate evil or an intent to bring it about that warrants Congress in
setting a limit to the expression of opinion where private rights are not concerned."); *Schaefer v.
United States*, 251 U.S. 466, 483 (Brandeis, J., dissenting) ("The question whether in a particular
instance the words spoken or written fall within the permissible curtailment of free speech is,
under the rule enunciated by this court, one of degree; and because it is a question of degree the
field in which the jury may exercise its judgment is necessarily a wide one. But its field is not
unlimited."); *Pierce v. United States*, 252 U.S. 239, 272 (1920) (Brandeis, J., dissenting). *See
also Gitlow v. New York*, 268 U.S. 652, 672 (1925) (Holmes, J., dissenting).

every act depends on the circumstances in which it was done." *Schenck*, 249 U.S. at 52; *see also*

*Dennis v. United States*, 341 U.S. 494, 544 (1951) (Frankfurter, J., concurring) ("We have

frequently indicated that the interest in protecting speech depends on the circumstances of the

occasion.").  Indeed, subsequent Supreme Court decisions have confirmed that while the First

Amendment must yield at times to the government's interest in national security, at other times,

the First Amendment interests at stake must prevail.[43]

Given that the application of the statute to these defendants warrants First Amendment

scrutiny, the question then becomes whether Congress may nonetheless penalize the conduct

alleged in the superseding indictment, for while the invocation of "national security" does not

free Congress from the restraints of the First Amendment, it is equally well established that the

invocation of the First Amendment does not "provide immunity for every possible use of

language," *Frohwerk*, 249 U.S. 204, 206 (1919), and that "the societal value of speech must, on

occasion, be subordinated to other values and considerations." *Dennis v. United States*, 341 U.S.

---

[43]*Compare Haig v. Agee*, 453 U.S. 280, 309 (1981) (upholding the Secretary of State's revocation of a former CIA employee's passport for exposing the identities of covert CIA agents in various places around the world despite the former employee's Fifth amendment right to travel and First Amendment rights); *Snepp v. United States*, 444 U.S. 507, 515 (1980) (per curiam) (imposing a constructive trust on book profits of former CIA agent who failed to submit book to CIA for pre-publication review); *Greer v. Spock*, 424 U.S. 828, 838 (1976) (upholding regulation prohibiting political speeches on military base); *Zemel v. Rusk*, 381 U.S. 1 (1965) (upholding restrictions on travel to Cuba from First Amendment challenge because "the right to speak and publish does not carry with it the unrestrained right to gather information."); *Dennis v. United States*, 341 U.S. 494, 510 (upholding conviction for conspiracy to advocate the overthrow of the United States government) *with United States v. New York Times*, 403 U.S. 713, 714 (1971) (per curiam) (denying government's request for injunction barring publication of the Pentagon Papers); *Brandenburg v. Ohio*, 395 U.S. 444, 448-49 (1969) (per curiam) (reversing conviction under Ohio criminal syndicalism statute because it failed to distinguish mere advocacy from incitement to "imminent lawless action."); *United States v. Robel*, 389 U.S. 258 (1967) (holding that provision making it unlawful for Communists to gain employment in defense industry violated First Amendment freedom of association).

494, 503 (1951).  As Justice Frankfurter aptly put it in *Dennis*:

> The demands of free speech in a democratic society as well as the interest in national security are better served by a candid and informed weighing of the competing interests, within the confines of the judicial process, than by announcing dogmas too inflexible for the non-Euclidian problems to be solved.

*Dennis*, 341 U.S. at 524-25 (Frankfurter, J., concurring).  Thus, to determine, on any given occasion, whether the government's interest prevails over the First Amendment, courts must begin with "an assessment of the competing societal interests" at stake, *Morison*, 844 F.2d at 1082 (quoting *Saxbe v. Washington Post Co.*, 417 U.S. 843, 859-60 (1974) (Powell, J., dissenting)), and proceed to the "delicate and difficult task" of  weighing those interests "to determine whether the resulting restriction on freedom can be tolerated."  *United States v. Robel*, 389 U.S. 258, 264 (1967) (quoting *Schneider v. State of New Jersey*, 308 U.S. 147, 161 (1939)).

As already noted, the defendants' First Amendment interests at stake in this prosecution, and those of the third parties raised by defendants, are significant and implicate the core values the First Amendment was designed to protect.  The collection and discussion of information about the conduct of government by defendants and others in the body politic is indispensable to the healthy functioning of a representative government, for "[a]s James Madison put it in 1822: 'A popular Government, without popular information, or a means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both.'"  *Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring) (quoting 9 Writings of James Madison 103 (G. Hunt ed. 1910)).  This is especially so in the context of foreign policy because, as Justice Stewart observed in the Pentagon Papers case:

> In the absence of the government checks and balances present in other areas of our national life, the only effective restraint upon executive policy and power in the areas of national defense and international affairs may lie in an enlightened citizenry — in an informed and critical public opinion which alone can here

protect the values of democratic government.

*New York Times v. United States*, 403 U.S. 713, 728 (1971) (Stewart J., concurring).

And, of course, this interest extends to information the government would prefer to keep secret

since "[t]here exists the tendency, even in a constitutional democracy, for government to

withhold reports of disquieting developments and to manage news in a fashion most favorable to

itself." *Morison*, 844 F.2d at 1081 (Wilkinson, J., concurring). *See also Halperin v. Kissinger*,

606 F.2d 1192, 1204 n.77 (D.C.Cir. 1979) (noting "the well-documented practice of classifying

as confidential much relatively innocuous or noncritical information."). Due regard for this

tendency requires the close judicial scrutiny of any government restriction on the "free flow of

information and ideas essential to effective self-government." *Morison*, 844 F.2d at 1081

(quoting *Saxbe*, 417 U.S. at 863).

But importantly, the defendants here are not accused merely of disclosing government

secrets, they are accused of disclosing NDI, *i.e.*, government secrets the disclosure of which

could threaten the security of the nation. And, however vital an informed public may be, it is

well established that disclosure of certain information may be restricted in service of the nation's

security, for "[i]t is 'obvious and unarguable' that no governmental interest is more compelling

than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v.

Secretary of State*, 378 U.S. 500, 509 (1964)).[44] And, as the Supreme Court has repeatedly noted,

one aspect of the government's paramount interest in protecting the nation's security is the

_____

[44]*See also Dennis*, 341 U.S. at 519 (Frankfurter, J., concurring) ("The right of a
government to maintain its existence–self-preservation–is the most pervasive aspect of
sovereignty. 'Security against foreign danger,' wrote Madison, 'is one of the primitive objects of
civil society.'") (quoting The Federalist No. 41).

government's "compelling interest in protecting both the secrecy of information important to our

national security and the appearance of confidentiality so essential to the effective operation of

our foreign intelligence service." *Snepp*, 444 U.S. at 509 n.3.[45]  Thus, the right to free speech and

the value of an informed citizenry is not absolute and must yield to the government's legitimate

efforts to ensure "the environment of physical security which a functioning democracy requires."

*Morison*, 844 F.2d at 1082.  This point is best expressed in the Supreme Court's pithy phrase that

"while the Constitution protects against the invasion of individual rights, it is not a suicide pact."

*Aptheker*, 378 U.S. at 509 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963)).[46]

        Of course, the abstract proposition that the rights protected by the First Amendment must

at times yield to the need for national security does not address the concrete issue of whether the

§ 793, as applied here, violates the First Amendment.  This determination depends on whether

§ 793 is narrowly drawn to apply only to those instances in which the government's need for

secrecy is legitimate, or whether it is too indiscriminate in its sweep, seeking in effect, to excise

the cancer of espionage with a chainsaw instead of a scalpel.  In this respect, the first clause of

---

[45]*See also Chicago & Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 111 (1948) (The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. "); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) ("[The President] has his confidential sources of information.  He has his agents in the form of diplomatic, consular and other officials.  Secrecy in respect of information gathered by them may be highly necessary, and the premature disclosure of it productive of harmful results.").

[46]Nor would the drafters of the First Amendment question the propriety of government secrecy in aid of the national security.  *See, e.g., United States v. Marchetti*, 466 F.2d 1309, 1316 (4th Cir. 1972) (quoting Louis Henkin, *The Right to Know and the Duty to Withhold: the Case of the Pentagon Papers*, 120 U.Pa.L.Rev. 271, 273-74 (1971)) (noting the frequent and uncontroversial employment of government secrecy since the constitutional convention).

§ 793(e) implicates only the defendants' right to disclose, willfully, information the government

has sought to keep confidential due to the potential harm its disclosure poses to the national

security in situations in which the defendants have reason to believe that such disclosure could be

used to injure the United States or aid a foreign government.  Likewise, § 793(d), which

defendants are charged with conspiring to violate, implicates the same interests, but is limited to

those people – generally government employees or contractors – with authorized possession of

the information.  Thus, it seems fair to say that § 793, taken together with its judicial glosses, is

more the result of a legislative scalpel and not a chainsaw.  This, however, does not end the

analysis.

    As defendants correctly argue, the analysis of the First Amendment interests implicated

by §§ 793(d) and (e) depends on the relationship to the government of the person whose First

Amendment rights are implicated.  In this respect, there are two classes of people roughly

correlating to those subject to prosecution under § 793(d) and those subject to prosecution under

§ 793(e).  The first class consists of persons who have access to the information by virtue of their

official position.[47]  These people are most often government employees or military personnel

with access to classified information,[48] or defense contractors with access to classified

---

[47]These people could be prosecuted under § 793(d) or § 793(e) depending on whether
they were authorized to possess the information they accessed through their official positions
with the government.

[48]*See, e.g., United States v. Pollard*, 959 F.2d 1011 (D.C.Cir. 1992); *Morison*, 844 F.2d
1057 (4th Cir. 1988); *United States v. Kampiles*, 609 F.2d 1233 (7th Cir. 1979); *United States v.
Doe*, 455 F.2d 1270 (1st Cir. 1972); *United States v. Regan*, 228 F.Supp.2d 742 (E.D.Va. 2002);
*United States v. Allen*, 31 M.J. 572 (N.M.C.M.R. 1990); *United States v. Safford*, 1969 WL 6134
(A.B.R. 1969).

information,[49] and are often bound by contractual agreements whereby they agree not to disclose classified information.  As such, they are in a position of trust with the government.  The second class of persons are those who have no employment or contractual relationship with the government, and therefore have not exploited a relationship of trust to obtain the national defense information they are charged with disclosing, but instead generally obtained the information from one who has violated such a trust.[50]

There can be little doubt, as defendants readily concede, that the Constitution permits the government to prosecute the first class of persons for the disclosure of information relating to the national defense when that person knew that the information is the type which could be used to threaten the nation's security, and that person acted in bad faith, *i.e.*, with reason to believe the disclosure could harm the United States or aid a foreign government.  Indeed, the relevant precedent teaches that the Constitution permits even more drastic restraints on the free speech rights of this class of persons.  Thus, in *United States v. Marchetti*, 466 F.2d 1309 (4th Cir. 1972), the Fourth Circuit held that enforcement of a secrecy agreement, signed by Marchetti when he began his employment with the CIA, and a secrecy oath, signed upon his departure from the CIA, did not violate the First Amendment despite the prior restraint on Marchetti's speech. *Id.* at 1311.  In so holding the Fourth Circuit recognized that:

Citizens have the right to criticize the conduct of our foreign affairs, but the

---

[49]*See, e.g.*, *United States v. Poulsen*, 41 F.3d 1330 (9th Cir. 1994); *United States v. Zettl*, 835 F.2d 1059 (4th Cir. 1987); *United States v. Walker*, 796 F.2d 43 (4th Cir. 1986); *United States v. Boyce*, 594 F.2d 1246 (9th Cir. 1979).

[50]*See, e.g., United States v. Truong*, 629 F.2d 908 (4th Cir. 1980); *United States v. Lee*, 589 F.2d 980 (9th Cir. 1979); *United States v. Ntube*, No. 93-0322-2, 1996 WL 808068 (D.D.C. 1996).

government also has the right and the duty to strive for internal secrecy about the
conduct of governmental affairs in areas in which disclosure may reasonably be
thought to be inconsistent with the national interest.

*Id.* at 315.  In light of this principle, the Fourth Circuit determined that the secrecy agreements

signed by Marchetti were a reasonable means of protecting the government's interest in

preserving secrecy about U.S. intelligence activities because "the Government's need for secrecy

in this area lends justification to a system of prior restraint."  Similarly, in *Snepp v. United States*,

444 U.S. 507 (1980) (per curiam), the Supreme Court upheld the imposition of a constructive

trust on the profits of a book published by a former CIA officer who had deliberately avoided

submitting the book to the CIA for prepublication review.  *Id.* at 508-09.  In so doing, the

Supreme Court did not require that the government prove that the book actually contained

classified information, noting that "a former intelligence agent's publication of unreviewed

material relating to intelligence activities can be detrimental to vital national interests even if the

published information is unclassified."  *Id.* at 511-12.  *See also Haig v. Agee*, 453 U.S. 280, 308

(1981) ("Agee is as free to criticize the United States government as he was when he held a

passport – always subject, of course, to express limits on certain rights by virtue of his contract

with the government.").

Taken together, *Marchetti* and *Snepp* stand for the proposition that government

employees' speech can be subjected to prior restraints where the government is seeking to protect

its legitimate national security interests.  Because prior restraints on speech are the most

constitutionally suspect form of a government restriction,[51] it follows from this proposition that

Congress may constitutionally subject to criminal prosecution anyone who exploits a position of

_____

[51]*See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971).

trust to obtain and disclose NDI to one not entitled to receive it.  The Fourth Circuit confirmed

this conclusion by unanimously upholding Morison's conviction under §§ 793(d) and (e),

subject, as noted, to the limitation that a document or photograph related to the national defense

must be potentially harmful to the United States.  For this reason, the government may

constitutionally punish government employees like Franklin for the willful disclosure of national

defense information, and if the government proves the defendants conspired with Franklin in his

commission of that offense, they may be subject to prosecution, as well.  18 U.S.C. § 793(g).

But the analysis must go beyond this because the defendants are also charged with

conspiring to violate § 793(e) for their own disclosures of NDI to those not entitled to receive it.

In this regard, they belong in the second class of those subject to prosecution under § 793 —

namely, those who have not violated a position of trust with the government to obtain and

disclose information, but have obtained the information from one who has.  The defendants argue

that unlike Morison, Marchetti or Snepp, they did not agree to restrain their speech as part of

their employment, and accordingly their First Amendment interests are more robust.  In this

respect, it is true that Morison was a naval intelligence officer working in a secure vaulted area,

and had signed a Non-Disclosure Agreement expressly acknowledging his liability to prosecution

under the espionage provisions for any unauthorized disclosure of classified information.  And

for this reason, when Morison disclosed classified information to *Jane's Defence Weekly*, it was

not only potentially harmful to the United States, it was a violation of his agreement with the

United States and a violation of trust.  *Morison*, 844 F.2d at 1060.  Indeed, this fact was central to

the Fourth Circuit's rejection of Morison's First Amendment Challenge.  Thus, Judge Russell,

writing for the majority, stated:

> [I]t seems beyond controversy that a recreant intelligence department employee who had abstracted from the government files secret intelligence information and had willfully transmitted or given it to one "not entitled to receive it" as did the defendant in this case, is not entitled to invoke the First Amendment as a shield to immunize his act of thievery.

*Id.* at 1069.  Judge Wilkinson likewise emphasized Morison's position as a government employee when he upheld the prosecution from Morison's First Amendment attack.  *See id.* at 1085 (Wilkinson, J., concurring) ("[I]t is important to emphasize what is *not* before us today.  This prosecution was not an attempt to apply the espionage statute to the press for either the receipt or publication of classified materials. . . . Such questions are not presented in this case, and I do not read Judge Russell's opinion to express any view on them.").  Similarly, in the litigation over the government's classification determinations following Marchetti's submission of his manuscript to the CIA, the Fourth Circuit held that "the First Amendment is [not a] bar against an injunction forbidding the disclosure of classifiable information," because "[w]ith respect to such information, by his execution of the secrecy agreement and his entry into the confidential employment relationship, [Marchetti] effectively relinquished his First Amendment rights."  *Alfred A. Knopf, Inc. v. Colby,* 509 F.2d 1362, 1370 (4th Cir. 1975).

One possible implication of this language is that a special relationship with the government is necessary before the government may constitutionally punish the disclosure of information relating to the national defense.  Seizing upon this possible implication, defendants here contend that the First Amendment bars Congress from punishing those persons, like defendants, without a special relationship to the government for the disclosure of NDI.  In essence, their position is that once a government secret has been leaked to the general public and the first line of defense thereby breached, the government has no recourse but to sit back and

-52-

watch as the threat to the national security caused by the first disclosure multiplies with every

subsequent disclosure.  This position cannot be sustained.  Although the question whether the

government's interest in preserving its national defense secrets is sufficient to trump the First

Amendment rights of those not in a position of trust with the government is a more difficult

question, and although the authority addressing this issue is sparse, both common sense and the

relevant precedent point persuasively to the conclusion that the government can punish those

outside of the government for the unauthorized receipt and deliberate retransmission of

information relating to the national defense.

Of course, in some instances the government's interest is so compelling, and the

defendant's purpose so patently unrelated to the values of the First Amendment, that a

constitutional challenge is easily dismissed.  The obvious example is the unauthorized disclosure

of troop movements or military technology to hostile foreign powers by non-governmental

persons, conduct typically prosecuted under § 794.[52]  But this is not such a case; the government

has not charged the defendants under § 794(a), and therefore the most relevant precedent,

although it dealt with the freedom of press, is the Supreme Court's decision in *New York Times*

*Co. v. United States*, 403 U.S. 713 (1971) (per curiam).  There, the Supreme Court, in a brief *per*

*curiam* decision, denied the United States' request for an injunction preventing the New York

Times and Washington Post from publishing the contents of a classified historical study of

---

[52]*See, e.g., United States v. Rosenberg*, 195 F.2d 583, 591 (2d Cir. 1952) (stating in a
§ 794(a) prosecution that "[t]he communication to a foreign government of secret material
connected with the national defense can by no far-fetched reasoning be included within the area
of First Amendment protected free speech.").  *See also Near v. Minnesota*, 283 U.S. 697, 716
(1931) ("No one would question but that a government might prevent . . . the publication of the
sailing dates of transports or the number and location of troops.") (citing Z. Chafee, Freedom of
Speech 10 (1920)).

United States policy towards Vietnam, known colloquially as the Pentagon Papers, on the ground

that the government failed to overcome the heavy presumption against the constitutionality of a

prior restraint on speech.  *See id.* at 714.  The *per curiam* decision was accompanied by six

concurring opinions and three dissents, and although the issue was not directly before the Court,

a close reading of these opinions indicates that the result may have been different had the

government sought to prosecute the newspapers under § 793(e) subsequent to the publication of

the Pentagon Papers.  Of the six Justices concurring in the result three—Justices Stewart, White

and Marshall—explicitly acknowledged the possibility of a prosecution of the newspapers under

§ 793(e).[53]   And, with the exception of Justice Black, whose First Amendment absolutism has

never commanded a majority of the Supreme Court, the opinions of the other concurring justices

arguably support, or at least do not contradict, the view that the application of § 793(e) to the

instant facts would be constitutional.  Justice Douglas's rejection of the potential applicability of

§ 793(e) to that case rested on his view that Congress specifically excluded "publication" from its

prohibited acts.  *See id*. at 720-22 (Douglas J., concurring).  The obvious implication of Justice

Douglas' opinion is that the communication – as opposed to publication – of information relating

to the national defense could be prosecuted under § 793(e).  Likewise, while Justice Brennan did

not specifically address the espionage statutes, his concurrence was based on the heavy

presumption against the constitutionality of prior restraints. *See id.* at 725-27 (Brennan, J.,

---

[53]*See id.* at 730 (Stewart, J., concurring) ("Undoubtedly Congress has the power to enact specific and appropriate criminal laws to protect government property and preserve government secrets.  Congress has passed such laws, and several of them are of very colorable relevance to the apparent circumstances of these cases."); *id.* at 737 (White, J., concurring) ("I would have no difficulty in sustaining convictions under these sections on facts that would not justify the intervention of equity and the imposition of a prior restraint."); *id.* at 745 (Marshall, J., concurring) (noting the possible relevance of 18 U.S.C. § 793(e)).

concurring).  Thus, among the concurring justices, only Justice Black seemed to favor a

categorical rule preventing the government from enjoining the publication of information to the

detriment of the nation's security, and even he relied on the absence of congressional authority as

a basis for denying the requested injunction.  *See id.* at 718 (Black, J., concurring).  Furthermore,

while the dissenting justices chiefly objected to the feverish manner of the Supreme Court's

review of the case, a survey of their opinions indicates the likelihood that they would have

upheld a criminal prosecution of the newspapers as well.  *See id.* at 752 (Burger, C. J., dissenting)

757 (Harlan, J., dissenting); *id.* at 761 (Blackmun, J., dissenting).  Thus, the Supreme Court's

discussion of § 793(e) in the Pentagon Papers case supports the conclusion that § 793(e) does not

offend the constitution.  While the Supreme Court's discussion of the application of § 793(e) to

the newspapers is clearly *dicta*, lower courts "are bound by the Supreme Court's considered *dicta*

almost as firmly as by the Court's outright holdings, particularly when, as here, a *dictum* is of

recent vintage and not enfeebled by any subsequent statement."  *McCoy v. Massachusetts*

*Institute of Technology*, 950 F.2d 13, 19 (1st Cir. 1991); *see also Gaylor v. United States*, 74

F.3d 214, 217 (10th Cir. 1996); *Reich v. Continental Gas Co.*, 33 F.3d 754, 757 (7th Cir. 1994);

*United States v. Bell*, 524 F.2d 202, 206 (2d Cir.1975); *Fouts v. Maryland Casualty Co.*, 30 F.2d

357, 359 (4th Cir. 1929).  In sum, Congress's attempt to provide for the nation's security by

extending punishment for the disclosure of national security secrets beyond the first category of

persons within its trust to the general populace is a reasonable, and therefore constitutional

exercise of its power.

It must be emphasized, however, that this conclusion rests on the limitation of § 793 to

situations in which national security is genuinely at risk; without this limitation, Congress loses

its justification for limiting free expression.  It was for this reason that the concurrences of Judge

Wilkinson and Judge Phillips in *Morison* insisted on the need for a jury instruction limiting

"information relating to the national defense" to information "potentially damaging to the United

States or . . . useful to an *enemy* of the United States."  *See Morison*, 844 F.2d at 1084

(Wilkinson, J., concurring) (emphasis added); *id.* at 1086 (Phillips, J., concurring).  As Judge

Wilkinson pointed out, use of this limiting instruction avoids "the possibility that the broad

language of this statute would ever be used as a means of publishing mere criticism of

incompetence in and corruption in the government."  *Id.* at 1084.  For this reason, "the espionage

statute has no applicability to the multitude of leaks that pose no conceivable threat to national

security, but threaten only to embarrass one or another high government official."  *Id.* at 1085

(Wilkinson, J., concurring).  Thus, the requirement that the information potentially damage the

United States properly "confine[s] prosecution [under § 793] to cases of serious consequence to

our national security."  *Id.* (Wilkinson, J., concurring).

    Nor is this judicial limitation on the meaning of "information relating to the national

defense" obviated or rendered unnecessary by the additional scienter requirement that the

defendants, in communicating the information allegedly received from their government sources,

must have reason to believe the communication "could be used to the injury of the United States

or to the advantage of any foreign nation."  18 U.S.C. §§ 793(d) and (e).  This scienter

requirement, by itself, is inadequate protection against a First Amendment challenge for three

reasons, all of which are related to the need for the government to justify its restriction on free

speech.  First, the requirement that the defendant have "reason to believe [the disclosure of

information] could be used to the injury of the United States or to the advantage of any foreign

nation" applies only to the communication of "information,"[54] and therefore, the intrinsic limitation of the term "relating to the national defense" to items potentially damaging to the United States is required to avoid rendering the statute unconstitutionally overbroad where persons exercise their First Amendment rights by transmitting a tangible item related to the national defense. *See Morison*, 844 F.2d at 1084-86.  Thus, to take a hypothetical example, without this limitation the statute could be used to punish a newspaper for publishing a classified document that simply recounts official misconduct in awarding defense contracts.  As demonstrated by the concurrences in *Morison*, such a prosecution would clearly violate the First Amendment.

Second, the scienter requirement is in the disjunctive—"reason to believe [the information] could be used to the injury of the United States *or* to the advantage of a foreign nation"—implying that the statute would permit prosecution for the communication of information in instances where there is no reason to believe the information could harm the United States, but there is reason to believe it could be used to the advantage of a foreign nation. For example, absent the judicial limitation on NDI, the statute would reach disclosure of the government's closely held secret that a foreign nation is sitting atop a huge oil reserve, when the disclosure of such information cannot plausibly cause harm to the United States.  This result is inconsistent with the obvious purpose of the statute and the command of the First Amendment, and must be rejected.  As Judge Hand observed in the context of the similar phrase in Section 2 of the Espionage Act (currently codified at § 794(a)):

---

[54]*See* Edgar and Schmidt, *Espionage Statutes*, 73 Colum.L.Rev. at 1023 (citing S.Rep.No. 427, 80th Cong., 1st<sup>t</sup> Sess. 7 (1949)); *id.* at 1024 (H.R.Rep.No. 647, 81st Cong., 1st Sess. (1949)).

> The section as enacted necessarily implies that there are some kinds of information 'relating to the national defense' which must not be given to a friendly power, not even to an ally, no matter how innocent, or even commendable, the purpose of the sender may be.  Obviously, so drastic a repression of the free exchange of information it is wise carefully to scrutinize, lest extravagant and absurd consequences result.

*United States v. Heine*, 151 F.2d 813, 815 (2d Cir. 1945).   Although Judge Hand reversed

Heine's conviction on the ground that the information was not closely held, his reasoning also

supports the need for limiting NDI to that information which is potentially harmful to the United

States, "lest extravagant and absurd consequences result."

Finally, even when a person is charged with the transmission of intangible "information"

the person had "reason to believe could be used to the injury of the United States," the

application of the statute without the requirement that disclosure of the information be potentially

harmful to the United States would subject non-governmental employees to prosecution for the

innocent, albeit negligent, disclosure of information relating to the national defense.  Punishing

defendants engaged in public debate for unwittingly harming a legitimate government interest is

inconsistent with the Supreme Court's First Amendment jurisprudence.[55]  Limiting the set of

information relating to the national defense to that information which the defendant *knows*, if

disclosed, is potentially harmful to the United States, by virtue of the statute's willfulness

requirement, avoids this problem.  Thus, for these reasons, information relating to the national

---

[55]*See, e.g., BE & K Construction Co. v. N.L.R.B.*, 536 U.S. 516, 531 (2002) (limiting regulation of retaliatory suits to those "both objectively *and* subjectively motivated by an unlawful purpose" on the First Amendment grounds); *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964) (holding that suits brought by public officials claiming defamation must allege both false statements and the subjective intent or reckless disregard of their falsity).  *See also Snepp*, 444 U.S. at 509 ("The district court found that Snepp had 'willfully, deliberately and surreptitiously breached his position of trust with the CIA and the [1968] secrecy agreement' by publishing his book without prepublication review.").

defense, whether tangible or intangible, must necessarily be information which if disclosed, is potentially harmful to the United States, and the defendant must know that disclosure of the information is potentially harmful to the United States.  The alternative construction simply is not sustainable.[56]  So limited, the statute does not violate the defendants' First Amendment guarantee of free speech.

For essentially the same reasons, § 793, as-applied to these defendants, does not violate the defendants' First Amendment right to petition the government for grievances.  The Supreme Court has stated that "[t]he right to petition is cut from the same cloth as the other guarantees of [the First] Amendment, and is an assurance of a particular expression of freedom." *McDonald v. Smith*, 472 U.S. 479, 482 (1985).  Indeed, "this right is implicit in 'the very idea of government, republican in form.'" *Id.* (quoting *United States v. Cruikshank*, 92 U.S. 542, 552 (1876)).  In addition, like the right to free speech, the right to petition the government protects not only the act of petitioning itself, but acts preparatory to such petitioning.  Thus, in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), the Supreme Court acknowledged that the antitrust immunity for petitioning activities recognized in *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 143 (1961), extends to acts "'incidental' to a valid effort to influence governmental action."  *Allied Tube*, 486 U.S. at 499 (citing *Noerr*, 365 U.S. at 143).  *See also Sosa v. DirectTV, Inc.*, 437 F.3d 923, 934-35 (9th Cir. 2006).  Citing this principle,

---

[56]As noted, the additional scienter requirement contained in the "reason to believe" clause that applies to the transmission of intangible information, is not superfluous because it relates not to the nature of the information, but to the subjective understanding of the defendant as to the possible *effect* of the disclosure.  In this sense, it is intended to heighten the required finding of culpable intent in cases where only intangible information has been disclosed, by imposing on the government the burden to prove beyond a reasonable doubt that the defendant acted in bad faith.

defendants argue that the conduct alleged in the superseding indictment is conduct within the "breathing space" of the right to petition the government because their ability to influence policy makers within the executive and legislative branches necessarily requires access to the sensitive information that informs the government's internal debate over foreign policy.  For this reason, defendants contend that § 793 cannot constitutionally be applied to their alleged conduct.

This argument suffers the same fatal flaws as defendants' argument under the First Amendment's free speech guarantee.  Like the First Amendment's guarantee of free speech, the right to petition the government for grievances is not absolute, and may be validly regulated.  *See California Motor Transport*, 404 U.S. at 514-15 ("First Amendment rights may not be used as the means or pretext for achieving 'substantive evils'") (citing *NAACP v. Button*, 371 U.S. 415, 444 (1963)).  Thus, in the libel context, the Supreme Court long ago held, and recently reaffirmed, that libelous petitions sent to the President of the United States may give rise to liability if the petition was "prompted by 'express malice,' which was defined as 'falsehood and the absence of probable cause.'" *McDonald*, 472 U.S. at 484 (quoting *White v. Nicholls*, 3 How. 266, 291 (1845)).  Likewise, in *Brown v. Glines*, 444 U.S. 348 (1980), the Supreme Court denied a First Amendment challenge to "Air Force regulations requiring members of the service to obtain approval from their commanders before circulating petitions on Air Force bases," and permitting denial of such approval whenever "distribution of the material would result in 'a clear danger to the loyalty, discipline, or morale of the Armed Forces, or material interference with the accomplishment of a military mission.'" *Id.* at 349.  This decision was based on the military's substantial interest in maintaining "a respect for duty and a discipline without counterpart in civilian life," and the Supreme Court's judgment that "Air Force regulations restrict speech no

more than necessary to protect the substantial government interest." *Id.* at 354-55.

Nor does the Petition Clause provide absolute immunity from the antitrust laws. While the Supreme Court has interpreted the Sherman Act as not applying to "[j]oint efforts to influence public officials" even when those efforts were "intended to eliminate competition," this immunity does not extend to petitioning activity that is "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Noerr*, 365 U.S. at 138, 144; s*ee also BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525-26 (2002) ("[W]hile genuine petitioning is immune from antitrust liability, sham petitioning is not."). This exception to the otherwise applicable antitrust immunity for petitioning activity applies when the petitioning activity (in this case lawsuits) is both "objectively baseless" and motivated by a subjective intent to use government process to "interfere directly with the business relationships of a competitor." *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60-61 (1993). *See also BE & K Construction Co. v. NLRB,* 536 U.S. 516, 537 (2002) (Scalia, J., concurring) ("[T]he implication of our decision today is that, in a future appropriate case, we will construe the National Labor Relations Act (NLRA) in the same way we have already construed the Sherman Act: to prohibit only lawsuits that are *both* objectively baseless *and* subjectively intended to abuse process."). These cases make clear that the right to petition the government is validly restrained if the government does so for a legitimate purpose. And because the government's vital and legitimate national security interest is validly served through these statutes, the defendants' right to petition the government, like their right to free speech, must yield.

Once it is determined that the statute does not infringe on the defendants' First

Amendment rights, it remains necessary to confront and address the defendants' challenge based

on the overbreadth doctrine.  The overbreadth doctrine is an exception to the generally applicable

rules regarding facial challenges, and permits a defendant whose speech is constitutionally

restricted to raise the First Amendment rights of third parties whose constitutionally protected

speech may be "chilled" by the specter of the statute's punishment.  *Virginia v. Hicks*, 539 U.S.

113, 118-19 (2003).  The overbreadth doctrine rests on the concern that "[m]any persons, rather

than undertake the considerable burden (and sometimes risk) of vindicating their rights through

case-by-case litigation, will choose simply to abstain from protected speech, harming not only

themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.*

at 119.  The Supreme Court has also recognized, however, that the overzealous application of the

overbreadth doctrine also imposes costs on society by preventing the government from

legitimately regulating  harmful speech. *Id.* at 119.  For this reason, in order to invalidate § 793

pursuant to the overbreadth doctrine the defendants must demonstrate that the alleged

overbreadth is "'substantial,' not only in the absolute sense, but also relative to the scope of the

law's plainly legitimate applications."  *Id.* at 120 (quoting *Broadrick*, 413 U.S. at 615).

Defendants' overbreadth challenge fails to meet this requirement.  As construed herein,

§§ 793(d) and (e) punish only those people who transmit information related to the national

defense, in tangible or intangible form, to one not entitled to receive it.  To prove that the

information is related to the national defense, the government must prove: (1) that the

information relates to the nation's military activities, intelligence gathering or foreign policy, (2)

that the information is closely held by the government, in that it does not exist in the public

domain; and (3) that the information is such that its disclosure could cause injury to the nation's

security.  To prove that the information was transmitted to one not entitled to receive it, the

government must prove that a validly promulgated executive branch regulation or order restricted

the disclosure of information to a certain set of identifiable people, and that the defendant

delivered the information to a person outside this set.  In addition, the government must also

prove that the person alleged to have violated these provisions knew the nature of the

information, knew that the person with whom they were communicating was not entitled to the

information, and knew that such communication was illegal, but proceeded nonetheless.  Finally,

with respect only to intangible information, the government must prove that the defendant had a

reason to believe that the disclosure of the information could harm the United States or aid a

foreign nation, which the Supreme Court has interpreted as a requirement of bad faith.  *See*

*Gorin*, 312 U.S. at 28.  So construed, the statute is narrowly and sensibly tailored to serve the

government's legitimate interest in protecting the national security, and its effect on First

Amendment freedoms is neither real nor substantial as judged in relation to this legitimate

sweep.  For this reason, defendants' overbreadth challenge fails as well.

## VI.

Defendant Rosen has moved separately to dismiss Count III of the superseding

indictment, which charges him with aiding and abetting Lawrence Franklin's disclosure of

information relating to the national defense to one not entitled to receive it, namely Rosen, in

violation of 18 U.S.C. §§ 793(d) and 2, on the ground that the overt acts alleged in the

superseding indictment cannot support the government's theory of liability.  The facts relevant to

Count III are contained within the overt acts alleged in support of the conspiracy charge in Count

I.  Specifically, these allegations are as follows: During a February 12, 2003 meeting Franklin

disclosed information relating to a classified draft internal policy document concerning a certain

middle eastern country and informed Rosen that he had prepared a separate document relating to

this draft policy document.  On March 10, 2003, Rosen and Weissman had a subsequent meeting

with Franklin.  Two days later, Franklin called Rosen and left a message indicating that he was

trying to fax a document to Rosen and Weissman.  In his message, Franklin stated that he was

unable to complete the fax and wanted to ensure Rosen was present to receive it.  The next day,

March 13, 2003, Franklin spoke with Rosen and obtained the latter's home fax number because

he preferred to send the fax to Rosen's residence.  Notwithstanding this preference, on March 17,

2003, Franklin sent a facsimile of the document he had prepared based on a classified draft

internal policy document to Rosen's office fax machine.  These facts represent the sum of the

superseding indictment's allegations regarding Count III.[57]

        As the defendants are quick to point out, the superseding indictment does not allege: (1)

that Rosen ever requested the document Franklin had prepared; (2) that Franklin ever asked for

Rosen's assistance in transmitting this document to anyone; (3) that the document had any

classification markings; or (4) that Rosen ever received or viewed the document.  Furthermore,

the defendants point to an additional fact, extrinsic to the superseding indictment, growing out of

Franklin's entry of a guilty plea to Counts I and V of the superseding indictment.  In the course of

---

        [57]In their classified pleadings, both defendant Rosen and the government point to various
facts not contained in the superseding indictment in support of their respective arguments.  These
facts are plainly not relevant to resolving the present motion, which challenges the legal
sufficiency of the superseding indictment.  *See United States v. Brandon*, 298 F.3d 307, 311 (4th
Cir. 2002) ("Thus, the indictment obviously tracks the statutory text of § 1344 which, as we
observed, is generally enough for the indictment to survive a motion to dismiss if it contains a
sufficient "statement of the facts and circumstances [to] inform the accused of the specific
offence . . . with which he is charged.").

his plea colloquy, Franklin stated in unequivocal terms that he did not believe that the document

at issue in Count III was classified.  Specifically, referring to the one page document, Franklin

told the Court, "it was unclassified – in my opinion, sir, it was unclassified and it is unclassified."

When the attorney for the government told the Court that "the government would prove that it

was classified," Franklin responded, "not a chance."  Franklin did not plead guilty to this count

and following his plea of guilty the government moved to dismiss the count as against Franklin,

which motion was granted.

    The Fourth Circuit has instructed that the review of an indictment for sufficiency should

proceed "under a liberal standard [such that] every indictment is . . . indulged in support of

sufficiency."  *United States v. Matzkin*, 14 F.3d 1014, 1019 (4th Cir. 1994) (quoting *United*

*States v. Fogel*, 901 F.2d 23, 25 (4th Cir. 1990)) (internal quotations and citations omitted).  An

indictment is sufficient "if it, first, contains the elements of the offense charged and fairly

informs a defendant of the charge against which he must defend, and, second, enables him to

plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United*

*States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999) (quoting *Hamling v. United States*, 418 U.S.

87, 117 (1974)).  For this reason, an indictment will survive a motion to dismiss if it tracks the

statutory text at issue and also "contains a sufficient statement of the facts and circumstances to

inform the accused of the specific offense with which he is charged."  *United States v. Brandon*,

298 F.3d 307, 311 (4th Cir. 2002) (quoting *Hamling*, 418 U.S. at 117-18).  Further, "a pretrial

motion to dismiss under Rule 12(b), Fed.R.Crim.P., 'cannot be based on a sufficiency of the

evidence argument because such argument raises factual questions embraced in the general

issue.'" *United States v. Lindh*, 212 F.Supp.2d 541, 576 (E.D.Va. 2002) (quoting *United States v.*

*Ayarza-Garcia*, 819 F.2d 1043, 1048 (11th Cir. 1987)); *see also United States v. Terry*, 257 F.3d

366, 371 (4th Cir. 2001) (King, J., concurring) ("It is elementary that a motion to dismiss an

indictment implicates only the legal sufficiency of its allegations, not the proof offered by the

Government."). In sum, a court considering the sufficiency of an indictment need ask only

whether the indictment tells "the defendant all that he needs to show for his defense, and . . . so

specify that with which he is charged that he will be in no danger of being a second time put in

jeopardy. If so, it should be held good." *Matzkin*, 14 F.3d at 1019 (quoting *United States v.*

*Cobb*, 905 F.2d 784 (4th Cir. 1990)).

These principles, applied here, compel denial of the motion. Count III clearly tracks the

statutory language, and the overt acts alleged in Count I that relate to Count III provide Rosen

notice of the offense conduct sufficient to allow him to avoid double jeopardy for these alleged

acts. *Wicks*, 187 F.3d at 427. Defendant Rosen's arguments in support of dismissal, including

his argument based on Franklin's statement at his plea colloquy, are not arguments about the

legal sufficiency of the indictment, but rather arguments about the sufficiency of the

government's proof. These arguments are, therefore, appropriately addressed to the jury and are

not a basis at this time for dismissal. For this reason, Rosen's motion to dismiss Count III must

be denied, as well.

## VII.

In the end, it must be said that this is a hard case, and not solely because the parties'

positions and arguments are both substantial and complex. It is also a hard case because it

requires an evaluation of whether Congress has violated our Constitution's most sacred values,

enshrined in the First and the Fifth Amendment, when it passed legislation in furtherance of our

-66-

nation's security.  The conclusion here is that the balance struck by § 793 between these competing interests is constitutionally permissible because (1) it limits the breadth of the term "related to the national defense" to matters closely held by the government for the legitimate reason that their disclosure could threaten our collective security; and (2) it imposes rigorous scienter requirements as a condition for finding criminal liability.[58]

The conclusion that the statute is constitutionally permissible does not reflect a judgment about whether Congress could strike a more appropriate balance between these competing interests, or whether a more carefully drawn statute could better serve both the national security and the value of public debate.  Indeed, the basic terms and structure of this statute have remained largely unchanged since the administration of William Howard Taft.  The intervening years have witnessed dramatic changes in the position of the United States in world affairs and the nature of threats to our national security.  The increasing importance of the United States in world affairs has caused a significant increase in the size and complexity of the United States' military and foreign policy establishments, and in the importance of our nation's foreign policy decision making.  Finally, in the nearly one hundred years since the passage of the Defense Secrets Act mankind has made great technological advances affecting not only the nature and

---

[58]It bears repeating that nothing in this Memorandum Opinion is meant to suggest or to intimate any view about the guilt or innocence of the defendants.  As required by law, the analysis in this Memorandum Opinion proceeded, for this purpose only, on the basis of an assumption that the superseding indictment's allegations are true.  Indeed, these defendants must be, and are, presumed innocent of the criminal wrongdoing alleged in the superseding indictment unless and until a jury were to find beyond a reasonable doubt to the contrary.  And it is also worth noting that nothing in this Memorandum Opinion is intended to suggest or to intimate any view about the wisdom of the government's decision to pursue this prosecution against these defendants.  Decisions concerning what crimes and persons should be prosecuted is a matter committed to the sole discretion of the Executive Branch and the role of the Judicial Branch is limited to adjudicating any prosecutions initiated by the Executive Branch.

potential devastation of modern warfare, but also the very nature of information and

communication.  These changes should suggest to even the most casual observer that the time is

ripe for Congress to engage in a thorough review and revision of these provisions to ensure that

they reflect both these changes, and contemporary views about the appropriate balance between

our nation's security and our citizens' ability to engage in public debate about the United States'

conduct in the society of nations.

   An appropriate Order will issue.

                           ___/s/_____

Alexandria, Virginia                T. S. Ellis, III
August 9, 2006                United States District Judge