**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cr225** |
| | ) | |
| **STEVEN J. ROSEN and** | ) | |
| **KEITH WEISSMAN** | ) | |

**MEMORANDUM OPINION**

In this Espionage Act prosecution, Defendants Steven Rosen and Keith Weissman are

charged under 18 U.S.C. § 793(g) with conspiracy to transmit information relating to national

defense[1] to those not authorized to receive it.  Defendant Rosen is also charged with aiding and

abetting the transmission of NDI to those not authorized to receive it, in violation of 18 U.S.C. §

793(d) and 18 U.S.C. § 2.  In preparing and presenting their defense to these charges, defendants,

pursuant to Rule 15, Fed. R. Crim. P., have submitted a motion seeking to depose three

Government of Israel ("GOI") officials whose testimony they believe will be exculpatory.  Since

these officials will not consent to being deposed, either in the United States or in Israel, the

question is whether their testimony can and should be compelled by way of (a) the U.S.-Israel

Mutual Legal Assistance ("MLA") Treaty[2] or (b) letters rogatory.  More precisely, the questions

presented are:

(1) Do the requested depositions meet the Rule 15 criteria?

---

[1] "Information relating to national defense" is sometimes referred to herein as "NDI."  This type
of information includes most classified information.  *See United States v. Rosen*, 445 F. Supp. 2d
602, 623 (E.D.Va. 2006) (Memorandum Opinion denying defendants' motion to dismiss).

[2] S. Treaty Doc. No. 105-40, 1998 WL 1984226 (1998).

1

(2) If so, should the U.S. government be ordered to request the GOI, pursuant to the U.S.-Israel MLA Treaty, to compel the GOI officials to submit to depositions in Israel?

(3) In the alternative, can and should letters rogatory issue to secure the depositions in Israel?

For the reasons that follow, defendants' motion must be denied.

## I.

A brief summary of the allegations contained in the Superceding Indictment (the "Indictment") provides the context for the resolution of this motion.  The Indictment's introductory allegations may be succinctly summarized.  Defendants were employed by the American Israel Public Affairs Committee (AIPAC) – Rosen as Director of Foreign Policy Issues, Weissman as Senior Middle East Analyst.  While they were employed by AIPAC, they cultivated relationships with United States government employees, including Lawrence Franklin, then at the Iran desk at the Department of Defense.[3]  The Indictment alleges defendants obtained NDI from Franklin and other government employees which they were not entitled to receive.  It is further alleged that defendants then passed that NDI on to others who were not entitled to receive it, including members of the press, other AIPAC staffers, other foreign policy analysts, and foreign officials.

To flesh out the conspiracy charge, the Indictment alleges fifty seven overt acts in furtherance of the conspiracy.  These overt acts are summarized here.

*Overt Acts 1-5* allege that the conspiracy began in April 1999, when Rosen told a foreign

---

[3] Franklin was originally named in the Indictment as a defendant and co-conspirator.  Since then, he has pled guilty to conspiracy to communicate NDI to one not entitled to receive it, in violation of 18 U.S.C. §§ 793 (d) and (g), conspiracy to communicate classified information in violation of 18 U.S.C. § 371, and unlawful retention of NDI in violation of 18 U.S.C. § 793(e).

official ("FO-1") he had acquired sensitive intelligence regarding terrorist activities in Central

Asia and discussed that intelligence with that official.  Two months later, Weissman told FO-1

that he had obtained a classified Federal Bureau of Investigation ("FBI") report relating to the

Khobar Towers bombing from three different sources, including a U.S. government official.

Weissman also told FO-1 he had advised a member of the media about this FBI report.  Eighteen

months later, in December 2000, defendants met with a U.S. government official ("USGO-1")

who had access to classified information regarding U.S. strategy towards a Middle Eastern

country.  Rosen later communicated this classified information to a member of the media.

*Overt Acts 6-14* allege that in January 2002, Rosen met with another U.S. government

official ("USGO-2") who disclosed classified information to Rosen, some of which Rosen later

relayed to a foreign national.  Rosen also prepared a memorandum containing classified

information provided by USGO-2 and distributed it to AIPAC staff.  Approximately two months

later, Rosen met USGO-2 and discussed classified information regarding Al-Qaeda.  The next

day, Rosen disclosed this classified information to a fellow AIPAC employee.  Rosen then

disclosed the information to another foreign official ("FO-2") a day later.  Franklin, Rosen, and

Weissman then exchanged phone calls in August 2002 to set up a meeting to discuss Iran policy

issues.

*Overt Acts 15-21* allege that in February 2003, Franklin discussed the contents of a

classified draft internal government policy document relating to Middle East policy with

defendants and a Defense Department official.  That same day, but after the meeting with

Franklin, defendants discussed the classified information Franklin had given them and its bearing

on a particular journalist's draft article.  Defendants and Franklin met again on March 10, 2003,

in Union Station, where, in the course of their conversation, they moved from restaurant to restaurant, concluding the meeting in an empty restaurant.

*Overt Acts 24-27* allege that Rosen discussed that classified draft internal policy document with FO-2 and a think tank analyst, and that defendants both discussed the document with FO-1 on separate occasions.

*Overt Acts 22-24 and 28-30* allege that Franklin prepared another document based on the classified internal policy document. He intended to send this document to Rosen's residence and solicited Rosen's home fax number for this purpose. Eventually, however, he faxed the document to Rosen at the latter's AIPAC office.[4] Rosen then discussed this document with two members of the media.

*Overt Acts 31-37* allege that in June 2003, Franklin, Rosen, and Weissman met again and discussed the same classified policy document, as well as a newspaper article discussing the document. During that meeting, Franklin allegedly disclosed classified information regarding potential attacks on United States troops in Iraq, telling defendants in the process that the information was highly classified. Intent on keeping the channel of information "wide open insofar as possible," Weissman took Franklin to a baseball game a few days later.

*Overt Acts 38 and 39* allege that soon thereafter, on October 24, 2003, Franklin and another foreign official ("FO-3") discussed the classified draft internal policy document. Franklin then allegedly provided Top Secret/SCI[5] information to the media on May 21, 2004. In

---

[4] Rosen's aiding and abetting charge arises out of the receipt of this fax.

[5] "SCI" refers to "Sensitive Compartmented Information," a classification which signifies that the information "not only is classified for national security reasons as Top Secret, Secret, or Confidential, but is also subject to special access and handling requirements because it involves

addition, Franklin unlawfully retained classified documents at his home on June 30, 2004.

*Overt Acts 41- 48* allege that Franklin was approached by the FBI in 2004 and thereafter

became a cooperating witness.  In his cooperating witness role, Franklin met with Weissman on

July 9th and 21st, 2004, and disclosed national defense information related to the Middle East,

including United States intelligence information concerning a foreign government's covert

actions in Iraq, presaging the disclosure of the latter with a warning that the information was

classified "agency stuff."  Weissman passed this information to Rosen and another AIPAC

staffer.  Over the next month, defendants also allegedly disclosed this NDI to two journalists and

FO-3.[6]

## II.

The proceedings related to defendants' Rule 15 motion merit brief summary.

Defendants' motion was initially denied because the deponents – three unnamed GOI officials –

would not agree to be deposed either here or in Israel.  Given this, granting the motion would

have been an exercise in futility, as there appeared to be no means to compel the testimony of the

GOI officials.  In recognition that these circumstances might change, defendants were granted

---

or derives from particularly sensitive intelligence sources and methods."  *See* 28 C.F.R. §
17.18(a); *see also* 31 C.F.R. § 2.43(w) (defining Sensitive Compartmented Information to mean
"information and materials concerning or derived from intelligence sources, methods, or
analytical processes, that requires special controls for restricting handling within
compartmentalized intelligence systems established by the Director of Central Intelligence and
for which compartmentation is established.").

[6] For a more complete recitation of allegations in the Indictment, *see United States v. Rosen*, 445
F. Supp. 2d 602 (E.D.Va. 2006) (Memorandum Opinion denying defendants' constitutional
challenges to 18 U.S.C. § 793).  This Part I summary is not intended to be complete; in
particular, it omits reference to numerous alleged telephone calls between the alleged co-
conspirators for the purpose of setting up meetings.  It also omits the details of the defendants'
alleged interactions with the FBI during the investigation of this matter.

leave to renew the motion.  They have now done so, arguing that although the GOI officials

remain unwilling to testify, letters rogatory and the U.S.-Israel MLA Treaty are available to

compel their depositions in Israel.

The government counters that the testimony sought is not material, as it is, at best,

cumulative and, at worst, inculpatory, and hence the motion should be denied.  Given this, the

government believes defendants' motion fails under Rule 15, and accordingly contends it is not

necessary to address defendants' constitutional argument and the possible use of either letters

rogatory or the MLA Treaty process.

### III.

Analysis properly begins with the threshold question whether defendants' motion meets

the Rule 15(a), Fed. R. Crim. P., criteria.  In this respect, it is important to note that depositions

in criminal proceedings, unlike their civil counterparts, are the exception not the rule; they are, in

other words, disfavored.  *See Drogoul v. United States,* 1 F.3d 1546, 1551 (11th Cir. 1993).

Specifically, depositions are permitted only "because of exceptional circumstances and in the

interests of justice" for the purpose of "preserv[ing] testimony for trial."  Rule 15, Fed. R. Crim.

P.  The "exceptional circumstances" and "interests of justice" limitations in the Rule's text are

usefully elucidated in the Advisory Committee Note, which states that courts should grant

depositions only "if it appears that (a) the prospective witness will be unable to attend or be

prevented from attending the trial, (b) the prospective witness' testimony is material, and (c) the

prospective witness' testimony is necessary to prevent a failure of justice."  Rule 15, Fed. R.

Crim. P., Advisory Committee Note.  Unless these conditions are met, Rule 15 depositions are

not appropriate, whether in the U.S. or abroad.  But if these three criteria are satisfied, the

6

depositions should be ordered, assuming appropriate compulsory process is available.

The parties appropriately do not dispute the first criterion, namely witness unavailability. The GOI witnesses reside abroad, will not come to the United States to be deposed, and will not consent to submit to depositions in Israel. They are, therefore, unavailable by any measure. Beyond this point of agreement the parties diverge; they sharply dispute the next two criteria for depositions, namely (i) whether the forecasted testimony is material and (ii) whether the depositions are necessary to prevent a failure of justice. The materiality requirement is primary; only if the forecasted testimony is material is it necessary to address the second criterion.

When Rule 15 depositions are requested by an accused, materiality has the same meaning the Supreme Court gave the term in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny,[7] namely, that the evidence or testimony must be exculpatory, and not "corroborative or cumulative of other evidence." *See United States v. Hajbeh*, 284 F. Supp. 2d 380, 383-85 (E.D.Va. 2003) (noting that no Fourth Circuit case has defined Rule 15(a) materiality); *cf. Drogoul*, at 1552 (noting, in resolving government's motion for depositions, that when a prospective witness is "unlikely to appear at trial and his or her testimony *is critical to the case*, simple fairness requires permitting the moving party to preserve that testimony – by deposing the witness – absent significant countervailing factors... .") (emphasis added); *see also* Charles Alan Wright, et al., 2 *Federal Practice and Procedure* § 242 (3ʳᵈ ed. 2006). It follows, then, that the

---

[7] *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (evidence is material under *Brady* if there is a "reasonable probability" that its disclosure would have caused a different result, *i.e.* when suppression of the evidence undermines confidence in the trial outcome). *See also United States v. Ellis*, 121 F.3d 908, 916-17 (4ᵗʰ Cir. 1997) (no *Brady* error where material is cumulative of other testimony); *Love v. Freeman*, 188 F.3d 502, 1999 WL 671939 at *5 (4ᵗʰ Cir. Aug. 30, 1999) (finding reversible *Brady* error as to some statements by victim, but not as to those statements that were cumulative of social worker's testimony about victim's statement to social worker).

materiality analysis requires examination of the forecasted testimony of the GOI officials to ascertain (i) whether it is exculpatory, *i.e.*, tends to negate an element of the crime or to establish a defense, and (ii) whether it is cumulative of other evidence.  The first step in the materiality analysis is to identify the elements of the crime; the next is to outline the forecasted testimony; the final step is to compare the elements and the forecasted testimony to ascertain whether the forecasted testimony negates any element of the charged crime or establishes a defense.

Defendants are both charged with conspiracy to transmit information relating to national defense to those not entitled to receive it, 18 U.S.C. § 793(g) and § 793(e).  Rosen is also charged with aiding and abetting Lawrence Franklin's transmission of national defense information to those not entitled to receive it.  18 U.S.C. § 793(d) and 18 U.S.C. § 2.  To prove the alleged conspiracy to disclose NDI to one not authorized to receive it, the government must prove all of the following:

(i) That the defendants unlawfully, knowingly, and willingly joined a conspiracy.

(ii) That the object of the conspiracy was to commit the conduct prohibited by 18 U.S.C. § 793(d)-(e),[8] *i.e.* that the conspiracy's goal was for one or more co-conspirators in lawful or unlawful possession of NDI to communicate the NDI to a person unauthorized to receive it.[9]

(iii) That as co-conspirators, defendants possessed all the culpable mental states that

---

[8] To prove a conspiracy, the government must show that the defendant "intend[ed] to further an endeavor which, if completed, would satisfy all the elements of a substantive criminal offense." *Salinas v. United States,* 522 U.S. 52, 65 (1997).

[9] Executive Order No. 13,292, which outlines the current government classification system, governs who is authorized to receive information within the meaning of § 793.  *See Rosen*, 445 F. Supp. 2d at 623.

would be necessary for conviction under § 793(d)-(e),[10] specifically:

(a) that defendants knew that the information which the conspiracy contemplated disclosing was NDI, *i.e.* that they knew the information disclosed or to be disclosed was closely held by the United States government and was of a type which, if disclosed, could harm the United States.[11]

(b) that defendants had reason to believe that the information disclosed or to be disclosed could be used to the injury of the United States or to the advantage of a foreign nation.[12]

(c) that defendants knew that persons to whom the disclosures were made or would be made were not authorized to receive the NDI.[13]

(d) that defendants joined the conspiracy knowing that the disclosures would be made "willfully," that is, with knowledge that the disclosures were illegal and could harm national security.[14]

To prove that Rosen aided and abetted Franklin's violation of § 793(d), the government

_____

[10] As the Supreme Court has stated, conspiracy to commit a particular substantive offense cannot exist without "at least the degree of criminal intent necessary for the substantive offense itself;" in other words, "the knowledge of the parties is relevant to the same issues and to the same extent as it may be for conviction of the substantive offense." *United States v. Feola*, 420 U.S. 671, 686, 694-95 (1975) (internal citations omitted). By extension, when a substantive offense has multiple scienter requirements, as do § 793(d) and (e), the government must prove that the alleged conspirator possessed all of the requisite mental states at the time he entered into the unlawful agreement.

[11] *See Rosen*, 445 F. Supp. 2d at 618-22, 626.

[12] *See* 18 U.S.C. § 793(d) and (e); *Rosen*, 445 F. Supp. 2d at 625-26.

[13] *See Rosen*, 445 F. Supp. 2d at 625 ("Thus, the government must prove beyond a reasonable doubt that the defendants knew the information was NDI, *i.e.*, that the information was closely held by the United States government and that disclosure of this information might potentially harm the United States, and that the persons to whom the defendants communicated the information were not entitled under the classification regulations to receive the information.").

[14] *Id.* at 626 ("As has been noted, the statute's "willfulness" requirement obligates the government to prove that the defendants knew that disclosing the NDI could threaten the nation's security, and that it was illegal... .").

9

must prove:

> (i) that the principal (Franklin) committed the substantive offense, namely violation of § 793(d).

> (ii) that Rosen participated in some stage of Franklin's illegal venture.[15]

> (iii) that Rosen was "cognizant of [Franklin's] criminal intent and the [unlawful nature] of [Franklin's] activity," that is, Rosen had knowledge of the intended result of Franklin's conduct and intended to bring about the same result as Franklin.[16]

Given this outline of the elements of the charged offenses, the analysis next proceeds to the nature of the forecasted testimony.

According to defendants, the GOI officials would testify:

> 1.  that defendants were not agents of Israel nor compensated by Israel,

> 2. about the nature of the relationship between AIPAC and Israel,

> 3. that the GOI officials met regularly with defendants, and that this was entirely proper,

> 4. that any "actions" that happened to benefit the GOI were always seen by the GOI as benefitting the United States,

> 5. that Israel and the United States have ongoing meetings about policy, and

> 6. about the "unique nature" of an alleged conversation between defendants and one of the foreign officials on July 24, 2004.

For purposes of resolving this motion, it is assumed that the GOI officials would testify in accordance with defendants' forecast.  It is also appropriately assumed that defendants will exercise their right to remain silent.  Given these assumptions, the analysis now proceeds to consider whether the forecasted testimony is material, *i.e.* whether it is exculpatory because it

---

[15] *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996).

[16] *Id.*

negates an offense element or establishes a defense, and if so, whether it is cumulative of other existing and available evidence.

*1. Defendants are not Israeli Agents*

Testimony by the GOI officials that defendants were not Israeli agents during the relevant time period is not material. This is so because the government need not prove that defendants were, in any sense, clandestine or covert agents of the GOI during the relevant time period; it is not an element of either of the charged offenses. It follows that a showing by defendants that they were not GOI agents is not exculpatory. In particular, a showing that defendants were not GOI agents is not relevant to whether the alleged disclosures occurred, or what defendants knew (i) about the lawfulness of any alleged disclosure, (ii) about whether the disclosed information allegedly was NDI, (iii) about whether the defendants had reason to believe the alleged disclosure could injure the United States or aid the GOI, (iv) about whether any intended recipient of NDI was entitled to receive it, or (v) about whether defendants lacked a bad faith purpose to harm the United States in disclosing the information. In short, whether defendants were GOI agents is immaterial to the application of § 793.[17]

Yet, this does not end the Rule 15 materiality analysis, as the government could decide, as a matter of trial tactics and in aid of showing scienter, to attempt to show or argue that defendants were GOI agents. In that event, the GOI officials' testimony might arguably satisfy Rule 15's materiality requirement. Yet it appears that such an attempt is foreclosed, given that the government has represented that it does not intend to attempt to make such a showing or to argue

---

[17] It is worth noting that a different result might obtain were the forecasted testimony to be that the alleged meetings between defendants and the GOI officials did not occur, or that even if the meetings occurred, no information was communicated.

or suggest to the jury that defendants are GOI agents.[18]   In these circumstances, it is clear that the proffered testimony of the GOI officials does not meet Rule 15's materiality requirement.

*2. The Relationship Between AIPAC and Israel*

Defendants assert that an explanation of the relationship between Israel and AIPAC will be necessary to disprove that defendants possessed the requisite "willfulness" *mens rea* required by § 793(e), and to disprove that they entered into a conspiratorial agreement.  In particular, because the government intends to offer tape recordings of some of defendants' conversations with the GOI officials, defendants believe it necessary to explain that they "regularly met with Israeli officials as part of their job" and that such meetings were not inherently improper.

Although defendants are correct that such testimony will likely be relevant and exculpatory, there is no reason to believe that only these three GOI officials are able to offer such testimony.  It is surely not true, as defendants claim, that "no one but the Israeli diplomats can explain why Israeli officials met with members of AIPAC and establish that no consideration or direction was given to Dr. Rosen or Mr. Weissman."  To the contrary, there is no reason to believe that there are no AIPAC employees who are knowledgeable about the relationship between AIPAC and the GOI and who could be summoned to testify on this subject.  Moreover, U.S. State Department and other U.S. government officials likely are able to testify as to whether the governments of the United States and Israel routinely used AIPAC as a diplomatic "back

---

[18] In this regard, it is important to distinguish between (i) defendants' status or non-status as covert or clandestine agents of the GOI, which is not material or relevant to the charged offenses, and (ii) the nature of the relationship between defendants, AIPAC, and the GOI, which is relevant as context for the charged offenses.  On the latter issue, there are doubtless witnesses, including AIPAC and U.S. government employees, who are available and competent to testify.  Thus, the GOI officials' forecasted testimony on this subject would be, at best, cumulative.  *See also* Part III-2, *infra*.

channel," which appears to be the essence of defendants' argument.  These persons could further testify concerning how this diplomatic back channel practice might bear on the various *mens rea* or scienter offense elements, including how this practice could affect (i) defendants' perception of the propriety of any disclosures made by or to them, and (ii) the reasonableness of defendants' assumption that the circumstances of such disclosures indicated that further disclosures by defendants were explicitly or implicitly authorized.  Simply put, the proffered testimony of GOI officials on the relationship of AIPAC and GOI, while potentially exculpatory, is not necessary to establish the nature of this relationship, as it would be cumulative to testimony available from a variety of witnesses present and subject to process in the United States.  Accordingly, this forecasted testimony does not meet Rule 15's materiality requirement.

*3. The Perception that Disclosing NDI Benefitted the U.S.*

Testimony that transmission of the alleged NDI to GOI officials allegedly benefitted the United States would tend to negate an element of the charged offenses.  As noted *supra*, the defendants must have joined the alleged conspiracy "willfully," that is, knowing that the contemplated disclosures were illegal and could harm national security; additionally, they must have had "reason to believe" that the contemplated disclosures could harm the United States or aid a foreign government.  Testimony that disclosures of alleged NDI were viewed by defendants, or their contacts in the diplomatic establishment, as beneficial to the United States' interests is thus exculpatory.

Yet this forecasted testimony, even given its potentially exculpatory nature, fails the second materiality requirement; it is cumulative of other testimony from various witnesses

13

subject to process here, including U.S. government and AIPAC officials, as well as experts.[19]

Moreover, defendants provide no reason to believe (nor is any discernible) that the GOI officials'

testimony would be in any sense unique or especially credible in this regard.  In sum, the

forecasted testimony on this subject, like the others, does not warrant Rule 15 depositions in

Israel.

*4. Policy Cooperation Between the GOI and the United States*

Testimony on the United States' policy cooperation with the GOI arguably may bear on

an element of the offense, namely, defendants' "reason to believe [the NDI to be disclosed] could

be used to the injury of the United States or to the advantage of a foreign nation."  18 U.S.C. §

793 (e).  While policy cooperation between the United States and the GOI might be relevant,

there is no reason to believe that a variety of witnesses subject to process in the U.S. would not

be able to furnish this testimony.  *See* Part III-2, *supra*.  It bears mention that the more specific

the details of the alleged cooperation between the two governments, and the more congruent the

relationship between the alleged policy cooperation and the NDI at issue in the case, the more

probative such cooperation becomes.  While more general testimony on this cooperation may

have some probative value, policy cooperation on specific issues or topics is likely more

probative.  In either case, testimony in this regard is likely available from witnesses subject to

process here, including AIPAC and U.S. government officials.  Hence, it appears the proposed

depositions on this subject would be cumulative to other competent testimony more readily

available in this country.  Again, defendants' Rule 15 request fails on materiality grounds.

---

[19] Defendants and the government have indicated they intend to present expert testimony on a variety of issues, including this one.

*5. July 21, 2004 Conversation*

According to defendants, the GOI officials would testify regarding the "unique nature" of a conversation between defendants and FO-3 prompted, defendants claim, by a July 21, 2004 conversation between Weissman and Franklin, who at that time was cooperating with the government.  Defendants allege that during the conversation, Franklin disclosed NDI, the nature of which was intended by Franklin to cause Weissman to relay the information to persons who could act on it, namely the GOI officials.[20]  The circumstances surrounding this particular conversation with the GOI officials, and the type of information allegedly disclosed by Franklin to Weissman and then by Weissman to AIPAC and the GOI officials, may be relevant to Weissman's *mens rea* in making the disclosure, but the GOI officials do not add any exculpatory information to that available from witnesses in the United States.  The nature of the information, and the allegedly feverish tone of the Franklin-Weissman conversation, is what allegedly motivated defendants to disclose the information to FO-3, and the GOI officials' testimony does not establish those facts and is not material.[21]

In summary, the GOI officials' forecasted testimony does not meet Rule 15's criteria; it either fails because it is not exculpatory, or when exculpatory, it is cumulative.  Given this, the requested Rule 15 depositions are not "necessary to prevent a failure of justice."  *See* Rule 15, Fed. R. Crim. P, Advisory Committee Note.

**IV.**

---

[20] Detail about this information is omitted, as the information is classified.

[21] Importantly, defendants do not claim the GOI official would testify that he never met with Weissman on this occasion or that Weissman did not disclose the information to him.

Defendants also argue that the GOI officials' testimony should be compelled either by letters rogatory or by invoking the MLA Treaty.  Failure to do so, defendants argue, violates their Sixth Amendment right to compulsory process.  The government responds that it is unnecessary to reach these issues because the GOI officials' forecasted testimony does not cross the Rule 15 threshold.  Although the government is correct, it is nonetheless worth addressing whether either of these devices – the MLA Treaty or letters rogatory – would be appropriate assuming *arguendo* that the testimony of the GOI officials was both exculpatory and not cumulative.

The MLA Treaty is a bilateral treaty that "provides for a broad range of cooperation in criminal matters."  Treaty on Mutual Legal Assistance in Criminal Matters, U.S.-Isr., 1998; Letter of Transmittal from President Clinton to the U.S. Senate, Apr. 2, 1998.  In particular, the treaty provides that the government of one nation (the "Requesting State") may request the assistance of the other (the "Requested State") on a broad range of matters related to the "investigation, prosecution, and prevention of offenses, including in proceedings related to criminal matters."  MLA Treaty Art. 1, ¶ 1.  Such assistance may include the "taking of testimony or statements of persons." *Id.* at Art.1, ¶ 2.  This includes, if necessary, "compel[ling] the appearance of a person for taking testimony and producing documents . . . to the same extent as would be permitted in investigations, prosecutions, and proceedings of [the Requested] State." *Id.* at Art 8, ¶ 2.

By its plain terms, it is clear that while the United States government (*i.e.*, the Executive Branch) could use the MLA Treaty process to secure the testimony of the recalcitrant GOI witnesses, defendants, as private parties, are not entitled to utilize this procedure.  Thus, Article 1 ¶ 4 provides in pertinent part that the MLA Treaty "is intended solely for mutual assistance

16

between the Parties," defined as the United States government and the GOI, and that its provisions "shall not give rise to any right, that does not otherwise exist, on the part of any private person to obtain, suppress, or exclude any evidence . . . ."  In other words, the MLA Treaty process is exclusively for the use of the two signatory governments, and not for the use of private parties.

Defendants urge that despite the MLA Treaty's plain terms, there is precedent for a federal court to order the government to make an MLA Treaty request on behalf of a criminal defendant.  In the prosecution of Michele Sindona, an Italian bank mogul, the federal district court in the Southern District of New York ordered the Department of Justice to make a US-Switzerland MLA Treaty request to obtain records from Swiss banks.  *See* 3 Michael Abbell & Bruno Ristau, *International Judicial Assistance*, § 12-2-1(2) n.10 (1990).[22]  Yet, even indulging the generous assumption that *Sindona* was rightly decided on this point, there is a crucial difference between the U.S.-Switzerland MLA Treaty, involved in *Sindona*, and the U.S.-Israel MLA Treaty, involved here, that suggests the opposite result should obtain here.  The U.S.-Switzerland MLA Treaty contains no language similar to that of Art. 1 ¶ 4 of the U.S.-Israel MLA Treaty.  Unlike the U.S.-Israel MLA Treaty, the U.S.-Switzerland MLA Treaty does not explicitly state that it provides no rights for private citizens to compel testimony.  *See* Treaty on Mutual Assistance in Criminal Matters, U.S.-Switz., 1973, 27 U.S.T. 2019.[23]  Thus, even

---

[22] Interestingly, this ruling did not result in a published opinion, despite its novelty.

[23] There is, however, an interpretive letter providing that "the limitations on use [of information obtained through the MLA Treaty process] . . . do not give rise to a right of any person in the United States to suppress or exclude evidence or to obtain other judicial relief."  Interpretive Letter from United States Ambassador Shelby Cullom Davis to Swiss Ambassador Dr. Albert Weitnauer, May 25, 1973, 27 U.S.T. 2019.  Of course, such extrinsic sources cannot override the

assuming *Sindona* was correctly decided, that case is distinguishable given the additional clause in the U.S.-Israel MLA Treaty that forbids compulsory process on behalf of a private citizen. Indeed, courts interpreting MLA Treaties with clauses identical to Art. 1 ¶ 4 in the U.S.-Israel MLA Treaty have uniformly held that the MLA Treaty creates no rights in individual defendants to force the government to request evidence under the MLA Treaty procedures or to complain of any violation of the Treaty.[24]   In short, the language of the U.S.-Israel MLA Treaty cannot be fairly read to authorize the depositions defendants seek.

Defendants next raise the possibility that enforcing Art. 1 ¶ 4 of the U.S.-Israel MLA Treaty as written will deny them their constitutional right to compulsory process.[25]   This argument fails because a compulsory process clause violation requires a "contested act or omission . . . attributable to the sovereign," which "cause[s] the loss or erosion of material testimony . . . favorable to the accused."   *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) (internal citations, quotation marks, and punctuation marks omitted).   This case does not fit this description; denial of defendants' motion to compel the U.S. government to

---

treaty's plain language; if a treaty's language is unambiguous, its terms must be given effect. *See In Re Commissioner's Subpoenas*, 325 F.3d 1287, 1294 (11th Cir. 2003) (internal citations omitted).  But where treaty text is ambiguous, extrinsic sources, including interpretive letters, may be consulted to elucidate the signatories' meaning. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989).

[24] *See, e.g., United Kingdom v. United States.*, 238 F.3d 1312, 1317 (11th Cir. 2001) (no provision under U.S.-Britain MLA Treaty for "individual defendants . . . to request the production of information"); *United States v. Odom*, 53 M.J. 526, 537 (N.M.Ct.Crim.App. 2000) (U.S.-Mexico MLA Treaty creates no rights in private parties to gather evidence or secure other assistance); *United States v. Almador-Galvan*, 215 F.3d 1334, 2000 WL 359981 at *1 (9th Cir. Apr. 7, 2000) (unpublished disposition) ("no individual rights" under U.S.-Mexico MLA Treaty).

[25] *See* U.S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . .").

invoke the MLA Treaty for defendants' benefit will not cause the loss of favorable testimony given that, as shown in Part III, *supra*, the forecasted testimony is either not exculpatory or else cumulative of testimony readily available here.  Moreover, even were this not the case, it is quite clear that the right to compulsory process extends only to forms of process a court can issue of its own power, not to forms of process that require the cooperation of the Executive Branch or foreign courts.  The rule is that "the right of compulsory process does not ordinarily extend beyond the boundaries of the United States."  *Theresius Filippi,* 918 F.2d at 247 (citing *United States v. Zabaneh*, 837 F.2d 1249, 1260 (5th Cir. 1988)).  *Accord United States v. Moussaoui,* 382 F.3d 453, 463-64 (4th Cir. 2004).

Nor is *United States v. Greco,* 298 F.2d 247 (2d Cir. 1962), to the contrary.  *Greco* is cited by defendants for its statement that an accused has a right to compulsory process where it is "within the power of the federal government to provide it."  *Id.* at 251.  Yet, defendants misread this statement and the case.  *Greco* held that a court's inability to compel the attendance of Canadian witnesses for a defendant did not give rise to a claim under the Sixth Amendment right to compulsory process.[26]  In other words, *Greco* stands for no more than the unremarkable proposition that when *a court itself* cannot compel testimony from a witness, a defendant's compulsory process rights are not violated by that witness' absence at trial.  It is a very different proposition to state, as defendants would have it, that a defendant's right to compulsory process is violated when the government (*i.e.,* the Executive Branch) declines to exercise a treaty power

---

[26] The decision proceeds on the premise that the court there had no power to compel the Canadian witnesses to appear.  There is no discussion of the availability or suitability of letters rogatory.

to compel the testimony of a non-American in another country.[27]  No court has so held.  This is

so because the right to compulsory process extends only as far as a court's own process powers,

and cannot be stretched to include compelling the invocation of treaty process powers available

only to the Executive Branch.

In short, because the MLA Treaty is not within the process power of the federal district

court, a court's failure to order the Executive Branch to invoke the MLA Treaty process in favor

of a defendant does not implicate a defendant's constitutional right to compulsory process.

**V.**

Letters rogatory stand on a different footing; they are the means by which a court in one

country requests the court of another country to assist in the administration of justice by

taking depositions.  *See The Signe*, 37 F. Supp. 819, 820 (E.D.La. 1941).  Federal courts have

both statutory and inherent authority to issue letters rogatory, regardless of whether the case is

civil or criminal.  *See* 28 U.S.C. § 1781; *United States v. Staples*, 256 F.2d 290, 292 (9th Cir.

1958), *United States v. Steele*, 685 F.2d 793, 802 (3d Cir. 1982).  And, it is also settled that the

decision to issue letters rogatory lies within a court's sound discretion.  *See United States v.*

*Mason*, 919 F.2d 139 (4th Cir. 1990) (unpublished per curiam decision) (citing *Leasco Data*

---

[27] It is worth noting that where federal court process extends to American citizens or detainees overseas, defendants have a constitutional right to the testimony of those persons.  *See, e.g., United States v. Moussaoui*, 382 F.3d 453, 463-65 (4th Cir. 2004) (compulsory process extends to witnesses held abroad in American custody when their custodian is amenable to writ of habeas corpus *ad testificandum*); *see also id.* at 483 (Williams, J., concurring); *United States v. Zabaneh*, 837 F.2d 1249, 1259-60 (5th Cir. 1988) (noting that federal courts typically exercise no process powers over persons abroad except for American nationals); *see also* 28 U.S.C. § 1783 (subpoena power over American nationals and residents located abroad).  In other words, the right to compulsory process is coextensive with, but no greater than, a court's own power to issue process.

20

*Processing Equip. Corp. v. Maxwell*, 63 F.R.D. 94 (S.D.N.Y.1973).  *Accord U.S. v. Liner,* 435

F.3d 920, 924 (8th Cir. 2006) (denial of letters rogatory reviewed for abuse of discretion).  In

general, "[w]here the relevancy or materiality of the testimony sought is doubtful, the court

should not grant the application" for letters rogatory.  26B C.J.S. *Depositions* § 34 (internal

citations omitted).  Instead, letters rogatory should be issued only where "necessary and

convenient."  35A C.J.S. *Federal Civil Procedure* § 614 (internal citations omitted).

Several factors counsel against the issuance of letters rogatory in this case.  First, as

discussed in Part III, *supra*, the proffered testimony either is not exculpatory or is cumulative of

other testimony from witnesses available in the U.S.  Second, delay attends the letters rogatory

process and counsels against issuance.  The letters rogatory procedure has been described as

"complicated, dilatory, and expensive."  *Societe Nationale Industrielle Aerospatiale v. U.S. Dist.*

*Court (Longstaff)*, 482 U.S. 522, 531 (1987).  While such delay would be justified if necessary to

ensure a fundamentally fair trial for defendants, the testimony of the GOI witnesses is not

necessary to ensure a fair trial for the reasons already discussed in Part III, *supra*.

## VI.

In summary, for the reasons stated herein, the proposed depositions do not satisfy the

requirements of Rule 15, Fed. R. Crim. P.; the testimony is not material or necessary to prevent a

failure of justice.  It follows that neither Rule 15 nor the constitution require invoking either the

MLA Treaty or letters rogatory to compel the GOI officials' testimony.  And even were the

testimony material, the use of the MLA Treaty would not be appropriate.

An appropriate Order will issue.

_____/s_____

Alexandria, Virginia                    T. S. Ellis, III
February 14, 2007                       United States District Judge