**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:05cr225** |
| | ) | |
| STEVEN J. ROSEN and | ) | |
| KEITH WEISSMAN. | ) | |

## MEMORANDUM OPINION

In this prosecution for conspiracy to violate the Espionage Act, defendants have moved for an evidentiary hearing and eventually, dismissal of the indictment to remedy the government's alleged constitutional violations. Defendants allege that the government relied on the Thompson Memorandum[1] to pressure defendants' employer, the American Israel Public Affairs Committee (AIPAC), to terminate defendants from their jobs and to cease advancing defendants' attorneys' fees for their defense in this case. According to defendants, this pressure violated their constitutional rights under the Fifth and Sixth Amendments by depriving them of both due process of law and the right to counsel.

For the reasons that follow, that defendants' motion must be denied, for even assuming the government engaged in the conduct alleged, it did not prejudice the defense. Importantly, however, the result reached here is neither an endorsement of the Thompson Memorandum policy, nor does it diminish the conclusion that defendants' allegations, if true, reflect government conduct that is inappropriate and fraught with the risk of constitutional harm.

---

[1] The Thompson Memorandum, described in more detail *infra*, refers to *Principles of Federal Prosecution of Business Organizations* (Jan. 20, 2003), a policy directive from then-Deputy Attorney General Larry D. Thompson to United States Attorneys intended to guide charging decisions in cases of putative organizational wrongdoing.

# I.

*A. Background*

Both defendants are charged in a superceding indictment, returned August 4, 2005, with conspiracy to disclose national defense information ("NDI") to persons not authorized to receive it, in violation of 18 U.S.C. § 793(g) and (e).  Rosen is additionally charged with aiding and abetting alleged co-conspirator Larry Franklin's unauthorized disclosure of NDI, in violation of 18 U.S.C. §§ 793(d) and 2.  The superceding indictment generally alleges that over the course of several years, defendants (i) cultivated sources of information within the United States government, (ii) obtained national defense information from those sources, and (iii) disseminated that information to persons not authorized to receive it, including other AIPAC staff, journalists, and foreign government officials.  For a more comprehensive recitation of the allegations against defendants, see *United States v. Rosen*, 445 F. Supp. 2d 602 (E.D.Va. 2006) (Memorandum Opinion denying motion to dismiss) (*Rosen I*).

*B. The Thompson Memorandum*

The government conduct at issue had its genesis in what is colloquially known as the Thompson Memorandum, the Department of Justice's (DOJ's) policy directive and guidance to United States Attorneys concerning the exercise of charging discretion in cases of potential organizational wrongdoing.  *See* L. Thompson, *Principles of Federal Prosecution of Business Organizations* (Jan. 20, 2003).  Issued on January 20, 2003, the Thompson Memorandum was in force during the period of time relevant here and was not withdrawn until January 12, 2006, when it was replaced by the so-called McNulty Memorandum, a new policy directive addressing the same subject.  *See* P. McNulty, *Principles of Federal Prosecution of Business Organizations*

(January 12, 2006).[2]  The core of the Thompson Memorandum is its ennumeration of nine

factors, summarized below, that prosecutors were directed to consider in deciding whether to

charge business organizations or other entities[3] whose agents were suspected of wrongdoing:

1. the nature and seriousness of the offense,
2. the pervasiveness of wrongdoing within the corporation, including any management culpability,
3. any history of similar conduct by the corporation,
4. the corporation's timely, voluntary disclosure of wrongdoing and willingness to cooperate in the investigation of its agents, including waiver of corporate attorney-client privilege and work product protection,
5. the existence and adequacy of the corporation's compliance program,
6. the corporation's remedial actions (including, *inter alia*, discipline or termination of wrongdoers),
7. collateral consequences, such as harm to nonculpable shareholders, pensioners, and employees,
8. the adequacy of prosecution of the responsible individuals, and
9. the adequacy of civil remedies.

*Id.* at § II ¶ A. The Thompson Memorandum elucidates the nine factors, and particularly

pertinent here is the elucidation of factor 4, describing circumstances relevant to an assessment of

the adequacy of a corporation's cooperation with the government investigation.  This is worthy of

quotation in full:

> Another factor to be weighed by the prosecutor [in assessing the adequacy of

---

[2] The McNulty Memorandum is more solicitous of organizational advances of attorneys' fees than its predecessor, stating that "prosecutors generally should not take into account whether a corporation is advancing attorney's fees to employees or agents under investigation or indictment," except in "extremely rare cases" where "the totality of the circumstances show that it was intended to impede a criminal investigation."  P. McNulty, *Principles of Federal Prosecution of Business Organizations* (January 12, 2006), § VII ¶ B.3-B.3 n.3.  The practical, political, or other reasons that led the DOJ to change its policy on fee advances are not relevant to the constitutional analysis required here.

[3] The Thompson Memorandum covered not just corporations but also "partnerships, sole proprietorships, government entities, and unincorporated associations."  *Id.* at § I n.1.  For ease of reference, these entities are referred to herein collectively as "organizations."

cooperation] is whether the corporation appears to be protecting its employees and agents. Thus, while cases will differ depending on the circumstances, a corporation's promise of support to culpable employees and agents, either through the advancing of attorney's fees, through retaining employees without sanction for their misconduct, or through providing information to the employees about the government's investigation pursuant to a joint defense agreement, may be considered by the prosecutor in weighing the extent and value of a corporation's cooperation.

*Id.* at § VI ¶ B. A footnote adds, "[s]ome states require [organizations] to pay the legal fees of officers under investigation prior to a formal determination of guilt. Obviously, a[n organization's] compliance with governing law should not be considered a failure to cooperate."

*Id.* at § VI ¶ B n.4.   In short, the Thompson Memorandum suggests that an organization that advances attorneys' fees to an employee the government deems "culpable" is more likely to be prosecuted than a similarly situated organization that does not advance fees, unless the organization is required by law advance fees.

*C. The Alleged Interference*[4]

The government conduct in issue here occurred in the 2004-2005 time period, prior to the August 4, 2005 issuance of the superceding indictment naming defendants.[5]  During this period, the government was actively investigating defendants and AIPAC.  Also during this period,

---

[4] Because the government claims that no relief is warranted even on defendants' asserted facts, it is appropriate to treat the government's response, in essence, as a motion to dismiss defendants' motion for relief, *i.e.*, to assume that the facts alleged by defendants are true and draw all reasonable factual inferences in their favor, to supplement those facts with any matter properly subject to judicial notice, and to disregard any arguments or conclusions of law masquerading as facts.  Then, based on the set of facts so constructed, the analysis considers whether defendants have stated any cognizable basis for relief.  *See, e.g., Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); *Jordan v. Alternative Resources Corp,* 458 F.3d 332, 338 (4th Cir. 2006) (internal citations omitted as to both) (discussing Rule 12(b)(6), Fed. R. Civ. P.).

[5] Some of the alleged government conduct overlapped with the May 26, 2005 issuance of the initial indictment that named only Franklin.

defendants were employed by AIPAC – Rosen as AIPAC's Director of Foreign Policy Issues, and Weissman as AIPAC's Senior Middle East Analyst.  It was part of defendants' AIPAC duties to meet regularly with government officials of both the United States and Israel.  Defendants contend that all the conduct alleged in the indictment was within the scope of their employment with AIPAC and was undertaken for AIPAC's benefit.[6]

Defendants allege that the government's investigation in 2004-2005 focused on AIPAC as well as defendants.  The investigation of AIPAC lasted into early 2005 and involved, *inter alia*, FBI interviews of numerous AIPAC officers and employees, searches of AIPAC offices, and meetings between prosecutors and AIPAC officials.  Defendants retained counsel in August 2004 and have been billed monthly for legal fees since then.  When the government's investigation of defendants became public knowledge, AIPAC stated that it would pay for and advance defendants' attorneys fees.  It also entered into a joint defense agreement with defendants.  An engagement letter endorsed by defendants, AIPAC, and defense counsel was signed September 1, 2004, and allegedly included an agreement that AIPAC would advance fees. The joint defense agreement was signed the same day.  For several months thereafter, AIPAC advanced defendants' attorneys' fees.  During that period, AIPAC counsel orally assured defense counsel that it would continue to make these advances.  This arrangement did not last; it ended in the spring of 2005 when AIPAC terminated defendants' employment, terminated the joint defense agreement, and ceased advancing defendants' legal fees.  This occurred, defendants

---

[6] While it was unquestionably within the scope of defendants' employment to meet with government officials and to obtain information pertinent to policies in which AIPAC had an interest, it is doubtful that AIPAC would consider that obtaining or passing NDI without authorization was within the scope of defendants' employment.

5

allege, because during meetings between AIPAC and government prosecutors, the prosecutors implicitly or explicitly (i) threatened AIPAC with criminal charges, and/or (ii) threatened further intense scrutiny of AIPAC in the event the government perceived AIPAC's cooperation as unsatisfactory. Alternatively, the government (i) offered AIPAC reduced charges and/or (ii) offered to halt further investigation of AIPAC should AIPAC's cooperation satisfy the government. Importantly, according to defendants, cooperation satisfactory to the government included, *inter alia*, terminating defendants and ceasing to advance defendants' legal fees.

Specifically, defendants allege that in a December 2004 meeting with AIPAC officials prosecutors stated that the investigation was analogous to one in the "corporate fraud arena," and they criticized AIPAC's leadership for "circling the wagons" by denying wrongdoing. Later, in a February 15, 2005 meeting, prosecutors allegedly stated that satisfactory cooperation from AIPAC could "get AIPAC out from under all of this." Defendants allege these two statements confirm that AIPAC was at least a subject, if not a target, of investigation.[7] On March 18, 2005, defendants allege that then-U.S. Attorney Paul McNulty and an unnamed Assistant U.S. Attorney told AIPAC counsel that AIPAC needed to fire defendants. The next business day, March 21, 2005, AIPAC fired defendants and terminated the joint defense agreement, but intended to keep

---

[7] A subject is a "person whose conduct is within the scope of the grand jury's investigation." A target is a person "as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant." *See United States Attorney's Manual* § 9-11.151 (June 2000). The government contends that AIPAC was neither a subject nor a target and thus that any alleged threats concerning AIPAC's payment of defendants' attorneys fees gained the government no leverage over AIPAC. Put differently, the government contends that because AIPAC was neither a subject nor a target, the government neither sought nor needed leverage over AIPAC. In any event, the analysis here proceeds on the assumption, given defendants' allegations, that AIPAC was at least a subject of investigation.

this fact secret from the public.  Yet, AIPAC did inform the government of the terminations on

March 22, 2005.  In the words of AIPAC counsel, this action was taken to gain "credibility with

the government," *i.e.*, to be able to claim compliance with the Thompson Memorandum.

On learning that defendants had been fired and the joint defense agreement terminated,

prosecutors allegedly continued to inquire whether AIPAC was continuing to pay defendants'

legal fees.  At an April 29, 2005 meeting between AIPAC and the government to resolve the fees

issue, defendants allege that the government pointedly asked AIPAC why it was paying

defendants' legal fees, severance pay, and health benefits.  According to defendants, AIPAC

counsel responded that defendants could not otherwise afford counsel.  Prosecutors allegedly

indicated their displeasure on the fees matter and informed AIPAC counsel that it should not only

cease paying defendants' attorneys fees, but also cut off defendants' severance pay and benefits.

Both AIPAC counsel and the prosecutors later confirmed to defense counsel that the government

had raised the issue of AIPAC's payment of counsel fees and health benefits at the April 29

meeting.

In sum, AIPAC advanced payment for Rosen's attorney's fees from September 2004 to

March 2005, and for Weissman's attorney's fees from September 2004 to June 2005.  AIPAC

has not advanced or paid any of defendants' attorneys' fees since then.  It is unclear whether

defendants continue to receive benefits.  Defendants further allege that once AIPAC attained

some degree of certainty that it would not be prosecuted, it offered to pay a "deeply discounted

sum" to defense counsel in satisfaction of any obligations to defendants, but not to pay defense

counsel in full.

**II.**

7

Defendants contend that the government's pressure on AIPAC violated defendants' constitutional rights in two ways. First, it interfered with defendants' right to expend their own resources towards their counsel of choice, in violation of the Sixth Amendment. Second, it deprived defendants of due process of law, in violation of the Fifth Amendment. Each contention is separately addressed.

*A. Sixth Amendment*

The Bill of Rights provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. Amend. VI. This protean right has several manifestations, some familiar, some less familiar. Familiar ones include the indigent's right to appointed counsel and the right of all defendants to effective assistance of counsel. *See Argersinger v. Hamlin*, 407 U.S. 25 (1972); *Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980). Less familiar and pertinent here is the now-established "right to be represented by an otherwise qualified attorney whom that defendant can afford to hire." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 624 (1989). Put another way, an individual has the "right to spend his own money to obtain the advice and assistance of . . . counsel." *Id.* at 626 (citing *Walters' v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 370 (1985) (Stevens, J., dissenting.)). Thus, it is clear that defendants have a right to expend their own funds, or funds to which they had a right, towards counsel of choice.[8]  Defendants contend

---

[8] Because the right to expend one's resources towards one's defense is not well developed in the law, it is unclear whether the right is (i) a Sixth Amendment right independent of the right to counsel of choice and to effective counsel, (ii) a component of the right to counsel of choice, (iii) a component of the right to effective assistance, or (iv) some sort of prophylactic rule designed to protect other Sixth Amendment rights. The best interpretation seems to be that the right to expend one's resources in one's own defense is an independent right, the scope of which delimits the right to counsel of choice. *See Caplin & Drysdale*, 491 U.S. at 626 ("Whatever the

this right was violated or interfered with by the government's alleged threats to AIPAC.

To prevail on their Sixth Amendment claim in this respect, defendants must prove the following elements: (i) that they had retained counsel of choice to represent them with funds of their own or funds to which they had a right, (ii) that the government wrongfully interfered with their right to be represented by counsel of choice, (iii) that the right to be free from government interference with retained counsel had attached at time of the interference, (iv) the interference prejudiced defendants.  The government contests each of these elements.

*1. Defendants' Right to Fee Advances*

The right asserted by defendants to make expenditures towards retained counsel of choice free from government interference is limited to the use of defendants' own funds.  *Caplin & Drysdale*, 491 U.S. at 626 (a defendant has a "right to spend his own money to obtain the advice and assistance of . . . counsel" but has "no Sixth Amendment right to spend another person's money for services rendered by an attorney.").  The government claims defendants cannot meet this threshold request because they had no right to have AIPAC pay their attorney's fees.

Defendants' right, if any, to have AIPAC advance attorney's fees may be derived from two sources: (i) a contract arising from the AIPAC bylaws,[9] or (ii) a separate contract arising

---

full extent of the Sixth Amendment's protection of one's right to retain counsel of his choosing, that protection does not go beyond 'the individual's right to spend his own money to obtain the advice and assistance of . . .  counsel.'") (internal citation omitted).

[9] District of Columbia law, which governs because AIPAC is incorporated there, follows the rule that an organization's bylaws are construed as a contract between the organization and its members or shareholders.  *See Meshel v. Ohev Sholom Talmud Torah*, 869 A.2d 343, 361 (D.C. 2005).  Yet, the law from other jurisdictions also recognizes that a bylaw making indemnification or advancement of fees mandatory may be enforced as a contract between the corporation and the employee-recipient.  *See Gentile v. SinglePoint Financial, Inc.*, 787 A.2d 102 (Del. Ch. 2001), *aff'd* 788 A.2d 111 (Del. 2001) (citing *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 342-43

AIPAC counsel's oral promises to continue advances, and/or AIPAC's practice of advancing fees for several months.  Both must be separately considered.

A close reading of the AIPAC bylaws reveals that they do not provide a contractual right to fee advancement, only to indemnification – that, is to reimbursement of fees after conclusion of the case, assuming a disposition favorable to the employee.  The pertinent AIPAC bylaw provides that

> AIPAC shall, to the fullest extent permitted by applicable law, indemnify and hold harmless any person who is or was a[n] . . . employee or agent of AIPAC . . . against any losses, claims, damages, expenses (including attorney's fees) or liabilities, to which the . . .  employee or agent may become subject in connection with any matter arising out of or related to AIPAC, its business or affairs, except to the extent any such loss, claim, damage, liability or expense is finally judicially determined to be primarily attributable to such . . . employee's or agent's gross negligence, bad faith, fraud or willful misconduct... .

On its face, this bylaw does not require advancement, only indemnification.  Defendants respond that failure to advance fees would constitute failure to indemnify "to the fullest extent permitted by applicable law," as the bylaw requires.

Defendants' argument in this regard assumes that fee advancement is merely a more advantageous form of indemnification – indemnification to the fullest extent of the law.  Yet

---

(Del. 1983)).  While no D.C. case directly endorsing this point could be located, the analysis here proceeds on the assumption that D.C. law would follow this sensible rule and construe the bylaw as a contract between AIPAC and its employees.  The analysis also assumes that a bylaw requiring advancement of attorney's fees to a non-director employee is permitted by the pertinent corporation statute, as a corporation may not adopt bylaws inconsistent with its articles of incorporation or with statute.  *See* D.C. Stat. § 29-301.05(12).  Because the D.C. non-profit corporation statute explicitly grants such corporations power only to indemnify officers and directors, *see* D.C. Stat. § 29-301.05(14), the analysis here proceeds on the assumption that AIPAC's bylaw providing for indemnification of employees and agents is a lawful exercise of AIPAC's powers to make contracts, D.C. Stat. § 29-301.05(8), to "lend money to and otherwise assist its employees other than its officers and directors," D.C. Stat. § 29-301.05(6), or to "dispose of all or any part of its property and assets," D.C. Stat. § 29-301.05(5).

advancement and indemnification are generally recognized as distinct and separate legal rights;

in particular, a right to indemnification may exist without a right to advancement. *See, e.g.,*

*Advanced Mining Systems, Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ch. 1992) (Allen, J.) *Bergonzi v.*

*Rite Aid Corp.*, 2003 WL 22407303 at *2 (Del. Ch. 2003) (Chandler,  J.) (citing *Citadel Holding*

*Corp. v. Roven*, 603 A.2d 818 (Del. 1992)); *Christman v. Brauvin Realty Advisors, Inc.*, 1997

WL 797685 at (N.D. Ill. 1997) ("a right to indemnification does not on its own provide a right to

advance payment of expenses" under Delaware partnership law); *Barry v. Barry*, 28 F.3d 848,

850-51 (8th Cir. 1994) (under Minnesota corporation law, advancement is distinct from

indemnification, but both are presumptively required unless articles or bylaws specify otherwise).

*See also* Joseph W. Bishop, *Law of Corporate Officers and Directors: Indemnification and*

*Insurance* at § 6:30 n.11.  Nor does a bylaw making indemnification mandatory implicitly make

advancement mandatory.  Instead, at least under Delaware law,[10] when a bylaw explicitly

requires indemnification but does not explicitly require advancement, the board of directors

retains discretion whether to advance fees.  *See Advanced Mining Systems, Inc. v. Fricke*, 623

A.2d at 84; *see also VonFeldt v. Stifel Financial Corp.*, 714 A.2d 79, 86 (Del. 1998); *Christman*,

1997 WL 797685 at * 2-3 (Delaware partnership law).  Since no provision in the AIPAC bylaws

is made for advancement of fees, it is reasonable to conclude defendants have no contractual

right to advancement of fees, as such a right should not be inferred from a right to

indemnification.

       Quite apart from the bylaws, defendants have alleged facts that, if true, would establish a

---

[10] No District of Columbia cases on this point could be located, but given the soundness
of the Delaware courts' reasoning, it appears likely that the District of Columbia would follow
the Delaware rule.

separate contract obligating AIPAC to advance fees.  This contract, defendants argue, is based on the oral promise of AIPAC counsel to defense counsel to continue advancing fees.[11]  Defendants argue further that this contract is evidenced by AIPAC's practice of advancing fees for several months.

Virginia choice of law rules govern which state's law determines the enforceability or validity of the alleged unwritten contract.  *See Klaxon v. Stentor Electric Mfg.*, 313 U.S. 487 (1941).  Virginia courts apply the Virginia statute of frauds to all disputes over unwritten contracts.  *See Logistics Transp. Co., Inc. v. Timber Trucking Co., Inc.*, 141 F.3d 1158 (Table), 1998 WL 200321 at *2 n.4 (4th Cir. Apr. 27, 1998) ("the forum's statute of frauds is to be applied where, as in Virginia, the statute operates only to affect the enforceability of the contract, and not its validity.").  Although Virginia's statute of frauds prohibits actions on unwritten contracts "not to be performed within a year," Va. Code § 11-2(8), a contract is not within the statute, and a writing is not needed, provided one party can complete his performance within a year, even if only by an improbable event.  *See Silverman v. Bernot*, 218 Va. 650, 654, 239 S.E.2d 118, 121 (1977).  Any obligation of AIPAC to advance fees could have been performed within a year of AIPAC counsel's promise, as at the time of the promise, it was conceivable that the investigation and prosecution of defendants could have ended before a year.  Thus, the Virginia statute of frauds does not apply.  In any event, AIPAC's part performance of the contract, by advancing fees for several months, removes the alleged oral contract from the statute of frauds.  *See T.G.*

---

[11] Defendants also refer to an engagement letter signed by defendants and defense counsel which, they maintain, AIPAC also endorsed.  Yet the letter was not made a part of the record, as defendants relied instead on the alleged unwritten contract, and so the analysis proceeds to consider whether the alleged unwritten contract would establish a contractual right to fee advances.

*Slater & Son, Inc. v. Donald P. and Patricia A. Brennan LLC*, 385 F.3d 836, 841-42 (4th Cir.

2004) (Virginia equity courts will enforce an oral agreement where it is certain and definite, and

the part performance is so extensive that nonenforcement would operate as a fraud).  In short, the

Virginia statute of frauds does not bar enforcement of the alleged oral contract between

defendants and AIPAC concerning advancement of defendants' attorneys fees.[12]  For these

reasons, the analysis proceeds on the basis that defendants have adequately alleged an

enforceable oral contract obligating AIPAC to advance fees.[13]

　　　Given that defendants had a colorable contract right to fee advances from AIPAC, it is

evident that defendants' Sixth Amendment claim does not fail on the ground the government

urges, namely that defendants' were spending "other people's money" on counsel.  Thus, the

circumstances at bar differ sharply from *Caplin & Drysdale*, the government's principal authority

on this point, as there, unlike here, the money for attorneys' fees belonged to the government by

virtue of the relation-back provision of the forfeiture statute.  *See* 21 U.S.C. § 853(c) (1982);

*Caplin & Drysdale*, 491 U.S. at 625.  By contrast, defendants' contractual rights to attorneys fees

from AIPAC was not forfeited by statute, but instead is a property right belonging to

---

[12] Nor is the alleged contract unenforceable for lack of consideration.  At this threshold
stage, it is appropriate to infer that defendants' continued employment with AIPAC was adequate
consideration for the promise to advance fees.

[13] Defendants assert primarily an implied-in-fact contract arising from AIPAC's practice
of advancing fees for several months.  This argument is not persuasive, because in the
circumstances presented, any implied contract would be subsumed in, or displaced by, any
express contract arising from AIPAC's oral promise to advance fees.  *See Southern Biscuit Co. v.
Lloyd*, 174 Va. 299, 6 S.E.2d 601 (1940) (express contract defining rights of the parties
necessarily precludes the existence of an implied contract of a different nature on the same
subject matter).

defendants.[14]  It follows that defendants have adequately established this element of their Sixth

Amendment claim.

*2. Wrongful Interference*

The next element defendants must show is that the government wrongfully interfered

with their Sixth Amendment right to use their own funds to retain counsel of choice.  There is no

doubt that, if defendants' allegations are taken as true, the government interfered with

defendants' contractual relations with AIPAC by pressuring or coercing AIPAC to cease

advancing fees.  In this regard, defendants correctly argue that the wrongfulness of such

interference should be informed by the civil law of tortious interference with contract, given that

the government's threats wrongfully induced a breach of the alleged contracts between each

defendant and AIPAC.  *See United States v. Stein*, 435 F. Supp. 2d 330, 367-69 (S.D.N.Y.

2006).[15]

---

[14] Contract rights are frequently "property" for constitutional purposes, including the
requirements of due process and just compensation for government takings.  *See, e.g, Mid-
American Waste Systems, Inc. v. City of Gary, Ind.*, 49 F.3d 286, 289 (7th Cir. 1995)
(Easterbrook, J.) ("Many contracts establish 'legitimate claims of entitlement' [and thus are
property for due process purposes].  How could they not?  Courts routinely enforce them . . .
[t]he Constitution itself protects them . . . If a contract creates rights specific enough to be
enforced in state court by awards of damages or specific performance, then it creates a legitimate
claim of entitlement; and if it creates such a claim, it is 'property.'"); *Ezekwo v. NYC Health and
Hospitals* Corp., 940 F.2d 775, 782-83 (2nd Cir. 1991), *Larsen v. Senate of Com. of Pa.*, 154 F.3d
82, 92 (3rd Cir. 1998), *Nat'l Educ. Ass'n-Rhode Island by Sciqulinksky v. Retirement Bd. of
Rhode Island Employees' Retirement Sys.*, 890 F. Supp. 2d 1143, 1164 (D.R.I. 1995).  *But cf.
Ezekwo*, 940 F.2d at 782 ("not every contractual benefit rises to the level of a constitutionally
protected property interest.").  *See also United States Trust Co. of N.Y. v. New Jersey*, 431 U.S.
1, 19 n.16 (1977) (contract rights may be property for takings and just compensation clauses);
*Lynch v. United States*, 292 U.S. 571, 577-79 (1934) (same).

[15] Defendants understandably cite *Stein* frequently, as *Stein* is the only published authority
discussing the issues presented by the government's use of the Thompson Memorandum.  There,
Judge Kaplan found that the government's threats to the defendants' employer (KPMG) deprived

14

In determining whether a interference with a contract is wrongful in private law cases, the general law of tortious interference with contract considers, *inter alia*, the following factors: the nature of the defendant's conduct, his motive, the nature of the plaintiff's interests interfered with, the interests sought to be advanced by the defendant, the social interests in protecting the defendant's freedom of action and the contractual interests of the plaintiff, the proximity or remoteness of the defendant's conduct to the interference, and the relations between the parties. *Restatement (Second) of Torts* § 767.

In this respect, defendants correctly point out that when the government's interests are weighed against defendant's the result is thoroughly one-sided: the government has no legitimate interest in arrangements for third parties to advance defendants' attorney fees unless, as is not true here, the advancement is alleged to be part of an actual obstruction of justice scheme.  In contrast, defendants have an undeniably strong interest – indeed, one protected by the Constitution – in presenting a defense via counsel of their choice, and in obtaining, without government interference, the contractually guaranteed fee advances that allow them to do so.  *See*

---

defendants of their rights to counsel and to fundamental fairness in criminal proceedings.  He then concluded that a showing of prejudice was unnecessary or that prejudice should be presumed, permitted the commencement of an ancillary civil action for attorneys fees by the defendants against KPMG, and adjourned the criminal trial *sine die* until the fee matter was resolved.  *See Stein*, 435 F. Supp. 2d at 356-82; *United States v. Stein*, 452 F. Supp. 2d 230 (S.D.N.Y. 2006) (ancillary complaint against KPMG stated cause of action for fee advancement); *United States v. Stein*, 461 F. Supp. 2d 201, 204-05 (S.D.N.Y. 2006) (adjourning trial).  To be sure, the two cases bear some resemblance to each other and the *Stein* analysis is instructive, but in the end, as noted *infra* Section II.A.4, this case differs markedly from *Stein* in an important respect: some counsel in *Stein* were financially incapable of continuing their representation through the trial without fee advances.  In those circumstances, it is not surprising that an ancillary breach of contract case was commenced to ensure defendants were adequately represented.  Owing to the professionalism and resources of these defense counsel, the adequacy of defendants' representation has not been impaired.

*Stein*, 435 F. Supp. 2d at 367-69.  It is clear, therefore, that defendants have adequately shown a

wrongful interference with their contractual relations with AIPAC and hence have satisfied the

second of the elements required to establish their Sixth Amendment claim.

*3. Attachment of the Right*

The government next argues that defendants' Sixth Amendment right to spend one's own

resources on counsel of choice had not attached at the time of the government's alleged pressure

on AIPAC, and hence no constitutional violation could have occurred.  The question of when this

right attaches or comes into existence is not easily answered.

It is blackletter law that the familiar right to counsel applies to criminal prosecutions, not

criminal investigations, and thus the right typically attaches "at the first formal charging

proceeding . . . after which the right applies at all critical stages of the criminal proceedings."

*United States v. Hylton*, 349 F.3d 781, 787 (4th Cir. 2003).  *See also Kirby v. Illinois*, 406 U.S.

682, 689 (1972); *Moran v. Burbine*, 475 U.S. 412, 430 (1986); *United States v. Gouveia*, 467

U.S. 180, 188-190 (19864).[16]  Importantly, the Supreme Court has held that the commencement

---

[16] While *Escobedo v. Illinois*, 378 U.S. 78 (1964), cited by defendants, suggests that the
right to counsel can attach prior to the initiation of judicial proceedings, subsequent cases have
confirmed that *Escobedo* actually concerned the so-called Fifth Amendment right to counsel, *i.e.*
that the purpose of requiring the presence of counsel in *Escobedo* was to ensure effectiveness of
the privilege against self-incrimination, not to vindicate the right to counsel *per se*.  *Gouveia*, 467
U.S. at 188 n.5.  Therefore, the analysis here proceeds without reliance on *Escobedo*.  On a
related note, defendants also cite *United States v. Harrison,* 213 F.3d 1206 (9th Cir. 2000), for the
proposition that the right to counsel attached at the time of the alleged pressure on AIPAC.  But
*Harrison* is not about when the right to counsel attaches, but is instead concerned whether the
government's knowledge of a pre-indictment relationship with counsel can constitute an
invocation of the right to counsel for *Miranda* purposes once an indictment issues.  There, the
Ninth Circuit held that a pre-indictment relationship with counsel might constitute a post-
indictment invocation of the right to counsel under certain circumstances, but the case also
affirmed that the right to counsel *per se* attaches only upon initiation of formal charges.  *Id.* at
1212.

of adversary judicial proceedings is the critical moment at which the right attaches because that is the time when the government's intent to prosecute becomes manifest.  In the Supreme Court's words, "the initiation of judicial proceedings . . . is the starting point for our whole system of adversary criminal justice.  For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified." *Kirby*, 406 U.S. at 689.  Consistent with this, the Fourth Circuit has stated that the right to counsel does not attach upon arrest or even filing of a federal criminal complaint.  *United States v. Alvarado*, 440 F.3d 191, 200 (4th Cir. 2006) (citing cases).  In short, the government urges that the right to counsel attaches only at arraignment or indictment.

While the government accurately states this general rule, some cases have attempted to carve out exceptions where the right may attach before adversary proceedings commence.  As these courts have noted, there is no doubt that the government's commitment to prosecute a defendant in some cases becomes concrete well before indictment, and that events prior to indictment can imperil a defendant's rights.  A review of these cases is instructive.  Defendants first cite a case holding that the right to counsel attached pre-indictment when the defendant had been arrested, incarcerated, arraigned on an information, and represented by counsel since arrest. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3rd Cir.) (*en banc*), *cert. denied*, 528 U.S. 824 (1999).  But this case is of limited aid to these defendants as they were not arraigned, arrested, or incarcerated at the time of the alleged interference.  In any event, since the Supreme Court has stated that the right to counsel attaches at arraignment,[17] *Matteo* does not provide strong support for the notion that the right to counsel attaches prior to commencement of judicial

---

[17] *Kirby*, 406 U.S. at 682 (citing *Powell v. Alabama*, 287 U.S. 45, 57 (1932)).

proceedings.

More helpful to defendants is a line of cases recognizing that there is merely a rebuttable presumption, not a *per se* rule, that no right to counsel exists before adversary proceedings formally commence.  In particular, the Seventh Circuit has stated that defendant may rebut this presumption by proving the government, prior to indictment, crossed the "constitutionally significant divide from factfinder to adversary."  *United States v. Larkin*, 978 F.2d 964, 969 (7th Cir. 1992), *cert. denied* 507 U.S. 935 (citing *United States ex. rel. Hall v. Lane*, 804 F.2d 79, 82 (7th Cir. 1986)).  Significantly, a Fourth Circuit panel relied on *Larkin* in an unpublished case predating *Alvarado* and *Hylton,* noting there that if the government had "assumed the adversarial role to the degree necessary," the right to counsel could attach at a post-arrest, pre-indictment lineup, although it ultimately concluded that the right did not attach in the circumstances presented.  *United States v. Burgess*, 141 F.3d 1160 (table), 1998 WL 141157 at * 2 (4th Cir. Mar. 30, 1998) (*per curiam*). The First Circuit in *Roberts v. Maine*, 48 F.3d 1287, 1291 (1st Cir. 1995), also followed *Larkin*, but noted that circumstances where the presumption is rebutted must be "extremely limited and, indeed, we are unable to cite many examples."  The *Roberts* court intimated, however, that such circumstances might arise were the government to delay indictment intentionally for the purpose of avoiding attachment of the right to counsel at a lineup.  *Id.*[18]   In

---

[18] Other authority follows *Roberts* in suggesting, albeit obliquely and in dicta, that the government may not delay formal charges solely to hold an uncounseled lineup.  *Larkin,* 978 F.2d at 969 (citing *Bruce v. Duckworth*, 659 F.2d 776, 783 (7th Cir. 1981), *cert. denied* 455 U.S. 955 (1982)) *United States ex re. Hall v. Lane*, 804 F.2d 79, 82-83 (7th Cir. 1986) ("Even if the Sixth Amendment right to counsel may sometimes vest at a line-up prior to the initiation of formal judicial proceedings, however, appellant is clearly wrong in suggesting that it always does so."); *United States v. Vaccaro*, 445 F. Supp. 2d 82, 86 (D. Mass. 2006) (right to counsel may attach before initiation of formal charges in rare circumstances, such as where government intentionally delays formal charges for the purpose of holding uncounseled lineup) (citing

addition to these cases, several district courts have concluded that a right to counsel existed in pre-indictment plea negotiations. *United States v. Fernandez*, 2000 WL 534449 (S.D.N.Y 2000); *Chrisco v. Shafran*, 507 F. Supp. 1312, 1319-20 (D.Del. 1981); *United States v. Busse*, 814 F. Supp. 760, 763 (E.D. Wis. 1993). These cases were not followed, however, in *United States v. Moody*, 206 F.3d 609 (6th Cir. 2000), where the Sixth Circuit reluctantly (and unpersuasively) concluded that the right to counsel does not attach in pre-indictment plea negotiations, despite the fact that in the circumstances there presented, the adversarial posture of the parties had clearly solidified because the defendant had been offered a specific plea bargain.

In sum, this diverse caselaw may be summarized as follows. First, the general rule (*Gouveia* and *Kirby*) is a bright line rule: the right to counsel does not attach until formal charges are initiated. Second, some courts, including the Fourth Circuit (*Burgess*) have suggested that in rare cases the right can attach before judicial proceedings commence. Third, it appears more likely that the right would attach before formal charging when there is some evidence that the government delayed charging for the purpose of conducting some pre-trial investigation, such as a lineup or an interrogation, without defense counsel when counsel would otherwise be required for any waiver of a defendant's rights to be effective.

This brief caselaw summary reflects some variability in the time various Sixth Amendment rights attach. This variability stems in large part from the fact that different manifestations of the Sixth Amendment right to counsel serve different purposes and interests. A bright line rule – no later than arraignment – serves the purposes underlying the indigent's Sixtth Amendment right to appointed counsel. The same rule applied to the Sixth Amendment right in

_____

*Roberts*, 48 F.3d at 1291).

19

issue here would leave important interests unserved.  Simply because there is no right to appointed counsel at a particular stage of an investigation, it does not follow that the government has *carte blanche* to interfere in pre-existing attorney-client relationships at that stage.  Rather, where, as here, an individual is a target or subject of an investigation, and he is in fact spending his own funds (or third-party funds to which he had a right) to retain counsel of his choice, his constitutional right to spend such funds has clearly attached.  To conclude otherwise would enable the government, which controls the time of indictment, to delay the indictment and hobble an individual's post-indictment ability to retain counsel of choice by exerting pressure on the individual's employer to refrain from advancing attorney's fees.

Yet, even assuming defendants' Sixth Amendment right here in issue had not attached at the time of the alleged government interference, it also does not follow that the interference did not cause constitutional harm to defendants' Sixth Amendment rights.  To the contrary, it is entirely plausible that pernicious effects of the pre-indictment interference continued into the post-indictment period, effectively hobbling defendants' Sixth Amendment rights to retain counsel of choice with funds to which they had a right.  As the *Stein* court put it, "the fact that events were set in motion prior to indictment with the object of having, or with knowledge that they were likely to have, an unconstitutional effect upon indictment cannot save the government . . . [i]n these circumstances, it is not unfair to hold [the government] accountable." *Stein*, 435 F. Supp. 2d at 366.  In sum, if, as alleged, the government coerced AIPAC into halting fee advances on defendants' behalf and the government did so for the purpose of undermining defendants' relationship with counsel once the indictment issued, the government violated defendants' right to expend their own resources towards counsel once the right attached.  Thus, defendants have, at

this threshold stage, also satisfied this element of their Sixth Amendment claim.

*4. Prejudice*

The final element defendants must establish to prevail on their Sixth Amendment claim is to show that the interference prejudiced their defense.  This they cannot do.

Analysis of the prejudice element must begin with a consideration of the defendants' contention that in this context prejudice need not be shown.  In support, defendants rely on *United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006), which held that no showing of prejudice is required for a Sixth Amendment violation where a district court denied a defendant his retained counsel of choice by not allowing that counsel to appear *pro hac vice*.  *Gonzalez-Lopez* is plainly distinguishable and hence not controlling here.  There, a court's action denied defendant his retained counsel of choice, whereas the alleged government interference here did not, in the end, deny these defendants their counsel of choice.  To the contrary, defense counsel in this case have remained fully engaged in this case zealously and very effectively representing defendants notwithstanding the government interference that allegedly led to the loss of the AIPAC fee payments.

Recognizing this distinction, defendants nonetheless argue that the loss of AIPAC's fee advances has had an adverse effect on their ability to mount a defense by reducing the resources available to counsel.  In other words, they claim that the loss of the AIPAC fee payments has reduced their counsel's effectiveness.  This argument fails because, as shown *infra*, a mountain of evidence convincingly demonstrates that defense counsel's zealous, thorough, and effective representation of defendants has not been adversely affected by the loss of AIPAC's fee payments.  But putting this point aside for the moment, it is noteworthy that defendants make this

effectiveness argument, for it is akin to a Sixth Amendment ineffective assistance of counsel claim.  *See Strickland v. Washington*, 466 U.S. 668 (1984).  Just as a showing of prejudice is required in that Sixth Amendment context, so too, for the same reasons, should such a showing also be required in this Sixth Amendment context.  Put another way, this is not a case like *Gonzalez-Lopez* in which defendant was denied counsel of choice altogether; rather it is a case like *Strickland,* where the claim is that counsel's effectiveness was impaired.[19]

Defendants next argue that even if prejudice is required, it must be presumed here because the government's interference with their right to use their own resources to pay their lawyers is a "structural defect" that "affect[s] and contaminate[s] the entire criminal proceeding." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991).  In other words, defendants argue that the government's interference with the attorney-client relationship defies harmless error analysis, as prejudice is so likely that "case by case inquiry into prejudice is not worth the cost." *Id.* at 310. However persuasive this argument might have been in *Stein*, this is a markedly different case, and it is unpersuasive here.  While this case is substantial in size and complexity, it is still dwarfed by *Stein*, a "19 defendant, 46 count superseding indictment charg[ing] what has been called the largest criminal tax case in United States history."  *United States v. Stein*, 2005 WL

---

[19] Similarly, in considering whether a showing of prejudice should be required, it is appropriate to draw on the general law of tortious interference with contract, as that tort bears a very close relationship to defendants' Sixth Amendment claim.  *See supra* Section II.A.2.  The civil tort, of course, requires a showing of harm or damages. *See, e.g., Cooper v. Laboratory Corp. of America Holdings, Inc.*, 150 F.3d 376, 381-82 (4th Cir. 1998); *Waldren Bros. Beauty Supply, Inc. v. Wynn Beauty Supply Co., Inc.*, 992 F.2d 59, 62 (4th Cir. 1993); 45 *Am.Jur.2d Interference* § 11.  Just as a civil tortious interference with contract does not give rise to a remedy when no damage resulted from the interference, so should the Sixth Amendment interference claim not give rise to a remedy absent a showing of prejudice, unless, as is not the case here, the interference rises to the level of a structural defect.

3071272 (S.D.N.Y. Nov. 15, 2005) (Order denying bail as to one defendant).  *Stein* involved

millions of pages of documents and hundreds of depositions, and an anticipated trial of such

length that some defense counsel could not even afford to attend trial, let alone prepare for it,

absent fee advances.  *Stein*, F. Supp. 2d at 371-72.  This case is substantial and complex, but not

of *Stein*'s magnitude.  This is a two count indictment against two defendants that is projected to

take no more than four to six weeks to try.  And the record in this case reflects that defense

counsel have mounted a vigorous and effective defense notwithstanding the absence of AIPAC

fee payments.  In short, however persuasive a presumption of prejudice may have been in *Stein*,

that argument is not persuasive here.  The difficulty of assessing prejudice is no greater than the

difficulty of doing so in the typical ineffective assistance of counsel case, which is now routine in

federal courts.  *See Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness

claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course

should be followed.").

Given that defendants must show prejudice to prevail on their claim, it remains only to

assess whether prejudice has occurred.  It has not, and any argument to the contrary is belied by

the intensity of defense counsel's efforts to date.  It is apparent from a review of the record that

notwithstanding any resource constraints, defense counsel have fully and energetically engaged

the complex issues in this case.  A record consisting of almost five hundred docket entries

reflects that over two dozen substantive motions have been filed on defendants' behalf, some of

which included multiple and lengthy briefs raising both novel and important arguments that

reflect very substantial research efforts.  Of course, in addition to their own motions, defense

counsel have filed responses vigorously contesting the dozens of substantive government

motions.[20]  The vigor and magnitude of the defense effort in this case may also be seen in the fact

that at least two and often three attorneys have appeared on behalf of each defendant at each of

the many hearings that have been held in this case.  Given the mountain of evidence testifying to

the vigor of the defense being mounted on behalf of these defendants, it is simply not tenable to

argue that the loss of AIPAC fee payments has caused defense counsel to do less than their

professional duty.[21]

   In sum, defendants' claim of a Sixth Amendment violation fails for lack of a showing of

prejudice.

*B. Fifth Amendment*

   Defendants' Fifth Amendment claim, succinctly put, is that the government's interference

_____

   [20] Memorandum Opinions resolving some of these issues reflect the complexity and
novelty of the claims defense counsel have both raised and opposed.  *See United States v. Rosen*,
445 F. Supp. 2d 602 (E.D.Va. 2006) (motion to dismiss indictment, raising constitutional
challenges to 18 U.S.C. § 793); *United States v. Rosen*, 444 F. Supp. 2d 664 (E.D.Va. 2006)
(successful defense opposition to government's motion to amend indictment); *United States v.
Rosen*, 447 F. Supp. 2d 538 (E.D.Va. 2006) (motion for disclosure of FISA materials); *United
States v. Rosen*, 471 F. Supp. 2d 651 (E.D.Va. 2007) (motion for show cause hearing, sanctions,
and dismissal of indictment for alleged violation of Rule 6(e), Fed. R. Crim. P.); *United States v.
Rosen*, 474 F. Supp. 2d 799 (E.D.Va. 2007) (motion to suppress defendants' statements); *United
States v. Rosen*, 240 F.R.D. 204 (E.D.Va. 2007) (motion pursuant to Rule 15, Fed. R. Crim. P., to
take depositions in Israel); *United States v. Rosen*, __ F. Supp. 2d __, 2007 WL 1202700
(E.D.Va. Apr. 19, 2007) (successful defense opposition to government's putative CIPA § 6(c)
substitutions).  It is particularly worth noting that the record reflects a willingness of counsel to
travel to Israel to take depositions, a fact that belies the claim that lack of fee payments is
limiting counsel's litigation options.

   [21] While defense counsel have offered to submit affidavits describing the extra efforts
they would have undertaken had AIPAC fee advances not ceased, such an effort would be
unpersuasive.  What counsel have actually done in providing a vigorous defense speaks so loudly
that any protestations to the contrary would not be audible or discernible.
   It is also worth noting that defense counsel's offer to catalogue prejudice undermines
their argument that prejudice should be presumed because specific instances of prejudice cannot
be shown.

with the AIPAC fee advances violated defendants' alleged substantive due process rights (i) to

fundamental fairness in criminal proceedings, and (ii) to make a defense.  Defendants claim that

because these rights are fundamental, interference with them via the Thompson Memorandum

(and threats made pursuant thereto) must satisfy strict scrutiny.  Finally, although the proffered

government interest in investigating crime and preventing obstruction of justice is compelling,

defendants argue that the Thompson Memorandum is not narrowly tailored to prevent

obstruction because it does not distinguish between fee advances that are part of an obstruction of

justice scheme and fee advances that are not.

This imaginative argument may be disposed of more easily than the Sixth Amendment

claim because it founders on a fundamental principle of constitutional law.  It is axiomatic that

substantive due process must be invoked cautiously, and when "a particular Amendment

provides an explicit textual source of constitutional protection against a particular sort of

government behavior, that Amendment, not the more generalized notion of substantive due

process, must be the guide for analyzing those claims." *County of Sarcramento v. Lewis*, 523

U.S. 833, 842 (1998) (internal citations omitted).  Moreover, substantive due process analysis

requires "a careful description of the asserted fundamental liberty interest." *Washington v.

Glucksberg*, 521 U.S. 702, 720-22 (1997); *see also id.* at 723 (formulating the asserted right as a

"right to commit suicide which itself includes a right to assistance in doing so" rather than the

more general "liberty interest in determining the time and manner of one's death.").

An equally careful formulation of the fundamental right allegedly protected by

substantive due process is called for here.  And, defendants' description of the right as

"fundamental fairness in criminal proceedings" or "the right to prepare a defense" falls far short;

it is insufficiently precise.  Distilled to its essence, defendants' due process claim is that the

government treated them unfairly because it interfered with their liberty or property interest to

expend their own funds towards their defense.  Clearly, whatever protection that right receives

derives from the Sixth Amendment, and in accordance with *City of Sacramento*, the claim must

be measured by that Amendment's standards.  So measured, it fails.  *See supra* section II.  There

is no need to undertake a separate inquiry addressing substantive due process when the right is

protected, to whatever extent it is protected, by another constitutional text.  For this reason,

defendants' Fifth Amendment claim fails.

## IV.

In closing, it is worth reiterating that the result reached here is in no way an endorsement

of the Thompson Memorandum policy directive with respect to an organization's payment or

advancement of attorney fees for employees who are targets or subjects of criminal

investigations.  Indeed, that policy is unquestionably obnoxious in general and is fraught with the

risk of constitutional harm in specific cases.  As Justice Blackmun noted in a different context,

"it is unseemly and unjust for the government to beggar those it prosecutes in order to disable

their defense at trial."  *Caplin & Drysdale, Chartered v. United States*, 491 U.S. at 635

(Blackmun, J., dissenting).  Fee advancement provisions are legitimate contractual rights,

especially important given the high cost of mounting a defense in the complex suits in which

corporate officers and employees may find themselves by virtue of their employment.  The

government must avoid wrongfully interfering with these important contractual rights.  That no

prejudice resulted here is the result of defense counsel's continuing, vigorous efforts despite the

loss of AIPAC's fee payments.  But since the right to expend one's resources to retain counsel of

choice is a *defendant's* right, no relief is warranted here, as no prejudice to the defense resulted

from the government's interference with defendants' right to have AIPAC pay their attorneys.

An appropriate Order will issue.


_____/s_____
Alexandria, Virginia                                    T. S. Ellis, III
May 8, 2007                                              United States District Judge