**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:05cr225 |
| | ) | |
| STEVEN J. ROSEN and | ) | |
| KEITH WEISSMAN | ) | |

## MEMORANDUM OPINION

At issue in this Espionage Act[1] prosecution is the government's second motion pursuant to § 6(c) of the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, to introduce certain summaries, redactions, and substitutions at trial in lieu of certain specific classified information, and to use the "silent witness rule" (SWR) with respect to portions of certain documents and recordings. After briefing on the motion, a sealed hearing was held over the course of eleven days in July, August, and September 2007,[2] during the course of which the Court heard argument and made rulings on, *inter alia*, (i) the relevance and admissibility of certain evidence under the Federal Rules of Evidence, (ii) the propriety under CIPA § 6(c) of the government's proposed redactions and summaries, and (iii) the propriety of the government's proposed use of the SWR. A sealed, classified order will record these rulings, while this memorandum opinion, which will be docketed and placed in the public record, will serve to identify and elucidate the legal principles that govern disposition of the government's motion.

_____

[1] 18 U.S.C. § 793 *et seq.*

[2] A twelfth and final hearing day is scheduled for November 7, 2007.

-1-

## I. CIPA Proceedings to Date

Defendants Steven Rosen and Keith Weissman are charged with conspiracy to violate the Espionage Act, in violation of 18 U.S.C. §§ 793(g) and (e).  Rosen is also charged with one count of aiding and abetting alleged co-conspirator Larry Franklin's unauthorized disclosure of national defense information,[3] in violation of 18 U.S.C. § 2, 793(d).  The Superseding Indictment generally charges that defendants cultivated sources of information within the United States government, obtained or sought to obtain NDI from those sources, and disclosed that information to a variety of other individuals not authorized to receive it, including American Israel Public Affairs Committee (AIPAC) staffers, journalists, and foreign government officials.

This case involves a large volume of classified information.  Discovery of such information, and its use at trial, is governed by CIPA. The preliminary stages of the CIPA process — the CIPA § 2 pre-trial conference, the CIPA § 3 protective order, and classified discovery pursuant to CIPA § 4 — are adequately described in a prior Memorandum Opinion. *See United States v. Rosen*, 487 F. Supp. 2d 703, 706-07 (E.D. Va. 2007) (*Rosen VII*) (granting defense motion to strike government's CIPA § 6(c) motion).[4]  Following classified discovery,

---

[3]  Hereinafter "NDI."

[4]  *Rosen VII* is the seventh of nine published opinions and orders that have issued in this case.  This is the tenth.  The other eight are as follows:

(i) *United States v. Rosen*, 445 F. Supp. 2d 602 (E.D. Va. 2006) (*Rosen I*) (denying defendants' motion to dismiss the indictment on constitutional grounds);
(ii) *United States v. Rosen*, 444 F. Supp. 2d 664 (E.D. Va. 2006) (*Rosen II*) (denying government's motion to prove an overt act at variance with the indictment);
(iii) *United States v. Rosen*, 447 F. Supp. 2d 538 (E.D. Va. 2006) (*Rosen III*) (denying defendants' motion for discovery of FISA materials);
(iv) *United States v. Rosen*, 471 F. Supp. 2d 651 (E.D. Va. 2007) (*Rosen IV*)

defendants filed notice pursuant to CIPA § 5 of classified information they reasonably expect to disclose, or to cause the disclosure of, at trial.[5]  At the government's request, a sealed hearing was held pursuant to CIPA § 6(a), at which the Court made preliminary relevance determinations.  Some of the noticed material was ruled irrelevant, while other material was ruled relevant and passed to the CIPA § 6(c) stage.

The government then filed a motion, ostensibly pursuant to CIPA § 6(c), in which it sought application of the SWR to most of the classified information at issue in the case. The Court struck this motion in its entirety, finding, *inter alia*, that the government's proposed extensive use of the SWR effectively closed the trial to the public and that the government had not adequately justified this trial closure under the applicable standard of *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984).  *See Rosen VII,* 487 F. Supp. 2d at 707-21. The government has now filed a second CIPA § 6(c) motion in which the proposed use of the SWR is significantly reduced, and in which the government also proposes numerous

---

(denying defendants' motion for show cause hearing, sanctions, and dismissal of indictment for alleged violation of grand jury secrecy);
(v) *United States v. Rosen*, 474 F. Supp. 2d 799 (E.D. Va. 2007) (*Rosen V*) (denying defendants' motion to suppress defendants' statements);
(vi) *United States v. Rosen*, 240 F.R.D. 204 (E.D. Va. 2007) (*Rosen VI*) (denying defendants' motion pursuant to Rule 15, Fed. R. Crim. P., to take depositions in Israel);
(vii) *United States v. Rosen*, 487 F. Supp. 2d 721 (E.D. Va. 2007) (*Rosen VIII*) (denying defendants' motion to dismiss the indictment because of alleged government pressure on AIPAC to cease paying defendants attorneys' fees); and
(viii) *United States v. Rosen*, ___ F. Supp. 2d ___, 2007 WL 3130601 (E.D. Va. Oct. 24, 2007) (Order) (*Rosen IX*) (denying defendants' motion for reciprocal discovery).

[5]  Defendants have since filed further CIPA § 5 notices listing additional classified information that may be disclosed at trial. These notices will be the subject of future CIPA proceedings.

conventional CIPA § 6(c) substitutions to be provided to the public and the jury in the same form. The motion has been fully briefed and argued, and is now ripe for resolution.

## II. Applicable Law

A.      CIPA

The goal of the CIPA process is to identify in advance of trial the universe of classified information to be disclosed at trial and to minimize unnecessary disclosure of classified information by use of substitutions, redactions, and summaries that do not meaningfully impair defendants' ability to present a defense.  This goal is not easily attained, as it requires both prosecutors and defense counsel to disclose, well in advance of trial, certain aspects of their trial strategy, including the identity of potential witnesses and the nature and thrust of expected trial testimony and potential jury arguments.  In effect, the CIPA process compels discovery well beyond that required by Rule 16, Fed. R. Crim. P.  And attaining the CIPA goal is all the more difficult where, as here, the case is complex, the relevant issues and topics numerous and the volume of pertinent classified documents large by any measure.  Thus, it is not surprising that the § 6(c) stage of the CIPA process has required eleven hearing days thus far and may require more.

By the time of the § 6(c) stage of the CIPA process, the universe of classified documents and testimony topics for use at trial has been previously identified.  The specific goal at hand is to consider the government's second § 6(c) motion to allow certain redactions of portions of classified documents and to use in lieu thereof certain substitutions and summaries to the end of avoiding unnecessary disclosure of classified information.  This motion is governed chiefly by § 6(c) itself, which, in pertinent part, provides that

> The court shall grant such a motion of the United States if it finds
> that the statement or summary will provide the defendant with
> substantially the same ability to make his defense as would
> disclosure of the specific classified information.

The government also proposes that certain classified documents and recordings be admitted at trial in redacted form, a proposal governed by CIPA § 8(b), which, in order to prevent unnecessary disclosure of classified information, authorizes "excision of some or all of the classified information contained therein, unless the whole ought in fairness to be considered."

It is quite clear, therefore, that the touchstone of permissible CIPA § 6(c) substitutions, summaries or redactions is fairness. It is not open to the court to question or second-guess the classification status of any document or the government's request to subject parts of documents to a substitution, redaction, or summary. *See Rosen VII*, 487 F. Supp. 2d at 707. Rather, the court's sole inquiry is whether a proposed substitution, redaction, or summary provides the defendants with substantially the same ability to make their defense as would the specific classified information. Further elucidation of this fairness standard is not found in either CIPA or the decided cases. The legislative history in this regard is similarly sparse, noting only that the "substantially the same ability" standard does not preclude substitutions that result in "insignificant" tactical disadvantages to the defense. *See* H.Rep. 96-1436, *reprinted in* 1980 U.S.C.C.A.N. 4307, 4310-11. In the end, each CIPA § 6(c) decision must be a careful judgment based on a clear understanding of the relevance of the classified material in issue and how it relates to the elements of the charged offenses and to a defendant's defenses. And, of course, this judgment must also be informed by a sensitivity, born of experience, to the dynamics of jury trials and to the ways in which typical jurors respond to evidence and a judge's instructions.

This discussion summarizes briefly the principles that govern disposition of the purely §

6(c) issues raised in the government's motion.  But this CIPA § 6(c) discussion does not, by

itself, fully describe the legal principles that control disposition of the government's motion at

bar inasmuch as that motion, together with related pleadings, also seeks to use the SWR in

connection with a subset of classified matters to be used at trial and also to invoke the

government's common law classified information privilege.

**B.     The Elements of the Offenses**

Given the important role the offense elements play in CIPA § 6(c) judgments, it is useful

to restate those elements here in Part B notwithstanding that they have elsewhere been stated.

Defendants are charged under § 793(g) with conspiracy to obtain and disclose NDI to persons not

authorized to receive it; they are not charged under § 793(d) or (e) with the substantive disclosure

offense itself.  The Fourth Circuit has explained that the elements of a conspiracy are "an

agreement among the defendants *to do something which the law prohibits*; knowing and willing

participation by the defendants in the agreement; and an overt act by the defendants in

furtherance of the purpose of the agreement."  *United States v. Hedgepeth*, 418 F.3d 411, 420

(4th Cir. 2005) (internal citations omitted and emphasis added).  It is also black letter law that to

prove a conspiracy, the government (i) need not prove all the elements of the underlying

substantive offense,[6] (ii) need not prove all the objects of a multiple object conspiracy, only one

object,[7] (iii) need not prove all the overt acts alleged, only that one conspirator committed one

---

[6]  *See Pinkerton v. United States*, 328 U.S. 640, 643 (1946).

[7]  *See United States v. Bolden*, 325 F.3d 471, 492 (4th Cir. 2003).

overt act alleged,[8] and (iv) need not prove that the overt act is independently criminal, that is, the

overt act may be "innocent when considered alone" so long as it "is knowingly committed by a

conspirator in an effort to accomplish some object of the conspiracy."[9]

Based on these principles, the government has argued that it need not prove that

defendants actually obtained or disclosed NDI, or that any individual to whom they actually

disclosed NDI was not authorized to receive it. This argument reflects an incomplete

appreciation of the import of *Rosen I*, which upheld the constitutionality, as applied, of § 793.

As noted, it is axiomatic that a conspiracy is an agreement to commit a crime.  *See Hedgepeth,*

*supra*.  Thus, if the statute defining the substantive offense is unconstitutional, no prosecution for

conspiracy to commit that offense will lie because the object of the agreement is not unlawful.

By extension, where, as here, a statute is saved from unconstitutionality only by a limiting

construction of the statute, the proof required by the limiting construction must also be adduced

in a prosecution for the conspiracy offense.  More precisely, a limiting construction, which

requires proof of additional *act elements* to avoid unconstitutionality, would be satisfied by proof

that the unlawful agreement contemplated that some co-conspirator would have committed the

additional act elements had the agreement been carried out.  *See Salinas v. United States*, 522

U.S. 52, 65 (1997) (conspiracy requires proof that defendants "intend[ed] to further an endeavor

which, if completed, would satisfy all the elements of a substantive criminal offense").  In

contrast, where a limiting construction of the statute defining the substantive offense requires

---

[8]  *See United States v. Fleschner*, 98 F.3d 155, 159 (4th Cir. 1996), *cert. denied*, 521 U.S.
1106 (1997).

[9]  *Fleschner*, 98 F.3d at 159.

proof of a particular *mental state*, that mental state must be proved beyond a reasonable doubt in

a conspiracy prosecution, as a conspiracy conviction will not lie unless the defendant possesses

"at least the degree of criminal intent necessary for [conviction of] the substantive offense itself."

*United States v. Feola*, 420 U.S. 671, 686 (1975).

The limiting construction of § 793(d) and (e) imposed in *Rosen I* requires proof of both

act and mental state elements.  As to the former, *Rosen I* stated that, for § 793(d) and (e) to

survive a vagueness challenge, the statutory term "information related to the national defense"

(NDI) must be confined to information closely held by the government and damaging to national

security if revealed.  *Rosen I*, 455 F. Supp. 2d at 618-22.  Second, to survive a vagueness

challenge based on lack of adequate notice, the statutory term "entitled to receive [NDI]" is

limited by the Executive Order establishing the classification system; that is, the Order defines

who is "entitled to receive" classified NDI.  *Id.* at 622-24.  Because the *Rosen I* construction of

the "NDI" and "entitled to receive" elements are constructions of act or circumstance

elements, and not mental states, and because this is a conspiracy case, the government is correct

that it need not prove that the individuals to whom defendants *actually disclosed* information

were not entitled to receive it, or that the information defendants *actually disclosed* was closely

held and damaging to national security.  These overt acts need not be independently unlawful.

Rather, it is sufficient if the government proves that the conspiracy's object or goal was to

disclose NDI (as construed in *Rosen I*) to unauthorized persons (as construed in *Rosen I*).

Yet *Rosen I* also provided that certain mental states closely related to the "NDI" and

"entitled to receive" elements must be proved for § 793 to pass constitutional muster.

Because a prosecution for oral disclosure of NDI would be constitutionally infirm if a defendant

lacked notice that the information disclosed was NDI or that the recipient was not entitled to receive it, the government must prove beyond a reasonable doubt that a defendant charged with an oral disclosure of NDI under § 793(d) or (e) actually knew that the information he disclosed was closely held by the government and damaging to national security if revealed, and actually knew that the recipient was not entitled to receive the information under the applicable classification regulations.  *Id.* at 623-25.  These are glosses on the statutory willfulness requirement that also require the government to prove, in cases involving oral disclosures rather than document disclosures, that the defendant had a bad faith purpose to harm the United States or to aid a foreign government.  *Id.* at 626.  And, § 793(d) and (e) impose still another mental state requirement in cases involving intangible information, namely that a defendant must have had "reason to believe" the disclosures could be used "to the injury of the United States or to the advantage of any foreign nation." § 793 (d), (e).  These mental state elements are part of the government's burden of proof even though the government need not prove that any particular disclosure involved revealing NDI to unauthorized persons.

Thus, *Rosen I* requires that to establish a prosecution for conspiracy to violate § 793(d) and (e) by orally disclosing NDI, the government must prove beyond a reasonable doubt that at the time they entered the unlawful agreement, the defendants (i) knew that the information the conspiracy sought to obtain and disclose was NDI, *i.e.*, knew that the information was closely held by the government and that the disclosure of the information would be damaging to the national security, (ii) knew the persons to whom the disclosures would be made were not authorized to receive the information, (iii) knew the disclosures the conspiracy contemplated making were unlawful, (iv) had reason to believe the information disclosed could be used

to the injury of the United States or to the aid of a foreign nation, and (v) intended that such injury to the United States or aid to a foreign nation result from the disclosures. *See Rosen I*, 445 F. Supp. 2d at 623-26; *Rosen VI*, 240 F.R.D. at 209-10.  The conspiracy charge fails absent proof of these mental state elements.

In addition to the conspiracy charge, Rosen is also charged with aiding and abetting Larry Franklin's violation of 18 U.S.C. § 793(d).  This charge is based on Rosen's receipt of a specific facsimile sent to him by Franklin.  To prove this offense, the government must prove (i) that Franklin committed the underlying offense, (ii) that Rosen participated in the crime as something he wished to bring about, (iii) that Rosen associated himself with Franklin's criminal venture knowingly and voluntarily – that is, that he shared Franklin's criminal intent and was aware of the unlawfulness of their acts – and (iv) that Rosen sought by his actions to make the criminal venture succeed.  *See, e.g.*, *United States v. Moye*, 454 F.3d 390, 398 (4th Cir.) (en banc), *cert. denied*, 127 S.Ct. 452 (2006).

## C.  The Silent Witness Rule

In addition to conventional CIPA substitutions, *i.e.* redactions, admissions, and summaries, the government also proposes use of the SWR, a procedure whereby certain evidence designated by the government is made known to the judge, the jury, counsel, and witnesses, but is withheld from the public.  Under this procedure, a witness referring to this evidence would not specifically identify or describe it, but would instead refer to it by reference to page and line numbers of a document or transcript, or more commonly by use of codes such as "Person 1," "Country A," etc.  The jury, counsel, and the judge would have access to a key alerting them to

the meaning of these code designations; the public, however, would not have access to this key.[10]

Any recordings containing the portions designated for SWR treatment would be played in open

court, but would revert to static when the portions designated to be treated under the SWR are

reached; thus, the public would not hear these portions.  At the same time, however, jurors,

counsel, and the judge would listen on headphones to the unredacted recording.  This SWR

procedure is in sharp contrast to the CIPA procedure, which contemplates that any substitutions,

summaries, and redactions will be made available to the public and jury in identical form.  As

this contrast makes clear, conventional CIPA § 6(c) substitutions, summaries, and redactions

differ from the SWR procedure chiefly in the following ways:

> (1) Use of conventional CIPA § 6(c) substitutions, summaries, and redactions
> results in trial participants and the public seeing and hearing the same trial,
> whereas use of the SWR results in the trial participants hearing or seeing some
> evidence the public does not see or hear.  In other words, the SWR results in
> closing a part of the trial to the public.
>
> (2) Use of the conventional CIPA § 6(c) substitutions, summaries, and redactions
> results in avoiding unnecessary disclosure of classified information to both trial
> participants and the public, as both groups see and hear the same substitutions,
> summaries and redactions of classified information; whereas, use of the SWR
> allows trial participants (including the jury), but not the public, to see and hear
> certain classified information.

---

[10] It is important to note that it became apparent during the course of CIPA § 6(c)
hearings that vigorous cross-examination may well lead to disclosure in open court of
information sought to be protected by the SWR.  This is so because the SWR cannot be
employed to force all witnesses to refer to protected information in code throughout their
testimony.  To be sure, a witness can be instructed to refer to a country named in a document or
transcript protected by the SWR as "Country A."  Yet that witness and others may be cross-
examined about, *inter alia*, the scope of their job responsibilities and public domain information
without being required to testify in code and, in the course of this, the witness may testify that his
job focuses on foreign policy with respect to a specific, named country, which, in turn, would
likely lead members of the public to decipher the true identity of "Country A."  *See* Transcript of
CIPA § 6(c) Hearing, *United States v. Rosen*, 1:05cr225, at 94-101 (E.D. Va. Aug. 16, 2007).

The SWR is a novel evidence presentation technique that has received little judicial attention in the context of the use of classified information in trials.  No published decision has explicitly approved or endorsed use of the rule in this context.  Indeed, the government has only proposed the SWR in three reported cases.[11]  Of these three attempts, only in *Zettl* did the district court permit the SWR's use, but that case is of limited guidance because the district court's reasoning in permitting the SWR with respect to the use of classified information is not reflected in any published decision, and the Fourth Circuit declined on appeal to reach the question.  This paucity of judicial precedent on the SWR's use in CIPA cases counsels caution with respect to its use in this context.

The threshold question that must be resolved with respect to the SWR's use in this case is whether it is even permissible to use in the CIPA context.  Put differently, the question is whether CIPA provides the exclusive means of dealing with classified information in criminal trials and, even if so, whether the SWR can be said to be authorized by CIPA § 6(c) as constituting a species of "summary" or "substitution" under that provision.  These are not easily answered questions.  Substantial arguments exist on both sides of these questions.  Defendants point chiefly to CIPA's comprehensiveness in its prescriptions for the handling of classified information in trial.  This comprehensiveness, defendants argue, manifests Congress' intent to

---

[11]  *United States v. Fernandez*, 913 F.2d 148, 161-62 (4th Cir. 1990); *United States v. North*, 1998 WL 148481 at *3 (D.D.C. Dec. 12, 1988); *United States v. Zettl*, 835 F.2d 1059, 1063 (4th Cir. 1987).  There have doubtless been other instances of the use of the SWR that have not led to published decisions.  And, of course, there are reported cases in which a district court was required to examine highly classified information *in camera* and *ex parte* in resolving a dispute.  *See, e.g., El Masri v. Tenet*, 437 F. Supp. 2d 530, 537 (E.D. Va. 2006) (reviewing the government's basis for an assertion of the "states secrets privilege" *in camera* and *ex parte*), *aff'd* 479 F.3d 296 (4th Cir. 2007), *cert. denied*, ___ S.Ct. ___ (Oct. 9, 2007).

forbid the use of any trial presentation techniques not specifically authorized by CIPA, including

the SWR. A closely-related statutory construction argument defendants advance relies on the

familiar interpretive canon *expressio unius est exclusio alterius*, namely that "[w]hen a statute

limits a thing to be done in a particular mode, it [the statute] includes the negative of any other

mode." *Diaz v. Va. Hous. Dev. Auth.*, 117 F. Supp. 2d 500, 504 (E.D. Va. 2000). Defendants

point further in support of their argument to Rule 26, Fed. R. Crim. P., which in general terms

states that trial testimony "must be taken in open court, unless otherwise provided by a statute or

by rules adopted under 28 U.S.C. §§ 2072-2077."

Although not insubstantial, these arguments, in the end, fail to persuade. CIPA, while

undeniably detailed in some respects, is neither explicitly nor implicitly exclusive as to the trial

treatment of classified information. CIPA provides no answer, for example, to the question

whether the classification markings on relevant documents should be removed as inadmissible

hearsay as to the issue whether the document's contents are NDI within the meaning of the

Espionage Act.[12] Nor does CIPA provide any guidance on whether it might either be appropriate

or required to issue a jury instruction limiting the purposes for which the jury might consider a

document's classification markings.[13] Similarly, CIPA does not address the question, presented

in this case, whether it is appropriate to allow disparate access by experts to certain classified

---

[12] NDI is information that is closely held by the government and potentially harmful to national security if disclosed. *See supra* Part II.B.

[13] Such a limiting instruction might appropriately state that the jury may not infer from document markings indicating that the document is "Secret" or "Classified" that the information contained therein was in fact closely held and was therefore NDI, but may consider these markings for the limited purpose of showing that the government *attempted* to hold the documents closely.

information redacted from a relevant classified trial document.[14]  Also not addressed by CIPA is

whether witnesses whose identity is classified may appear to testify using a pseudonym, a mask

or some other device to conceal the witness's identity.[15]  CIPA is also silent about the

government's classified information privilege, which exists independent of CIPA.  *See infra* Part

II.D.

In sum, CIPA is neither exhaustive nor explicitly exclusive with respect to the

presentation of classified testimony or documents at trial.  It follows that CIPA cannot be said to

exclude the use of the SWR at trial.  And, indeed, while no court has squarely addressed this

precise question, a few courts have implicitly approved the use of the SWR at trial.[16]  Other

courts, without using the "SWR" term, have approved the presentation of evidence in one form

---

[14]  Here, for instance, the government intends to show its experts the full, unredacted forms of documents that have been subject to the CIPA § 6(c) process, while claiming that it is appropriate to limit the access of defendants' experts to the redacted and substituted forms of the same documents.

[15]  *See United States v. Moussaoui*, 382 F.3d 453, 456 n.1, 480 n. 37 (4th Cir. 2004) (noting that the names of enemy combatants defendant sought to subpoena were classified and that, to protect national security interests, the district court could use "alternate names for people or places" in creating substitutions for those witnesses' proposed testimony); *United States v. Marzook*, 435 F. Supp. 2d 708 (N.D. Ill. 2006) (allowing use of pseudonyms at a suppression hearing to protect the classified identities of secret agents of the Israel Security Agency).  Indeed, in *United States v. Lindh*, the court indicated that it would allow a clandestine government intelligence agent to appear at an evidentiary hearing under an assumed name, and the courtroom would be arranged in such a way that the government, the defendant and defense counsel could see and confront the agent, while others in the courtroom would be able to see, but not hear the agent.  *See Lindh*, 1:02cr37 (E.D. Va. 2002).

[16]  *See Zettl*, 835 F.2d at 1063 (noting the district court's approval of limited use of the SWR and affirming on other grounds); *cf. Fernandez*, 913 F.2d at 161-62 (rejecting the proposed use of the SWR as untimely, but noting that the government's proposal was "ingenious"); *North*, 1988 WL 148481 at *3 (rejecting the use of the SWR in "this particular case which will involve thousands of pages of redacted material and numerous substitutions" without addressing its applicability in other contexts).

to the jury and in another form to the public.[17]   In doing so, these courts have given effect to

Congress' express intent in enacting CIPA that federal district judges "must be relied on to

fashion creative and fair solutions to these problems," *i.e.*, the problems raised by use of

classified information in trials.  S. Rep. 96-823, *reprinted in* 1980 U.S.C.C.A.N. 4294.[18]  In short,

the SWR is precisely the sort of judicially-created fair solution envisioned by Congress.

    Nor is Rule 26 of any aid to defendants' argument.  The Rule is general and aspirational

and suffers the fate of all general rules:  It has well-established exceptions.  Courts in criminal

cases have in a variety of circumstances partially closed proceedings to accommodate overriding

interests, such as the safety of confidential informants and undercover officers.[19]  The SWR is

simply another of these exceptions.  Of course, the SWR should be used sparingly and only

---

[17] *See United States v. Pelton*, 696 F. Supp. 156, 157-60 (D. Md. 1986) (allowing recorded conversations containing classified information to be played only to the court, counsel, defendant, and the jury, while making only a redacted trial transcript available to the public); *United States v. George*, Nos. 91-0521 & 92-0215, 1992 WL 200027, at *3 (D.D.C. July 29, 1992) (withholding witnesses' names from the public, but disclosing them to defendant, the court, and government's counsel via a "key card" filed under seal).

[18] There is no legislative history directly addressing the SWR.  Defendants cite statements in the legislative history, including private citizen statements expressing a general desire to preserve public trials.  These general statements are not a sound, reliable basis for concluding that Congress intended in CIPA to preclude the use of the SWR.  To conclude otherwise would logically lead to prohibiting all partial trial closings in any context, a result clearly at odds with precedent.  *See supra* notes 17-18 and *infra* note 20.

[19] *See, e.g.*, *Carson v. Fischer*, 421 F.3d 83, 88-91 (2d Cir. 2005) (finding courtroom closure appropriate to protect confidential informant); *Brown v. Artuz*, 283 F.2d 492, 501-02 (2d Cir. 2002) (approving courtroom closure during testimony of undercover officer); *United States v. Leos-Hermosillo*, No. 98-50546, 2000 WL 300967, at *1 (9th Cir. Mar. 22, 2000) (upholding via unpublished opinion the closure of a trial to protect a confidential informant); *cf. United States v. Galloway*, 937 F.2d 542, 545-47 (10th Cir. 1991) (remanding case to the district court to explain on the record its reasoning for partially closing trial during complaining witness's testimony).

where the standards governing trial closures are met.  It may not be used excessively, as was true with the government's first motion pursuant to CIPA § 6(c).[20]

Less difficult to answer is the second question posed, namely whether the SWR is merely a species of redaction or substitution authorized by CIPA § 6(c).  It is not.  CIPA § 6(c) redactions and substitutions, unlike the SWR, do not effect any closing of the trial to the public.  To the contrary, CIPA plainly envisions that substitutions and redactions will be made available in the same form to the public as to the trial participants.  This is confirmed not only by the plain meaning of CIPA's text, but also by the absence of any statutory language or legislative history concerning the First Amendment considerations raised by the partial closing of the trial that results from the SWR's use.  It is difficult to believe that this important constitutional consequence went unnoticed by CIPA's drafters.  It went unnoticed because it was not present; CIPA's redactions and substitutions do not close the trial.  The SWR is not part of CIPA.  To conclude otherwise impermissibly engrafts on CIPA a judicial gloss of constitutional magnitude never envisioned, discussed, or provided for by CIPA's architects.

Given that the SWR is not part of CIPA and is neither foreclosed by CIPA nor by Rule 26, the question now presented is what standards apply for its application.  As explained in *Rosen VII*, use of the SWR constitutes a partial closure of the trial – or, if used extensively, a complete closure of the trial – because it prevents the public from seeing and hearing the complete body of

---

[20]  In the government's first motion pursuant to CIPA § 6(c), it requested the use of the SWR for eighteen minutes and twenty-four seconds (18:24) of recorded conversations and thirty-six documents.  By contrast, in its second motion, the government reduced its request to six minutes and forty-five seconds (6:45) and one document.  During the course of the § 6(c) hearings, the use of the SWR was approved for only four minutes and six seconds (4:06), out of a total of four hours, thirteen minutes and fifty-one seconds (4:13:51) of recorded conversations.

evidence in the case.  *See Rosen VII*, 487 F. Supp. 2d at 707-21.  Of course, the SWR is not *per se* impermissible because it closes the trial, but use of the procedure is permissible only after a searching analysis, both because the rights of the public and defendants to a public trial are constitutionally guaranteed, and also because erroneous deprivation of the right to a public trial is *per se* prejudicial.  *See id.* at 716 (citing cases). Specifically, because the SWR effects a partial closure of the trial, the use of the rule must survive scrutiny under *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501 (1984) ("*Press-Enterprise*") and *Waller v. Georgia*, 467 U.S. 39, 48 (1984) (applying *Press-Enterprise* when public trial right is asserted by defendant rather than the press).  *Press-Enterprise* requires that before a trial may be closed to the public, the proponent of the closure must demonstrate, and the court must find, (i) that a compelling interest exists to justify the closure, (ii) that the closure is no broader than necessary to protect that interest, and (iii) that no reasonable alternatives exist to closure. Additionally, the court must also make findings concerning these determinations on the record.  *See Press-Enterprise*, 464 U.S. at 510; *see also Bell v. Jarvis*, 236 F.3d 149, 166 (4th Cir. 2000). Importantly, as applied to a trial closure premised on the need to protect classified information, the *Press-Enterprise* inquiry into reasonable alternatives must consider whether a conventional CIPA substitution is feasible in the circumstances.

Although *Press-Enterprise* does not require an explicit finding that a trial closure is fair to defendants, it is appropriate to reject any use of the SWR that is unfair to defendants.  This is so for several reasons.  First, defendants have a due process right to a fundamentally fair trial.[21]

---

[21] *See, e.g.*, *Rogers v. Tennessee*, 532 U.S. 451, 460 (2001) (due process generally safeguards interests in fundamental fairness); *United States v. Karas*, 624 F.2d 500, 506 (4th Cir. 1980) (prosecutor's argument did not deprive defendant of due process right to a fundamentally

Second, *Press-Enterprise* and its progeny are concerned with conventional sealing of

proceedings and simply did not foresee or address this novel procedure, which is a "highly

artificial" means of presenting evidence that could, in many circumstances, inhibit the ability of

witnesses and counsel to communicate with the jury, to the detriment of defendants' ability to

present their defense fairly.  *Fernandez*, 913 F.2d at 162.  In other words, conventional sealing of

a courtroom under *Press-Enterprise* does not alter the manner in which evidence and argument

are presented, but merely restricts who is physically present to hear the evidence and argument.

The SWR is different.  It has some features of both a trial closure, in that some evidence

presented to the jury is kept from the public, and of a CIPA substitution, in that some evidence is

discussed in open court only via codes or euphemisms, which, in a limited way, may be viewed

as analogous to substitutions allowed by § 6(c).  Thus, even though the SWR is not a substitution

or redaction authorized by CIPA, it is only sensible that both *Press-Enterprise* analysis and a

CIPA-like fairness analysis should be undertaken before the SWR's use is authorized. Yet the

potential for unfairness from a conventional substitution and from the SWR are different in

important ways, a point that merits further elaboration.

Because the SWR, unlike a conventional summary or redaction, permits the jury to view

the actual evidence the government seeks to protect from public disclosure, there is no potential

for unfairness based on the factfinder's inability to learn relevant, classified facts which have

been summarized or redacted out.  Yet there is potential for unfairness in the SWR's use; it lies

---

fair trial); *Estes v. Texas*, 381 U.S. 532, 587 (1965) (Harlan, J., concurring) (presence of
television cameras at trial "violated the fundamental right to a fair trial"); *Riggins v. Nevada*, 504
U.S. 127, 154 n.4 (1992) (Thomas, J., dissenting) (forcible administration of medication to a
defendant might, in some cases, "violate a defendant's due process rights to a fundamentally fair
trial").

(i) in the awkwardness of presentation and resulting jury confusion, (ii) in witnesses' and counsel's inability to explore fully and argue about the facts protected by the SWR, and (iii) in the prejudice from employing a procedure that suggests to the jury that the information being discussed is a closely-held government secret when the jury itself must decide that very issue. *See Rosen VII*, 487 F. Supp. 2d at 707-21.  Assessing unfairness of this sort is more difficult than assessing the fairness of a conventional CIPA substitution.  Under CIPA § 6(c), a court need only consider whether defendants, in making their defense, need to introduce into evidence factual details present in the classified information, but not in the substitution. In other words, § 6(c) calls for a focused evidentiary ruling: Are particular facts contained in the classified material, but not in the substitution relevant and significantly exculpatory?  In contrast, fairness under the SWR must consider all the mechanics of the SWR's use at trial, including whether the defendants can fairly present evidence, cross-examine, and argue to the jury about the facts protected by the SWR, whether an ordinary juror will be able to follow the evidence and argument if presented by the SWR, and whether the prejudice from the rule's use is curable by an instruction or otherwise.  This fairness analysis is no easy task, but it is required.

The SWR's use may entail a second type of potential unfairness to a defendant, namely infringement of a defendant's Sixth Amendment right to a public trial.[22]  This right helps ensure that the public sees the evidence and proceedings so that it can make its own assessment about the fairness of the proceedings.  This public scrutiny of a trial provides some insurance against an unfair prosecution or proceeding.  The public's assessment of the fairness of a trial may be

---

[22] The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . public trial."  U.S. Const. amend. VI.

impaired by the use of the SWR if that use distorts the meaning of the underlying evidence.

Thus, even if an SWR proposal does not hinder the defense in presenting its case, the SWR may,

in certain circumstances not present here, be appropriate to reject or modify an SWR

"substitution" or code if the code significantly distorts the meaning of the underlying

information.  Unlike the effect the SWR may have on a defendant's right to cross-examine, this

public trial concern is adequately accommodated by the *Press-Enterprise* test for trial closure, as

the analysis for closing a trial under the First Amendment is the same as the analysis required for

closing a trial under the Sixth Amendment.  *See Waller*, 467 U.S. at 45-47.

To summarize, because the concerns animating both *Press-Enterprise* and CIPA are

present when the SWR is used, it is appropriate to approve use of the SWR only when both tests

are satisfied, that is only when the government establishes (i) an overriding reason for closing

the trial, (ii) that the closure is no broader than necessary to protect that interest, (iii) that no

reasonable alternatives exist to closure, and (iv) that the use of the SWR provides defendants

with substantially the same ability to make their defense as full public disclosure of the evidence,

presented without the use of codes.[23]

---

[23]  At oral argument, the government argued that a court lacks discretion to reject the
SWR unless defendants establish a specific need for disclosure of the information to be
protected by the SWR.  This is incorrect.  First, it is clear that, under *Press-Enterprise*, the party
seeking a trial closure bears the "weighty" burden of establishing the elements necessary to
support the closure.  *Press-Enterprise*, 464 U.S. at 509-10.  Thus, the three elements articulated
in *Press-Enterprise* – compelling interest, narrowly tailored, and no reasonable alternatives – are
the government's burden to bear in justifying the SWR.  Importantly, a court is required under
*Press-Enterprise* to consider the feasibility of a conventional CIPA substitution, which may be a
reasonable alternative that protects the classified information but does not close the trial.
Moreover, although authority on the SWR's use is sparse, an analogy to CIPA confirms that the
government also bears the ultimate burden of persuasion concerning the fairness of the SWR.
Under CIPA, once the government proposes a substitution, a defendant bears the burden of
coming forward with a relevant evidentiary theory about why disclosure of the specific classified

D.      **The Classified Information Privilege**

The parties dispute whether the government possesses a common law privilege in classified information, and, if so, they dispute its strength. The first question is easily answered: Fourth Circuit precedent makes clear that the government has a common law privilege in classified information and that this privilege is not displaced by CIPA. This circuit's first pronouncement on this privilege appears in *United States v. Smith*, 780 F.2d 1102 (4th Cir. 1985). There, the defendant was a CIA agent charged with disclosing information about Army Intelligence double agent operations to the Soviet Union. Smith sought to introduce evidence of various "free lance" CIA intelligence operations in Asia, with which neither he nor his handlers were involved, to prove that he reasonably believed he was actually serving American interests by disclosing the double agent operations. Labeling the information as "of marginal relevance at best," the Fourth Circuit held that its use was barred by the government's common law privilege in classified information, which was likened to the government's informer privilege recognized in *Roviaro v. United States*, 353 U.S. 53 (1957). *Smith*, 780 F.2d at 1110 n.13.

In support of their opposition to the privilege's existence, defendants note that other courts have criticized and rejected this aspect of *Smith*.[24] Defendants also note that this circuit in

_____

evidence is needed to make substantially the same defense, but the government, as movant, bears the ultimate burden of persuasion to prove that the substitution is fair under CIPA § 6(c). Likewise, if the government makes a showing that closing the trial via the SWR is warranted under *Press-Enterprise*, defendants must advance a reason why the SWR's use impairs their ability to make substantially the same defense as public disclosure, but the government bears the ultimate burden of persuasion concerning the SWR's fairness.

[24] *See, e.g.*, *United States v. Libby*, 453 F. Supp. 2d 35, 39-44 (D. D.C. 2006) (arguing that since Congress considered and rejected a heightened relevance standard when adopting CIPA, CIPA § 6(a) implicitly precludes adoption of a common law classified information privilege requiring a stricter standard of relevance than Rule 401, Fed. R. Evid.).

a later opinion — *United States v. Moussaoui* — arguably criticized *Smith* in other respects.  Yet, in the end defendants' argument must fail inasmuch as *Moussaoui*, the Fourth Circuit's latest pronouncement on this issue, unequivocally affirmed the existence of the government's classified information privilege.  *See* 382 F.3d at 469-74.

Defendants fare better on the parties' dispute over the strength of the privilege, namely what showing a defendant must make to overcome the privilege if the government invokes it. The government, pointing to *Smith*, argues that the privilege is not overcome unless the information as to which the privilege is claimed is "essential to the defense."  780 F.2d at 1107. Defendants, in response, point to *Moussaoui* in support of the arguably less rigorous standard of "relevant and helpful."  382 F.3d at 472.  Putting aside whether there is any practical difference between these standards,[25] defendants have the better argument because *Moussaoui* is the latest and clearest circuit authority on this issue.  In *Moussaoui*, the Fourth Circuit reiterated that, under *Smith* and *Roviaro*, "a defendant becomes entitled to disclosure of classified information upon a showing that the information 'is relevant and helpful to the defense . . . ***or*** is essential to a fair determination of a cause.'"  382 F.3d at 472 (quoting *Smith*, 780 F.2d at 1107) (emphasis added).[26]  The disjunctive is not accidental.  Thus, a defendant need not show that testimony is

---

[25] It is hard to see any difference, as a practical matter, between information that is "relevant and helpful" to the defense, in which case it is clearly material to the defense, and information that is "essential" to the defense.  *See Smith*, 780 F.2d at 1107.  Certainly, any defendant facing a prosecution for a serious crime would consider relevant and helpful evidence to be material to his defense and indeed to be essential to his defense.  At best, the distinction between the two standards is a fine one, and it is a virtue of the result reached here that it avoids courts having to make judgments based on such fine distinctions.

[26] *Cf. Fernandez*, 913 F.2d at 154 (citing *Smith*, 780 F.2d at 1107) (discussing the meaning of *Smith* in the CIPA context).

essential to his defense to overcome the government's assertion of its classified information privilege; a defendant can defeat the privilege by showing that the evidence as to which the privilege is claimed is either "relevant and helpful to the defense" *or* "essential to a fair determination of a cause." *Id.*[27]

In addition to clarifying the standard a defendant must meet to overcome the privilege, *Moussaoui* specified that it is not for the court to review and second guess the government's decision to classify a document or information; that decision is committed to the sole discretion of the Executive Branch. *Moussaoui*, 382 F.3d at 470; *see also Fernandez*, 913 F.2d at 154. A court must therefore accept the government's contention that the privilege applies.[28] Notwithstanding the privilege, however, "once the district court determines that an item of classified information is relevant and material, that item must be admitted unless the government provides an adequate substitution." *Moussaoui*, 382 F.3d at 476. In short, a court must not attempt to weigh or balance the risk of harm to the government that might result from disclosure

---

[27] While the Fourth Circuit in *Moussaoui* found the testimony subject to the government's privilege was "essential" to the defense, the court did not indicate that such a finding was required to overcome the privilege. Rather, after citing the *Roviaro* "relevant and helpful" *or* "essential to a fair determination" standard, the court found that the defendant had shown the testimony was essential to the defense. Put differently, the showing of essentiality was more than sufficient, *i.e.*, more than what was required, to overcome the government's privilege. *See Moussaoui*, 382 F.3d at 476.

[28] This is arguably a shift from *Smith*, which may be read as limiting the privilege's protection to the government's means and methods of gathering intelligence. *See Smith*, 780 F.2d at 1107-08 (analogizing the government's interest in protecting informers' identities with its interest "in protecting sensitive sources and methods of gathering information" and that disclosure risked the "drying up of a primary source of information to our intelligence community"). *Moussaoui*, however, suggests that the privilege extends beyond classified means and methods. *See* 382 F.3d at 470 ("accept[ing] as true" the government's assertion that information over which it asserted the privilege would harm national security interests).

-23-

against the risk of harm to a defendant's right to a fair trial owing to non-disclosure; instead, "the 'balancing' [a court] must conduct is primarily, if not solely, an examination of whether . . . the information the Government seeks to withhold is material to the defense." *Id.*

In sum, then, there exists a government classified information privilege and a district court's task in deciding questions relating to this privilege is to determine whether the evidence in which the government claims the privilege is "relevant and helpful to the defense" ***or*** "essential to a fair determination of a cause." *Id.* at 472 (internal citations omitted). If so, the privilege is defeated unless the government provides an adequate substitution. Importantly, however, courts must not engage in any balancing of the government's interest in nondisclosure against the defendant's interest in disclosure. As noted, of course, the government may propose substitutions, which may be accepted if fair to defendants, or if not accepted, the government may nonetheless refuse to allow the information's admission at trial, but would be subject to an appropriate sanction. *See* CIPA §§ 6(c) and (e); *Moussaoui*, 382 F.3d at 476.

This Memorandum Opinion outlines the legal principles governing the disposition of the government's second motion pursuant to CIPA § 6(c). A separate classified, sealed order will issue applying the principles elucidated here and setting forth the specific rulings made with respect to the government's second CIPA § 6(c) motion.

_____/s/_____
Alexandria, Virginia                      T. S. Ellis, III
November 1, 2007                     United States District Judge