IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
Public
NOV - 2 2007
CLERK, U.S. ...
ALEXANDRIA, VA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:05cr225 |
| ) | |
| STEVEN J. ROSEN and ) | |
| KEITH WEISSMAN. ) | |

## MEMORANDUM OPINION

In the pretrial stage of this Espionage Act[1] prosecution, defendants have requested the issuance of witness subpoenas for twenty current and former government officials. The government has objected to sixteen of these subpoenas arguing, *inter alia*, that the proffered testimony of these persons is irrelevant, immaterial, or at best, cumulative. At issue, therefore, is whether the sixteen disputed subpoenas should issue. For the reasons set forth in this memorandum opinion and related classified order, the government's objection is sustained in part and overruled in part.

I.

A brief summary of the offenses charged in the Superseding Indictment (the "Indictment") provides necessary context for the resolution of this issue. Defendants Steven J. Rosen and Keith Weissman have been charged with conspiracy to communicate information relating to the national defense ("NDI") to persons not authorized to receive it, in violation of 18

---

[1] 18 U.S.C. § 793 *et seq.*

U.S.C. § 793(g) and (e).[2] Rosen has also been charged with aiding and abetting Lawrence Franklin in his unauthorized communication of NDI to persons not authorized to receive it, in violation of 18 U.S.C. §§ 793(d) and 2.[3]

Throughout the course of the alleged conspiracy, defendants were employed by the American Israel Public Affairs Committee (AIPAC), in Washington, D.C. AIPAC is a pro-Israel organization that lobbies Congress and various Executive Branch agencies on issues relating to Israel and U.S. foreign policy in the Middle East. The Indictment alleges that, in order to further AIPAC's policy goals, Rosen and Weissman engaged in a conspiracy between April 1999 and August 27, 2004, to obtain NDI and communicate it to persons not authorized to receive it. In general, the Indictment alleges that the defendants cultivated relationships with various sources within the United States government and elsewhere to gather NDI, which they then communicated to co-workers, journalists, and foreign government officials, none of whom were authorized to receive such information.

More specifically, the Indictment describes fifty-seven overt acts in furtherance of the alleged conspiracy, including telephone calls and in-person meetings, during which information the government alleges to be NDI was obtained by defendants, who were not authorized to

---

[2] "NDI" is information that is both closely held by the U.S. government and potentially damaging to the United States if disclosed. *See United States v. Rosen*, 445 F. Supp. 2d 602, 618-22 (E.D. Va. 2006) (Memorandum Opinion denying defendants' motion to dismiss) [*Rosen I*].

[3] Franklin, originally charged in the Indictment as a defendant and co-conspirator, pled guilty (i) to one count of conspiracy to communicate NDI to a person not entitled to receive it, in violation of 18 U.S.C. § 793(d) and (g); (ii) to one count of conspiracy to communicate classified information to an agent of a foreign government, in violation of 50 U.S.C. § 783 and 18 U.S.C. § 371; and (iii) to unlawful retention, in violation of 18 U.S.C. § 793(e). He was sentenced to 151 months incarceration, followed by three years of supervised release, and a $10,000 fine.

receive it, and who then disclosed the NDI to persons who were also not authorized to receive it. These overt acts are briefly summarized here.

*Overt Acts 1-5* allege that in April 1999, Rosen told a foreign official ("FO-1") that he had "picked up an extremely sensitive piece of [U.S.] intelligence," which he described as "codeword protected intelligence," about terrorist activities in Central Asia. Indictment, at 8, ¶ 1. Rosen disclosed this intelligence to the official and the two discussed it during two separate meetings in April and May 1999. In June 1999, Weissman allegedly told FO-1 that he had learned from three different sources, including U.S. government officials, that a "secret FBI, classified FBI report" concerning the Khobar Towers bombing had been prepared. *Id.* at 8, ¶ 3. Weissman later told FO-1 that he had interested a member of the media in the classified report on the bombing. Then, in December 2000, Rosen and Weissman met with a U.S. government official (USGO-1), who had access to a classified U.S. government paper discussing strategy options against a Middle Eastern country and internal government deliberations on those options. After that meeting, Rosen allegedly disclosed information concerning this classified strategy to a member of the American media.

In *Overt Acts 6-14*, the government alleges that in January 2002, Rosen met with a second U.S. official (USGO-2). Following this meeting, Rosen circulated a memorandum containing classified information discussed in this meeting to fellow AIPAC employees. Rosen also allegedly disclosed the classified information obtained during this meeting to a foreign national. About two months later, in March 2002, Rosen met with USGO-2 and the two discussed classified information concerning Al-Qaeda. Within days following that meeting, Rosen allegedly disclosed this information to a fellow AIPAC employee and to a second foreign official

("FO-2").

*Overt Acts 15-34* allege that in February 2003, Rosen and Weissman met with Franklin and a Department of Defense official. Rosen stated that he was excited to meet with a "Pentagon guy" who was a "real insider." *Id.*, at 10, ¶ 16. At this meeting, Franklin disclosed alleged NDI relating to a classified draft of an internal U.S. government policy document concerning a Middle Eastern country. Between February and June of 2003, defendants continued to meet with Franklin on this issue.[4] Defendants also allegedly disclosed the existence of this document and the internal deliberation surrounding it to FO-1, FO-2, a senior fellow at a Washington think tank, and two members of the media.

*Overt Acts 35-37* allege that in June 2003, Franklin told Rosen and Weissman that he had "highly classified" information concerning potential attacks upon United States forces in Iraq. Franklin asked Rosen and Weissman not to use this information. In response to this meeting, Rosen and Weissman discussed that the information Franklin had given them was "quite a story," and decided to keep the relationship with Franklin "wide open insofar as possible." *Id.* at 14, ¶ 36. In furtherance of this goal, the Indictment alleges that Weissman took Franklin to a major league baseball game.

*Overt Acts 38-40* allege that in October 2003, Franklin discussed the aforementioned internal policy document with another foreign official ("FO-3"). In May 2004, Franklin allegedly

---

[4] Rosen's aiding and abetting charge stems from a March 2003 conversation between Franklin and Rosen, in which Franklin requested Rosen's home fax number so that Franklin could send Rosen a document he had prepared concerning the internal policy document.

-4-

gave reporters Top Secret/SCI[5] information. The Indictment also alleges that in June 2004, Franklin unlawfully retained classified documents at his home in West Virginia.

*Overt Acts 41-48* allege that on July 9 and 21, 2004, Franklin, by then cooperating with the government, met with Weissman and disclosed to him information concerning several Middle Eastern countries. Weissman relayed this information to Rosen, who in turn disclosed the information to FO-3, a member of the media, and other AIPAC employees.[6]

## II.

To date, there have been extensive pretrial proceedings in this case, including the government's provision of substantial discovery to defendants in the form of documents and recordings, the bulk of which are classified.[7] As a result of these proceedings, defendants have requested the issuance of subpoenas to twenty current and former high-ranking government officials. From the Department of State, defendants seek subpoenas for:

(i) Condoleezza Rice, Secretary of State (then-National Security Advisor)

---

[5] "SCI" refers to "Sensitive Compartmentalized Information," a classification indicating that the information "not only is classified for national security reasons as Top Secret, Secret, or Confidential, but is also subject to special access and handling requirements because it involves or derives from particularly sensitive intelligence sources and methods." 28 C.F.R. § 17.18(a); *see also* 31 C.F.R. § 2.43(w) (defining Sensitive Compartmentalized Information to mean "information and materials concerning or derived from intelligence sources, methods, or analytical processes, that requires special controls for restricting handling").

[6] For a more complete recitation of the allegations in the Indictment, *see Rosen I*, 445 F. Supp. 2d at 607-10. The summary contained in Part I here is intended only to provide an overview of the charged conspiracy for purposes of analyzing whether defendants' proposed subpoenas should issue. It omits descriptions of conversations between defendants and Franklin for purposes of setting up meetings, as well as the interactions between defendants and the FBI while defendants were being investigated.

[7] These pretrial proceedings have included closed hearings held pursuant to the Classified Information Procedures Act ("CIPA"), 18 U.S.C. App. 3.

(ii) Richard Armitage, former Deputy Secretary of State

(iii) William Burns, U.S. Ambassador to Russia

(iv) Marc Grossman, former Undersecretary of State for Political Affairs

(v) Lawrence Silverman, Deputy Chief of Mission of the U.S. Embassy to the Slovak Republic

(vi) Matthew Bryza, Deputy Assistant Secretary of State

(vii) Marc Sievers, Political Officer, U.S. Embassy to Israel

(viii) David Satterfield, Senior Advisor to the Secretary of State and Coordinator for Iraq (then-Deputy Assistant Secretary of State, Bureau of Near Eastern Affairs)

(ix) Dennis Ross, former U.S. Ambassador

(x) Edward Walker, former U.S. Ambassador to the UAE, Egypt, and Israel, and former Assistant Secretary of State

(xi) Mark Parris, former U.S. Ambassador to Turkey

From the National Security Council, defendants request subpoenas for:

(i) Stephen Hadley, National Security Advisor (then-Deputy National Security Advisor)

(ii) Elliott Abrams, Deputy Assistant to the President and Deputy National Security Advisor for Global Democracy Strategy Affairs

(iii) Bruce Reidel, former Special Assistant to the President and Senior Director for Near East and South Asian Affairs on the National Security Council Staff

(iv) Kenneth Pollack, former Director for Persian Gulf Affairs for the National Security Council

From the Department of Defense, the officials for whom subpoenas are requested are:

(i) Paul Wolfowitz, former Deputy Secretary of Defense

(ii) Douglas Feith, former Undersecretary of Defense

(iii) Michael Makovsky, former employee of the Office of the Secretary of Defense,

Office of Near East and South Asia

      Office of Near East and South Asia

    (iv) Lawrence Franklin, former Department of Defense employee

Finally, defendants seek to subpoena retired U.S. Marine Corps General Anthony Zinni.

The government objects to the issuance of subpoenas to all but four of these officials,[8] arguing, *inter alia*, that the proffered testimony is neither material nor favorable to the defense. Moreover, the government contends that even where some testimony from these persons might be material and favorable, that testimony would nonetheless be cumulative and hence the subpoenas should not issue, especially as the persons involved are current or former high-ranking government officials. Defendants counter that each of the prospective witnesses will offer testimony that is both material and favorable to their defense. They claim the testimony of these persons will negate the government's contention that the information defendants obtained and disclosed was NDI by showing that this information was neither closely held by the U.S. government, nor were the disclosures of this information damaging to the U.S.

Defendants also submit that these current and former officials' testimony will demonstrate that defendants did not have the requisite mental states necessary for convictions under § 793(g) and (e). Indeed, defendants claim that testimony from these current and former officials will tend to show that the overt acts reflect nothing more than the well-established official Washington practice of engaging in "back channel" communication with various non-governmental entities and persons for the purpose of advancing U.S. foreign policy goals. More specifically, defendants claim that U.S. government officials regularly conveyed sensitive, non-

---

[8] The government does not object to the issuance of subpoenas to Franklin, Satterfield, Pollack, or Makovsky.

public information to them and others within AIPAC with the expectation that AIPAC employees would further disclose the information to their co-workers, foreign government officials, members of the media, and any other individual who could use it to advance U.S. foreign policy interests. Defendants claim that in this way, AIPAC played an important role in U.S. foreign policy development. If true, the U.S. government's use of AIPAC for "back channel" purposes may serve to exculpate defendants by negating the criminal states of mind the government must prove to convict defendants of the charged offenses. For a description of the culpable mental states the government must prove, see *Rosen I*, 445 F. Supp. 2d at 618-26.

The purpose of this memorandum opinion, which will be placed in the public record,[9] is to set forth the legal principles that inform and control whether the disputed subpoenas should issue. No classified information is included in this memorandum opinion so that the principles governing the resolution of the government's objections to defendants' subpoena requests may be available to the public. Because the reasoning relating to the issuance of specific subpoenas entails discussion of classified information, that discussion will appear only in the sealed, classified order that will issue contemporaneously.

### III.

The procedural context in which the government's objections arise also merits brief discussion. On March 8, 2006, defendants filed a motion, pursuant to Local Criminal Rule

---

[9] This memorandum opinion is the eleventh published opinion to issue in this case. The tenth in the series addresses the principles that govern the resolution of the questions presented in the government's latest CIPA § 6(c) motion and briefly describes the previous nine published opinions. *United States v. Rosen*, ___ F. Supp. 2d ___, 1:05cr225, at ___ (E.D. Va. Nov. 1, 2007) (Memorandum Opinion) [*Rosen X*].

17(D)[10], seeking issuance of witness subpoenas to Secretary of State Condoleezza Rice, retired General Anthony Zinni, Ambassador William Burns, and Deputy Ambassador David Satterfield. The motion was granted on the ground that defendants had "made a prima facie showing that the testimony of these government officials is relevant and favorable to the defense." *United States v. Rosen*, 1:05cr225 (E.D. Va. Apr. 21, 2006) (Order) (citing *United States v. Valenzuela-Bernal*, 458 U.S. 585, 867 (1982)). Thereafter, these four subpoenas, along with thirteen subpoenas to which Local Rule 17(D) did not apply,[11] were issued and served upon the appropriate government agencies in accordance with regulations adopted pursuant to the Housekeeping Statute, 5 U.S.C. § 301, and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951). The notices served upon the government agencies are typically referred to as "*Touhy* notices" — so named because they comply with regulations promulgated by each government agency dictating the specific procedures that must be followed in order to subpoena any employee[12] of that

---

[10] Local Rule 17(D) provides, in relevant part, that: "Without first obtaining permission of the Court, no subpoena shall issue for the attendance at any hearing, trial, or deposition of . . . (4) any member of the President's Cabinet; (5) any Ambassador or Consul; or (6) any military officer holding the rank of Admiral or General."

[11] In March 2006, defendants requested issuance of ten subpoenas of current or former government officials. At the conclusion of CIPA § 6(a) proceedings, in March 2007, defendants amended their request to add seven additional current or former officials. Finally, during the course of briefing the motion at bar, defendants served the Department of Justice Court Security Officer (CSO) with subpoenas and *Touhy* notices for three additional government officials, for a total of twenty current or former officials.

[12] The parties concede that the *Touhy* regulations apply to both current officials and to former officials called to testify about actions and events that took place while they were employed by the government.

agency,[13] the use of which regulations was upheld by the Supreme Court in *Touhy*.

*Touhy* and the regulations adopted pursuant to the Housekeeping Statute merely allow for the "centralizing [of an agency's] determination as to whether subpoenas . . . will be willingly obeyed or challenged." *Id.* at 468. Thus, an employee of a federal agency or department may not be held in contempt for refusing to comply with a subpoena based on instructions set forth in the regulations. *Id.* Instead, a defendant or litigant wishing to subpoena a government official or government documents must serve the subpoena on the head of each agency or department, failing which the subpoena must be quashed.[14] Once a defendant or litigant complies with an agency's or department's *Touhy* regulations, the agency or department head must either authorize compliance with the subpoena or formally assert a privilege that would justify refusal to comply with the subpoena. *See United States v. Reynolds*, 345 U.S. 1, 7-8 (1953) ("There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer."). It is then left to the appropriate court to determine whether that claim of privilege bars the production of the evidence or testimony sought.

Importantly, the Housekeeping Statute does not and cannot confer on the Executive Branch the unilateral or unreviewable power to refuse to comply with a valid subpoena. *See* § 301 ("This section does not authorize withholding information from the public or limiting the

---

[13] For example, the procedures that must be followed to subpoena an official of the State Department are contained in 22 C.F.R. § 172.1 *et seq.*

[14] *See, e.g., United States v. Wallace*, 32 F.3d 921, 928-29 (5th Cir. 1994); *United States v. Bizzard*, 674 F.2d 1382, 1387 (11th Cir. 1982); *cf. United States v. Soriano-Jarquin*, 492 F.3d 495, 504 (4th Cir. 2007) (holding that a defendant who does not comply with *Touhy* regulations may not claim his constitutional rights were violated by the quashing of subpoenas).

availability of records to the public.").[15] Thus, a court may find the asserted privilege invalid or inapplicable. But even in the face of a valid privilege, if "a defendant demonstrates that a witness can provide testimony material to his defense, then the government's interest must give way." *United States v. Rivera*, 412 F.3d 562, 569 (4th Cir. 2005). This means that even where a valid privilege is asserted, if a defendant shows that the subpoena to compel testimony or documents is material to his defense, a court should "order production of the evidence or the witness and leave to the Government the choice of whether to comply with that order." *Id.* (quoting *United States v. Moussaoui*, 382 F.3d 453, 474 (4th Cir. 2004)). The government's refusal to comply with a subpoena in these circumstances may result in dismissal or a lesser sanction. *See Moussaoui*, 382 F.3d at 476-77 (stating that "dismissal of the indictment is the usual course" when the government refuses to comply with a court's order compelling material testimony, although lesser sanctions may be required). These principles all flow from the recognition that a defendant has a fundamental, constitutional right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI.

In this case, there is no indication that any agency or department will assert a privilege and direct any current or former official to refuse to comply with a subpoena. Rather, the

---

[15] *See also Touhy*, 340 U.S. at 472 (Frankfurter, J., concurring) (pointing out "the very narrow ruling" of *Touhy* and arguing that once a department head is validly served under the *Touhy* regulations, "[i]t will of course be up to him to raise those issues of privilege from testimonial compulsion"); *N.L.R.B. v. Capital Fish Co.*, 294 F.2d 868 (5th Cir. 1961) (holding that the Housekeeping Statute "cannot be construed to establish authority in the executive departments to determine whether certain papers and records are privileged," nor can it "bar a judicial determination of the question of privilege or a demand for the production of evidence found not privileged"); *Streett v. United States*, No. CIV.A.96-M-6-H, 1996 WL 765882, at *4 (W.D. Va. Dec. 18, 1996) ("*Touhy* may [not] be used as a tool by the executive to usurp the judiciary's role in determining what evidence will enter into the courtroom.").

-11-

government has independently objected to the requested subpoenas of the majority of these current and former officials on the ground that these officials will offer testimony that is irrelevant, immaterial, or, at best, cumulative. Thus, the question now presented is whether defendants have made a showing that they are entitled to compulsory process of the individual government officials for whom they have requested subpoenas.[16]

### IV.

Analysis of the parties' dispute over the subpoenas properly begins with the Sixth Amendment principle that every defendant in a criminal case has the right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend VI. In acknowledging the importance of this right, the Supreme Court has noted that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Indeed, "[t]he very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts," making it "imperative to the function of courts that compulsory process be available." *United States v. Nixon*, 418 U.S. 683, 709 (1974); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967); *Moussaoui*, 382 F.3d at 471 (explaining that the right to compulsory process "is integral to our adversarial criminal justice system"). Yet the right to compulsory process is not absolute: a defendant may not, via compulsory process, "secure the attendance and testimony of any and all witnesses," but must first "at least make

---

[16] In the event the government does assert a privilege, the analysis here and in the related sealed order of the government's current objection — that the government officials sought to be subpoenaed can offer no non-cumulative, material, or favorable testimony — will be relevant, if not also dispositive, to a privilege later asserted by a government agency or department. This is so because a finding that testimony would be material to the defense may trump a valid governmental privilege. *Rosen X*, ___ F. Supp. 2d. ___, 1:05cr225, at Part II.D; *see also Moussaoui*, 382 F.3d at 471-72.

some plausible showing of how their testimony would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982); *see also Moussaoui*, 382 F.3d at 471 ("[A] defendant must demonstrate that the witness he desires to have produced would testify 'in his favor.'") (quoting U.S. Const. amend. VI); *see also United States v. Lindh*, 210 F. Supp. 2d 780, 782 (E.D. Va. 2002).

The Supreme Court, borrowing from due process cases such as *Brady v. Maryland*, 373 U.S. 83 (1963), has noted in the Sixth Amendment context that evidence is material if its exclusion might prejudice the outcome of the defendant's case. *See Valenzuela-Bernal*, 458 U.S. at 867-69 (citing *United States v. Agurs*, 427 U.S. 97, 104 (1976)). And while a defendant may not compel a witness to testify based on "mere speculation" that such testimony would be favorable to his defense,[17] it is important to note that where, as here, a defendant does not have access to a proposed witness, "he cannot be required to show materiality with the degree of specificity that applies in the ordinary case." *See Moussaoui*, 382 F.3d at 472 (citing *Valenzuela-Bernal*, 458 U.S. at 870-71, 873). In such a case, a defendant need not explain precisely "*how* a witness may testify"; rather, "events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Valenzuela-Bernal*, 458 U.S. at 871.

Finally, any requested testimony must pass muster under the Federal Rules of Evidence. Thus, as already noted, the testimony must be relevant, *i.e.*, it must tend to make any fact "of consequence to the determination of the action more or less probable." Rule 401, Fed. R. Evid. Of course, not all relevant evidence is admissible. Relevant evidence may be excluded "if its

---

[17] *See Rivera*, 412 F.3d at 570.

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, Fed. R. Evid. In this respect, the government vigorously contends that testimony of many of the current and former officials defendants seek to subpoena on the subject of the U.S. government's relationship with AIPAC would be cumulative of testimony available from non-governmental witnesses, including AIPAC employees. This contention prompts two responses.

First, nothing in the Sixth Amendment right to compulsory process requires, nor should it require, an accused to refrain from calling government officials as witnesses until he has exhausted possible non-governmental witnesses to prove a fact. Inconvenience to public officials in the performance of their official duties is not a basis for infringing a defendant's Sixth Amendment compulsory process rights.[18] And this point is particularly clear where, as here, the forecasted testimony would likely be more credible and probative were it to come from a government official, as compared to an AIPAC employee.

The second response is simply to acknowledge the difficulty in this case of reaching a confident or reliable judgment at this pretrial stage as to the cumulative nature of any government witness's trial testimony given the unavailability of these witnesses to defendants. While it may be appropriate to quash a subpoena on cumulativeness grounds when it is pellucidly clear that the expected testimony would be the same as testimony already offered, it is not clear at this pretrial stage what testimony each witness will provide. To make these cumulativeness judgments based

---

[18] In this respect, it is also worth noting that several of the persons defendants seek to subpoena are not currently serving as public officials, and hence requiring their appearance to testify would not involve any disruption of official business.

on the paucity of information now available is to risk denying defendants their Sixth Amendment rights.

In summary, therefore, to warrant the issuance of these disputed subpoenas, defendants must simply make a "plausible showing"[19] that each current or former government official sought to be subpoenaed would provide testimony that would be (i) relevant to the charged crimes, (ii) material, in that the testimony might have an impact on the outcome of the trial, and (iii) favorable to the defense.[20]

V.

The rulings with respect to each disputed subpoena are set forth in the accompanying sealed and classified Order, but the government makes three general arguments that merit brief discussion here. The government first contends that conversations with current or former government officials not listed as overt acts in the Indictment are irrelevant to the defense. In particular, the government claims that whether defendants occasionally had conversations with government officials that did not involve unauthorized NDI disclosures has no bearing on whether, in the overt acts alleged in the Indictment, defendants broke the law by conspiring to obtain and disclose NDI to those not authorized to receive it.[21] This argument misses an

---

[19] *Valenzuela-Bernal*, 458 U.S. at 867.

[20] Resolution of this issue requires comparison of the proffered testimony of these current and former officials to the elements of the offense and the various *mens rea* requirements. These elements have been set forth fully before and are not reiterated here. *See Rosen X*, ___ F. Supp. 2d ___, 1:05cr225, at Part II.B.

[21] In this respect, the government relies primarily on a 2005 Order rejecting defendants' request, under Rule 16, Fed. R. Crim. P., for disclosure of all recorded statements they made that were in the government's possession. *See United States v. Rosen*, 1:05cr255 (E.D. Va. Nov. 8, 2005) (Order). While that Order correctly noted that "the absence of criminal conduct at certain

important point. As defendants correctly point out, circumstantial evidence can be probative of the lack of criminal intent. *See United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998) (stating that "as a general rule most evidence of intent is circumstantial").[22] Here, defendants are entitled to show that, to them, there was simply no difference between the meetings for which they are not charged and those for which they are charged, and that they believed the meetings charged in the Indictment were simply further examples of the government's use of AIPAC as a diplomatic back channel.

The government next argues that conversations to which neither defendant was a party cannot be relevant to defendants' states of mind. While true as a general proposition, such meetings may nonetheless have affected defendants' states of mind if the contents of those meetings were later communicated to them by other AIPAC employees.[23] The government is

---

times is not relevant to the existence of criminal conduct at other times," *id.* at 2, it did not examine whether non-criminal meetings might bear on defendants' states of mind. Such meetings may be relevant for that purpose.

[22] *See also United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005) ("The law . . . recognizes that the *mens rea* elements of knowledge and intent can often be proved through circumstantial evidence . . . ."); *United States v. Hurn*, 368 F.3d 1359, 1364-65 (11th Cir. 2004) (noting that a criminal defendant "has the right to introduce evidence that is not directly relevant to an element of the offense" where that evidence might tend to negate the existence of an element of the offense, such as intent or willfulness); *United States v. Fauls*, 65 F.3d 592, 597-98 (7th Cir. 1995) (upholding the admission of a conversation between defendant and another individual before the charged criminal conduct as relevant to defendant's state of mind); *United States v. Abroms*, 947 F.2d 1241, 1249 (5th Cir. 1991) (upholding the admission of a meeting not charged in the indictment "to show [defendant's] knowledge and state of mind").

[23] The CIPA § 6(a) Order in this case is not to the contrary. That Order noted merely that defendants would have to show that certain information was communicated to other AIPAC employees with the implicit or explicit instruction that it be further communicated to defendants. Defendants may demonstrate such an implicit instruction by presenting evidence that U.S. government officials routinely expected information they shared to be conveyed to others within AIPAC — those best equipped to use the information to further U.S. policy goals.

correct, however, that it is the AIPAC employee's disclosure of the conversation to defendants, and not the government official's original conversation with the AIPAC employee, that is relevant to defendants' states of mind. Put differently, the mere fact that a government official relayed classified information to AIPAC employees outside defendants' presence could not have affected defendants' states of mind. Rather, it is the fact that AIPAC employees later related the circumstances and contents of those conversations to defendants that would have borne on defendants' mental states. Thus, defendants may introduce evidence of conversations between government officials and AIPAC employees that occurred outside defendants' presence if they show that defendants were told of these conversations. To be sure, this testimony may be presented by the AIPAC employee who had the conversation with the government official and relayed the contents to defendants. Yet, the testimony of the government official may nonetheless be necessary as corroboration or to rebut any government evidence attacking the AIPAC employee's testimony.[24]

In contrast to conversations offered solely to negate defendants' *mens rea*, conversations between two or more government officials, even if not communicated to defendants, might be relevant to show that particular government officials authorized the disclosure of non-public information to defendants or to AIPAC. For instance, if defendants can demonstrate that a high-ranking government official authorized his subordinate to disclose NDI to AIPAC employees,

---

[24] *Cf. Abroms*, 947 F.2d at 1249-50 (finding that testimony about a meeting outside defendant's presence but later related to him was relevant to show that conversation actually took place). As with cumulativeness questions, though, these determinations are context-specific and are best resolved at trial.

such an authorization would clearly be exculpatory to defendants.[25]

Finally, the government argues that where a current or former official would testify concerning meetings other government officials (not the testifying witness) had with AIPAC, such testimony would be inadmissible hearsay. This argument can be disposed of on two grounds. The first is that such testimony may not be hearsay, as it may be an admission by the government. *See* Rule 801(d)(2), Fed. R. Evid. The second is that even if a hearsay objection might be appropriate, it is premature at this stage in the proceedings, where the specific nature of each witness's testimony is not yet known. Thus at this stage, the government's hearsay argument is not a sufficient basis to defeat defendants' Sixth Amendment compulsory process right.

## VI.

Based on the foregoing, and for the reasons set forth in the accompanying sealed and classified order, the government's objections to the issuance of witness subpoenas to these current and former government officials are sustained in part and overruled in part.

A classified and sealed order reflecting the specific reasoning and ruling for each requested witness subpoena will issue. The public record may nonetheless reflect that the following witness subpoenas may issue:

---

[25] The parties dispute whether the "public authority" defense applies in this case. This defense requires a showing that the government official in question had actual authority to sanction a defendant's otherwise criminal behavior. *See United States v. Fulcher*, 250 F.3d 244, 253 (4th Cir. 2001); *United States v. Kuai Li*, 475 F. Supp. 2d 590, 593 (E.D. Va. 2007). It is premature at this stage to determine the applicability of this defense, which will depend upon facts to be adduced at trial. In any event, defendants contend that the current and former officials they seek to subpoena will provide exculpatory testimony in addition to the public authority defense.

(i) Condoleezza Rice, Secretary of State (then-National Security Advisor)

(ii) Richard Armitage, former Deputy Secretary of State

(iii) William Burns, U.S. Ambassador to Russia

(iv) Marc Grossman, former Undersecretary of State for Political Affairs

(v) Lawrence Silverman, Deputy Chief of Mission of the U.S. Embassy to the Slovak Republic

(vi) Matthew Bryza, Deputy Assistant Secretary of State

(vii) Marc Sievers, Political Officer, U.S. Embassy to Israel

(viii) David Satterfield, Senior Advisor to the Secretary of State and Coordinator for Iraq (then-Deputy Assistant Secretary of State, Bureau of Near Eastern Affairs)

(ix) Stephen Hadley, National Security Advisor (then-Deputy National Security Advisor)

(x) Elliott Abrams, Deputy Assistant to the President and Deputy National Security Advisor for Global Democracy Strategy Affairs

(xi) Kenneth Pollack, former Director for Persian Gulf Affairs for the National Security Council

(xii) Paul Wolfowitz, former Deputy Secretary of Defense

(xiii) Douglas Feith, former Undersecretary of Defense

(xiv) Michael Makovsky, former employee of the Office of the Secretary of Defense, Office of Near East and South Asia

(xv) Lawrence Franklin, former Department of Defense employee

Alexandria, Virginia
November 2, 2007

                                                    /s/
T. S. Ellis III
United States District Judge