## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | Case No. 1:05cr225 |
| | ) | |
| **STEVEN J. ROSEN** and | ) | |
| **KEITH WEISSMAN** | ) | |

### MEMORANDUM OPINION

In this Espionage Act[1] prosecution, defendants Steven J. Rosen and Keith Weissman seek to introduce the expert testimony of J. William Leonard, a retired United States government official with substantial experience and expertise in the field of information classification. Defendants subpoenaed Leonard pursuant to Rule 17, Fed. R. Crim. P., and Leonard has now moved to quash the subpoena on the ground that his testimony may be barred by 18 U.S.C. § 207 (2007), which restricts the activities of former executive branch officers and employees. The government also argues that Leonard's testimony is in fact barred by § 207(a)(1) and that an order directing such testimony, as contemplated in § 207(j)(6)(A), is unwarranted. Defendants oppose Leonard's motion to quash, arguing that § 207(a)(1) does not preclude Leonard's testimony and that an order should nonetheless issue directing his expert testimony pursuant to § 207(j)(6)(A). For the reasons that follow, § 207(a)(1) does not apply to Leonard and accordingly his motion to quash must be denied and the subpoena enforced.

**I.**

Context useful for the resolution of the question presented is provided by brief summaries of

---

[1] 18 U.S.C. § 793 *et seq.* (1996).

1

(i) the Indictment's[2] allegations, (ii) a major disputed offense element and (iii) Leonard's qualifications and forecasted expert testimony.

### A. The Indictment's Allegations

The Indictment is not a short document; it spans 26 pages and charges five crimes against three defendants as follows:

(i) Count I charges conspiracy to transmit information relating to the national defense ("NDI")[3] to those not entitled to receive it, in violation of 18 U.S.C. § 793(g), against defendants Steven Rosen, Keith Weissman and Lawrence Anthony Franklin.

(ii) Counts II, III and IV charge communicating NDI to those not entitled to receive it, in violation of 18 U.S.C. §§ 793(d) and 2, against defendant Franklin and, with respect to Count III, against defendant Rosen, as well.

(iii) Count V charges conspiracy to communicate classified information to an agent of a foreign government, in violation of 50 U.S.C. § 783 and 18 U.S.C. § 371, against defendant Franklin.

Only Count I against Rosen and Weissman and Count III against Rosen remain, as Franklin has pled guilty and, as a result, the remaining counts have been resolved.[4]

The bulk of the Indictment is devoted to a description of the conspiracy alleged in Count I. This conspiracy is alleged to have commenced in or about April 1999 and continued through August 27, 2004. The 57 overt acts alleged in furtherance of the conspiracy describe a number of separate

---

[2] The "Indictment" refers throughout to the Superseding Indictment dated August 4, 2005.

[3] As judicially defined, NDI is information (i) that is closely held by the United States and (ii) that if disclosed would be potentially damaging to the United States or useful to an enemy of the United States. *United States v. Rosen*, 445 F. Supp. 2d 602, 620-22 (E.D. Va. 2006) (citing, *inter alia, Gorin v. United States*, 312 U.S. 19 (1941), *United States v. Morrison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988), *Morrison*, 844 F.2d at 1084, 1086 (Wilkinson, J. concurring and Phillips, J. concurring)).

[4] On October 5, 2005, Franklin pled guilty to one count of conspiracy to communicate national defense information to one not entitled to receive it, in violation of 18 U.S.C. §§ 793(d) and (g), and to one count of conspiracy to communicate classified information to an agent of a foreign government in violation of 50 U.S.C. § 783 and 18 U.S.C. § 371.

2

episodes in which Rosen and Weissman, or one of them, received alleged NDI without authorization and disclosed it to persons not authorized to receive it. Also included in the Indictment are brief descriptions of Rosen's and Weissman's backgrounds.

During the period of the conspiracy, Rosen and Weissman were employed by the American Israel Public Affairs Committee (AIPAC) in Washington, D.C. AIPAC is a pro-Israel organization that lobbies the United States executive and legislative branches on issues of interest to Israel, particularly U.S. foreign policy with respect to the Middle East. Rosen was AIPAC's Director of Foreign Policy Issues and was primarily engaged in lobbying officials of the executive branch with policy-making authority over issues of interest to AIPAC. Rosen did not have a security clearance during the period of the alleged conspiracy and had not held a security clearance since his employment with the RAND Corporation in the late 1970s and early 1980s. Weissman, in turn, was AIPAC's Senior Middle East Analyst and worked closely with Rosen in lobbying the executive branch of the U.S. government. Weissman has never held a security clearance. Alleged co-conspirator Lawrence Franklin worked on the Iran desk in the Office of the Secretary of the Department of Defense (DOD) and held a top secret security clearance during the alleged conspiracy.

In describing the conspiracy's means and methods, the Indictment states that in furtherance of their lobbying activities, defendants (i) cultivated relationships with government officials with access to sensitive U.S. government information, including NDI, (ii) obtained this information from these officials, and (iii) then transmitted this information to persons not otherwise entitled to receive it, including members of the media, foreign policy analysts, and officials of a foreign government. As noted, the Indictment's overt acts describe a number of specific episodes in which defendants, or one of them, obtained information alleged to be NDI and then disclosed this NDI to a variety of persons, including journalists, foreign government officials, other AIPAC employees and think tank

members. The alleged NDI for each of these episodes is described in the Indictment in only very general terms, as follows:

|    | Date | NDI Description |
|----|------|-----------------|
| 1. | April 1999 | information concerning "terrorist activities in Central Asia" |
| 2. | June 1999 | information revealing the existence (but not contents) of a "classified FBI report on the Khobar Towers bombing" |
| 3. | December 2000 | information concerning U.S. "strategy options against a Middle Eastern country and the internal United States government deliberations on those options" |
| 4. | March 2002 | "classified information regarding Al-Qaeda" |
| 5. | February 2003 | information related to a "classified draft internal United States government policy document concerning a Middle Eastern country" |
| 6. | March 2003 | Franklin's typed document concerning contents of an appendix to document described in #5 |
| 7. | June 2003 | "classified information related to potential attacks upon United States forces in Iraq" |
| 8. | July 2004 | "classified national defense information concerning a foreign government's covert actions in Iraq" |
| 9. | July 2004 | "United States intelligence related to certain Middle Eastern countries" |

Notably, with one exception, all alleged NDI disclosures to defendants were made orally rather than by way of documents.[5]

### B. Disputed Offense Element

---

[5] The sole exception is the incident described in #6 above in which it is alleged that Franklin sent Rosen by facsimile a document Franklin created from the contents of a classified document. This incident is both the subject of the § 793(d) offense in Count III and an overt act of the conspiracy alleged in Count I.

It is apparent from the Indictment's allegations, the elements of the charged offenses,[6] and the parties' forecasted trial testimony that a major battleground at trial will be the parties' dispute over whether the information defendants are alleged to have obtained and disclosed in each of the various episodes qualifies as NDI, *i.e.*, whether that information, at the time defendants allegedly received or disclosed it, was closely held by the United States, and whether its disclosure would be potentially damaging to the United States or useful to an enemy of the United States. This dispute will be expressed at trial largely through the testimony of competing experts. And it is clear from the parties' forecasts of their experts' trial testimony[7] that this NDI dispute will be a major focus of the trial.

NDI, it is worth noting, is not synonymous with "classified"; information that is classified by the executive branch of government may or may not qualify as NDI. Because the sets of NDI and classified information are the result of distinct processes and different decision-makers, they need not be identical sets. The executive branch has the authority to classify and hold closely information the unauthorized disclosure of which is deemed by the government to have the potential to damage the national security.[8] By contrast, NDI in a § 793 prosecution is that information, which at the time of an alleged unauthorized disclosure, is found by the jury beyond a reasonable doubt (i) to have been

---

[6] For a discussion of the offense elements, see *Rosen*, 445 F. Supp. 2d at 620-22; *United States v. Rosen*, 520 F. Supp. 2d 786, 793 (E.D. Va. 2007). As for Count III, the government, *inter alia*, must prove beyond a reasonable doubt that the information Rosen is alleged to have received in that count qualifies as NDI. As for Count I, the conspiracy count, it is true that the government need not prove that the conspiracy succeeded in obtaining NDI. *See United States v. Nicoll*, 664 F.2d 1308, 1315 (5th Cir. 1982), overruled on other grounds, *United States v. Henry*, 749 F.2d 203 (5th Cir. 1984)). Yet, the government has forecasted that it will seek to do so, apparently recognizing that, as a practical matter, it must do so to persuade a jury to convict.

[7] In addition to the expert disclosures required by Rule 12, Fed. R. Crim. P., the parties have been required by the Classified Information Procedures Act (CIPA), 18 U.S.C. App. 3, to make extensive disclosures of anticipated direct and cross-examination testimony of experts.

[8] For a brief discussion of the government's classification scheme, see *Rosen*, 445 F. Supp. 2d at 622–24.

closely held by the government and (ii) to be potentially damaging to the United States or useful to an enemy of the United States if disclosed without authorization. In short, the government designates what information is labeled and treated as classified, while a court or jury determines what information qualifies as NDI in a § 793 prosecution. In such a prosecution, evidence that information is classified does not, by itself, establish that the information is NDI; evidence that information is classified is, at most, evidence that the government intended that the designated information be closely held. Yet, evidence that information is classified is not conclusive on this point; it is open to a defendant to show that the government in fact failed in the attempt to hold the information closely because, for example, the information was leaked or was otherwise in the public domain. Further, the government's classification decision is inadmissible hearsay on the second prong of the NDI definition, namely whether unauthorized disclosure might potentially damage the United States or aid an enemy of the United States.

This discussion serves to underscore the important role experts will play in this case; it makes clear that the parties' NDI disputes, which are central to this case, will be resolved by a jury largely on the basis of expert testimony.

### C. Leonard's Qualifications and Forecasted Expert Testimony

Leonard is a former civil servant who was employed by the United States government in a number of roles from 1973 until his retirement in January 2008. From 1973 to 2002, he was employed by the DOD in various capacities. Particularly pertinent here is that from 1996 to 1998, Leonard served as the Director of Security Programs for the DOD. Then, from 1999 to 2002, he served at times as the Deputy Assistant Secretary of Defense responsible for security and information operations. In these capacities, his responsibilities included developing and monitoring policies to ensure (i) that there were no leaks of classified information, (ii) that any leaks were investigated and

(iii) that information was properly classified.

From 2002 to January 2008, Leonard was appointed to serve as the Director of the Information Security Oversight Office (ISOO). This position is colloquially referred to as the "Classification Czar" because the Director is responsible for oversight of the government-wide classification system.

In addition to the foregoing, Leonard, while employed by the DOD, participated on the Interagency Security Classification Appeals Panel (ISCAP) from 1999 to 2002 as DOD's representative. Also, from 2002 to 2008, he served as the Executive Secretary of ISCAP. Among ISCAP's duties and responsibilities is the review of agency classification decisions to determine whether the information classified meets the required classification standards.

In January 2008, Leonard retired as Director of ISOO and Executive Secretary of ISCAP. He currently serves as an unpaid Senior Counselor to the Archivist of the United States, in the capacity of "special Government employee." In that capacity, he works only part-time, when a particular issue arises. In the future, he may also become a paid part-time employee of the Office of Personnel Management in the capacity of "re-employed annuitant."

In or around March 2006, while he was still Director of ISOO, Leonard met with a number of the prosecutors in this case. According to Leonard's uncontroverted affidavit, the meeting took place at Leonard's office and lasted approximately one hour. Leonard and the prosecutors discussed in only general terms the classification process and the development and classification of National Security Council policies. In this respect, he shared with the prosecutors his own general view regarding the government's over-classification of information. Indeed, he advised the prosecutors that in the course of his government service he had left a lengthy paper trail critical of the classification policies of government agencies. Notably, however, they did not discuss any of the particular policies or countries at issue in this case. Nor did the meeting's participants discuss the particular facts of this

7

case; they did not discuss any classified information at issue, nor did the prosecutors disclose to Leonard any of the alleged NDI information or show him any classified documents. Further, Leonard did not participate in any decision-making by the government attorneys with respect to this case; he did not give them any advice or recommendations regarding the prosecution of this case. Following this brief meeting, Leonard was not contacted again by the government concerning this case.

Defendants thereafter contacted Leonard and sought his expert testimony on their behalf in this case. Sensitive to his legal and ethical responsibilities as a former executive branch employee, Leonard sought the advice of the National Archives and Records Administration's Designated Agency Ethics Official regarding his availability to testify as an expert on defendants' behalf. The Ethics Official reported that he lacked sufficient information concerning whether Leonard had participated "substantially" in this case and hence could not determine whether Leonard's trial testimony would be barred by 18 U.S.C. § 207(a)(1) or the applicable regulations. But, he noted that Leonard could be directed to testify by court order, notwithstanding the restriction contained in 18 U.S.C. § 207(a)(1). Defendants then moved for such an order, arguing (i) that § 207(a)(1) does not apply to Leonard because he did not participate "substantially" in this case while he was a government employee, and (ii) that even if § 207(a)(1) does apply, an order directing Leonard's testimony is warranted pursuant to § 207 (j)(6)(A). The government opposed defendants' motion, arguing as a threshold matter that because Leonard did not face prosecution under § 207(a)(1), there was no jurisdiction to adjudicate his responsibilities under that statute or to issue an order authorizing his testimony. The government further argued (assuming there was jurisdiction to adjudicate the underlying issue) (i) that § 207(a)(1) did apply to Leonard because he participated substantially in this case while he was a government employee, and (ii) that an order directing his testimony pursuant to § 207(j)(6)(A) would be unwarranted.

8

Following briefing, a hearing on the matter, and supplemental briefing, but prior to an adjudication of either the jurisdictional question or the merits of the issue, Leonard was served with a subpoena to testify as an expert witness at trial. Leonard has now moved to quash the subpoena, arguing that he fears prosecution under § 207(a)(1). Because the parties have previously filed briefs on the applicability of § 207(a)(1) to this witness, the matter is now ripe for disposition.

It remains to review briefly defendants' forecast of Leonard's trial testimony. Understandably characterizing Leonard's experience and expertise as "unsurpassed," defendants, by counsel, advise that Leonard has examined the alleged NDI and classified and unclassified documents in this case and is prepared to offer testimony, *inter alia*, in general, as follows:

1. a description of the classification practices and procedures of the government, including the (in his opinion) pervasive practice of over-classification of information, namely the practice of classifying information that is neither closely held, nor damaging to the national security if disclosed;

2. a description of the "back channel practice," *i.e.*, the practice of high level officials of disclosing classified information to unauthorized persons (e.g., journalists and lobbyists) for the purpose of advancing national security interests;

3. his opinions as to whether the alleged NDI in this case qualifies as such, namely whether the information alleged to be NDI was (i) closely held by the government and (ii) would be potentially damaging to the United States or helpful to an enemy of the United States if disclosed to an unauthorized person; and

4. whether, in the circumstances of this case, the defendants reasonably could have believed that their conduct was lawful.

Given Leonard's work experience and professional qualifications, it is not surprising that defendants consider him their "most important and irreplaceable" witness.

## II.

The government argues, as a threshold matter, that there is no jurisdiction to issue an order

9

authorizing Leonard's testimony in this case. Specifically, the government argues that the § 207 issue is not ripe and any ruling would be an impermissible advisory opinion. In support of this argument, the government cites *In re Air Crash Disaster at Detroit Metro Airport*, 737 F.Supp. 399 (E.D. Mich. 1989). This argument, carefully examined, fails.

To begin with, there can be no serious doubt that a court has the power to adjudicate, *i.e.*, the jurisdiction to decide, whether to quash or to enforce its own trial subpoena. Nor is there anything unripe about the question whether the trial subpoena issued to Leonard should be quashed on § 207 grounds. This question is squarely presented by issuance of the subpoena and the motion to quash it. The parties need to know now — in advance of the already scheduled trial — whether the issued subpoena will be judicially enforced or quashed in light of § 207. Nor does the resolution of this question depend on future events or facts. The question is ripe now; it is "a controversy [that] is presented in clear-cut and concrete form." *Miller v. Brown*, 462 F.3d 312, 318-19 (4th Cir. 2006) (citation and internal quotation marks omitted). In this respect, the case on which the government relies is sharply distinguishable. There, the court declined to issue an order directing two Federal Aviation Administration (FAA) officials to testify, reasoning that because the officials had not been prosecuted under § 207, the matter was not ripe and any order would constitute an impermissible advisory opinion. *In re Air Crash Disaster*, 737 F.Supp. at 401–02. Yet, notably no trial subpoena had issued in that case, nor was there any motion to quash that might serve to frame the issue. Instead, there was only a concern that § 207 might bar an FAA official from appearing as a witness and thus a desire to have a court assuage the concern by issuing, in essence, an advisory opinion. This is not an advisory opinion; it is, instead, an opinion that resolves the parties' mature and immediate dispute over whether § 207(a)(1) bars Leonard from testifying in this case. Indeed, the sharp contrast between *In re Air Crash Disaster* and this case underscores the ripeness of the question at bar and the presence

of jurisdiction to resolve it.[9]

### III.

Given the existence of jurisdiction, it is now necessary to address whether § 207(a)(1) bars enforcement of the trial subpoena in this case.

The various provisions of § 207 place restrictions on certain activities of former officers, employees and elected officials of the executive and legislative branches of government. Violations of these restrictions carry criminal penalties. *See* 18 U.S.C. § 216(a). Section 207 sets forth a number of prohibitions on certain post-government employment activities of executive branch officers and employees. Pertinent here is the first of these prohibitions,[10] which is set forth in § 207(a)(1) and which provides as follows:

> Any person who is an officer or employee . . . of the executive branch of the United States (including any independent agency of the United States), . . . and who, after the termination of his or her service or employment with the [United States] knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the [United States] on behalf of any other person (except the [United States]) in connection with a particular matter—
>
> > (A) in which the [United States] is a party or has a direct and substantial interest,

---

[9] Also worth noting is that at the time *In re Air Crash Disaster* was decided, § 207 did not state, as it now does, that the restrictions set forth in subsection (a) might give way to the issuance of a court order. *See* 18 U.S.C. § 207(j)(6)(A) (providing that "a former officer or employee of the executive branch of the United States . . . who is subject to the restrictions contained in subsection (a)(1) with respect to a particular matter may not, except pursuant to court order, serve as an expert witness for any other person (except the United States) in that matter"). Thus, in adding subsection (j)(6)(A), Congress made clear that the § 207 scheme clearly contemplates the exercise of jurisdiction in instances where the question whether subsection (a) applies is a necessary antecedent to the question whether an order should issue under subsection (j).

[10] Apart from § 207(a)(1)'s lifetime ban that is the focus of the instant dispute, § 207 contains additional prohibitions, including a two-year ban in § 207(a)(2) and one-year bans in each of § 207(b) and § 207(c). None of these prohibitions have been raised or argued by the parties, and none appear relevant here.

>   (B) in which the person participated personally and substantially as such officer or employee, and
>
>   (C) which involved a specific party or specific parties at the time of such participation,
>
> shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a)(1).[11]  In essence, this prohibition is designed to prevent former government officials from using the specific knowledge — rather than any general expertise — obtained during their employment for the benefit of parties whose interests conflict with those of the United States.[12] As applicable here, § 207(a)(1) permanently prohibits former officials, like Leonard, from appearing in court in cases in which the government has an interest, like the instant case, and testifying on a matter in which the former official "participated personally and substantially" while employed. The question presented here is therefore whether Leonard, by virtue of his brief interview with prosecutors in connection with this case, "participated personally and substantially" in this case.

The starting point in the analysis is to recognize that the statute defines the term "participated" to mean

>   an action taken as an officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or other such action . . . .

18 U.S.C. § 207(i)(2). On this record, it is clear that in no way can it fairly be said that Leonard

---

[11] Section 207(a)(1) applies to employees of both the United States and the District of Columbia, but because Leonard was an employee of the United States, references to the District of Columbia have been omitted from the statute throughout this Opinion.

[12] *See United States v. Clark*, 333 F.Supp.2d 789, 793 (E.D. Wis. 2004) (applying § 207(a)(1) to bar former Assistant United States Attorney from acting as counsel to defendant on whose case he had worked as a prosecutor).
   An exception to the § 207(a)(1) prohibition is found in § 207(j)(6), which permits such officer or employee to testify as a fact witness. *See* § 207(j)(6). Where the former officer or employee appears as an expert, however, he may escape § 207(a)(1) only if a court order issues pursuant to § 207(j)(6)(A).

"participated" in this case merely by virtue of his one-hour meeting with prosecutors. The record reflects that he did not participate in any "decision" relating to the case, he gave no "approval" or "disapproval" with respect to the case, nor did he render "advice," provide any "recommendation" or "investigat[e]." *Id.* Thus, because Leonard's one-hour meeting with prosecutors in this case does not fit within, nor can it be shoe-horned to fit within, the statutory definition of "participated," it follows that the § 207(a)(1) lifetime prohibition does not apply to Leonard acting as a defense expert in this case. Yet, even if the term "participated" might be stretched beyond its plain meaning to include Leonard's one-hour meeting with prosecutors, in no way can such participation fairly be deemed to be "substantial" as required to warrant the application of § 207(a)(1)'s lifetime prohibition. This conclusion is confirmed by the regulation giving effect to § 207(a)(1), which provides that the lifetime restriction outlined in that section applies only to former government employees who participated in a matter "through decision, approval, disapproval, recommendation, the rendering of advice, investigation or otherwise." 5 C.F.R. § 2637.201(d)(1). Indeed, the regulation confirms that "substantial involvement"

> means that the employee's involvement must be of significance to the matter, or form a basis for a reasonable appearance of such significance. It requires more than official responsibility, knowledge, perfunctory involvement, or involvement on an administrative or peripheral issue. . . . While a series of peripheral involvements may be insubstantial, the single act of approving or participation in a critical step may be substantial.

*Id.* It is pellucidly clear that Leonard's one-hour meeting with the prosecutors is, at most, "perfunctory involvement" that falls far short of satisfying the regulatory definition of "substantial," which is entitled to deference pursuant to *Chevron v. Naturalization Resources Defense Counsel*, 467 U.S. 837 (1984). Further confirmation of this conclusion is provided in the regulation's two examples of "substantial involvement," which serve by juxtaposition to make clear the distinction between

substantial and insubstantial participation. Example 1 illustrates insubstantial participation while Example 2 illustrates participation that is substantial, as follows:

> *Example 1*: If an officer personally approves the departmental budget, he does not participate substantially in the approval of all items contained in the budget. His participation is substantial only in those cases where a budget item is actually put in issue. Even then, the former Government employee is not disqualified with respect to an item if it is a general program rather than a particular matter involving a specific party. The former Government employee may, however, have official responsibility for such matters . . . .
>
> *Example 2*: A Government lawyer is not in charge of, nor has official responsibility for a particular case, but is frequently consulted as to filings, discovery, and strategy. Such an individual has personally and substantially participated in the matter.

5 C.F.R. § 2637.201(d)(1). Given Example 1, it is hard to see how Leonard's one-hour meeting with prosecutors qualifies as substantial participation. Indeed, if the involvement of the officer in Example 1 is insubstantial, then the insubstantiality of Leonard's involvement in this prosecution follows *a fortiori*. And, the sharp contrast between Example 2's description of substantial involvement and Leonard's description of the one-hour meeting with prosecutors makes clear that his involvement in this case cannot be labeled as substantial and hence § 207(a)(1) is inapplicable. According to his affidavit, Leonard did not render "decision, approval, disapproval, recommendation, . . . advice, [or] investigation" during the March 2006 meeting with prosecutors. He was not told the specific facts of this case, nor was he shown any documents relating to the alleged NDI. Instead, the conversation was limited to a general discussion of classification policies and procedures. Nor did Leonard have any subsequent involvement in this matter, until he was approached by defendants to be an expert witness on their behalf. Given the current record, Leonard simply cannot fairly be said to have participated substantially in this prosecution by virtue of his one-hour meeting with prosecutors.[13]

---

[13] In opposition, the government argues that the "substantial involvement" determination

To conclude otherwise — to hold that § 207(a)(1) bars Leonard's involvement in this case — would empower the government to disable former government employees from serving as expert witnesses against the government by the simple expedient of meeting briefly with these former employees and discussing only general matters rather than any case-specific questions or issues. Neither § 207(a)(1)'s plain language nor common sense sanctions such a result. Indeed, the unwisdom of allowing the government to disable its former officers or employees from serving as experts merely by meeting with them as occurred here is especially evident in cases of this sort as the government, through its current and former officers and employees, has a near monopoly on the pertinent expertise regarding classified information and the process by which information becomes classified.[14]

There is but scant authority on the scope of "substantial[]" participation under § 207(a)(1), but what exists supports the result reached here. Thus, a comparison of this case to the few published cases finding substantial involvement under § 207(a)(1) supports the conclusion that Leonard's involvement in this case is neither participation, nor *a fortiori* substantial participation. *See Clark*, 333

---

requires a consideration of "the full range of that meeting including the significance, or even the lack of significance of [Leonard's] comments, the importance of those comments to the government in this very case and the internal deliberations concerning expert testimony, presentation of evidence and other issues trial counsel must resolve in preparing a case for trial." The short answer to this argument is found in the contents of Leonard's affidavit, which makes clear "the full range" of the meeting and the significance of his general comments on the government's tendency to over-classify information. It is understandable that the government found this view to be of concern, and hence determined to proceed no further with him. Leonard's general views doubtless suggested to the government that he would likely disagree with the government's view that the classified information in this case qualifies as NDI. That Leonard might disagree with the government in this respect is no reason to allow the government to invoke § 207(a)(1) to prevent Leonard from serving as a defense expert.

[14] It is also worth noting that stretching § 207(a)(1) beyond the boundaries carefully delineated by Congress might well have the effect of impairing the government's ability to employ highly skilled persons. *See* 5 C.F.R. § 2637.10(c)(5).

F. Supp. 2d at 794-95 (former Assistant United States Attorney's assignment to criminal defendant's case, approval of prosecution memorandum in that case, receipt of investigative reports, discussion of case with lead law enforcement agent, and assistance in obtaining records and subpoenas barred him from later serving as criminal defendant's counsel); *United States v. Martin*, 39 F. Supp. 2d 1333, 1335 (D. Utah 1999) (same). By the same token, the sole reported case found holding a former government officer's involvement insubstantial also supports the result reached here. In *CNA Corp. v. United States*, 81 Fed. Cl. 722, 729–730 (2008), the Court of Claims held that a contracting officer was arbitrary and capricious in excluding a prospective bidder from an award under the National Children's Study (NCS) based on his conclusion that the bidder's principal investigator was a doctor who participated substantially in the NCS program. Specifically, the Court of Claims held, contrary to a Health and Human Services ethics opinion, that the bidder's investigating doctor was not barred by § 207(a)(1) because this doctor had not participated substantially in the NCS given that the NCS was a twenty-plus year multi-factor study in which the bidder's doctor had been only one of approximately 2,500 persons who provided inputs during the NCS planning phase. *Id.* This doctor, it appears, was a member of a team that developed one of numerous preliminary protocols which at the time of the court case had not yet been finalized. *Id.* Again, if the bidder's doctor's participation was not substantial, then Leonard's one-hour meeting with prosecutors is another *a fortiori* case.

Finally, it is worth noting that the result in *CNA*, and the result reached in the instant case, find further support in those decisions interpreting the ethics rule governing disqualification of former government attorneys growing out of their personal and substantial participation in matters while in government service. *See, e.g., Babineaux v. Foster*, No. 04cv1679, 2005 WL 711604, at *6 (E.D. La. Mar. 21, 2005) (unpublished) (copying government attorney on internal responses to complaint did not disqualify attorney from later representing complainant); *Sec. Gen. Life Ins. Co. v. Super. Ct. in*

*and for Yuma County*, 149 Ariz. 332, 334 (1986) (former insurance department director not disqualified from subsequent representation of company investigated during his tenure because he was not "personally involved to a material degree in the investigative or deliberative process"). Although the context is different, these cases are nonetheless instructive given that the ethics rule applied in these cases was derived from § 207. *See* Model Rules of Prof'l Conduct R. 1.11(a)(2) (2007) (government lawyer "shall not . . . represent a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee"); *id.* at annot. ("personal and substantial," as used in R. 1.11(a)(2), "comes from . . . § 207").

**IV.**

In summary, because Leonard did not participate substantially in this matter as a result of his single, relatively brief meeting with prosecutors in March 2006, it follows that he is not subject to the lifetime ban on representation contained in § 207(a)(1). For this reason, Leonard's motion to quash the subpoena on the ground that he is barred from testifying by § 207(a)(1) must be denied and Leonard's trial subpoena must be judicially enforced.[15]

An appropriate Order will issue.

Alexandria, Virginia
February 17, 2009

/s/
T. S. Ellis, III
United States District Judge

---

[15] It is worth noting that the order denying Leonard's motion to quash and enforcing the trial subpoena is not an order pursuant to § 207(j)(6)(A). This is so because the government's brief meeting with Leonard does not trigger § 207(a)(1) and hence, it is unnecessary to reach or decide whether the circumstances at bar warrant the issuance of an order pursuant to § 207(j)(6)(A). *Cf Adams v. United States*, No. 03cv49, 2008 WL 5429801, at *3–5 (D. Idaho Dec. 31, 2008) (court issued order pursuant to § 207(j)(6)(A) by assuming, without deciding, that § 207(a)(1) was applicable).